UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,


       -against-                          S1 05 Crim. 0888 (LAK)


JEFFREY STEIN, et al.,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# OPINION

Appearances:

Marc A. Weinstein
Justin S. Weddle
Katherine Polk Failla
Kevin M. Downing
Stanley J. Okula, Jr.
Julian J. Moore
Assistant United States Attorneys
MICHAEL J. GARCIA
UNITED STATES ATTORNEY

David Spears
RICHARDS SPEARS KIBBE & ORBE LLP
Craig Margolis
VINSON & ELKINS LLP
*Attorneys for Defendant Jeffrey Stein*

Stanley S. Arkin
Joseph V. DiBlasi
Elizabeth A. Fitzwater
ARKIN KAPLAN LLP
*Attorneys for Defendant Jeffrey Eischeid*

Michael S. Kim
Leif T. Simonson
KOBRE & KIM LLP
*Attorneys for Defendant Mark Watson*
Stuart Abrams

Caroline Rule
Robert S. Fink
Christopher M. Ferguson
Usman Mohammad
KOSTELANETZ & FINK, LLP
*Attorneys for Defendant Richard Smith*

Richard Mark Strassberg
GOODWIN PROCTOR LLP
*Attorneys for Defendant David Greenberg*

George D. Niespolo
DUANE MORRIS LLP
*Attorneys for Defendant Randy Bickham*

Steven M. Bauer
Karli E. Sager
LATHAM & WATKINS, LLP
*Attorneys for Defendant John Larson*

David C. Scheper
Julio V. Vergara
OVERLAND BORENSTEIN SCHEPER
& KIM LLP
*Attorneys for Defendant Robert Pfaff*

M. Breeze McMennamin
David S. Hammer
FRANKEL & ABRAMS
Jack S. Hoffinger
Susan Hoffinger
HOFFINGER STERN & ROSS, LLP
*Attorneys for Defendant Raymond J. Ruble*

Ronald E. DePetris
Marion Bachrach
Dana Moskowitz
DEPETRIS & BACHRACH, LLP
*Attorneys for Defendant Philip Wiesner*

John F. Kaley
DOAR RIECK KALEY & MACK
*Attorneys for Defendant[1] Steven
Gremminger*

Susan R. Necheles
HAFETZ & NECHELES
*Attorneys for Defendant Richard Rosenthal*

James R. DeVita
BRYAN CAVE LLP
John A. Townsend
TOWNSEND & JONES LLP
*Attorneys for Defendant Carol Warley*

Michael Madigan
Robert H. Hotz, Jr.
Christopher T. Schulten
AKIN GUMP STRAUSS HAUER
& FELD LLP
*Attorneys for Defendant John Lanning*

Russell M. Gioiella
Richard M. Asche
LITMAN, ASCHE & GIOIELLA, LLP
*Attorneys for Defendant Carl Hasting*

E. Lawrence Barcella, Jr.
Deborah Salzberg
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
*Attorneys for Defendant Larry DeLap*

Charles A. Stillman
STILLMAN FRIEDMAN & SCHECHTMAN,
P.C.
Carl S. Rauh
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
*Attorneys for KPMG LLP*

Lewis J. Liman
Stephen M. Rich
Jennifer A. Kennedy
CLEARY GOTTLIEB STEEN & HAMILTON
LLP
Paul B. Bergman
PAUL B. BERGMAN, P.C.
*Attorneys for the New York Council of
Defense Lawyers as* Amicus Curiae

Stephanie Martz
Mark I. Levy
KILPATRICK STOCKTON LLP
*Attorneys for National Association of
Criminal Defense Lawyers as* Amicus
Curiae

Cristina Arguedas
Ann Moorman
ARGUEDAS, CASSMAN & HEADLY, LLP
Michael Horowitz Michelle Seltzer
CADWALADER, WICKERSHAM &
TAFT LLP
*Attorneys for Gregg Ritchie*

Gerald B. Lefcourt
GERALD B. LEFCOURT, P.C.
Jay Philip Lefkowitz
KIRKLAND & ELLIS LLP
*Attorneys for Defendant David Amir Makov*

William R. McLucas
Howard M. Shapiro
Jonathan E. Nuechterlein
Christopher Davies
WILMER CUTLER PICKERING HALE AND
DORR LLP
George R. Kramer
Renee S. Dankner
Marjorie E. Gross
Robin S. Conrad
Amar D. Sarwal
*Attorneys for The Securities Industry
Association, The Association of
Corporate Counsel, The Bond Market
Association and The Chamber of
Commerce of the United States of
America as* Amici Curiae

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Thompson Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    KPMG Gets Into Trouble and "Cleans House" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    KPMG's Policy on Payment of Legal Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    The Initial Discussion between the USAO and Skadden . . . . . . . . . . . . . . . . . . . . . . 10

    KPMG Gets the Message . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    The Government Presses Its Advantage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    The Conclusion of the Investigation, KPMG's Stein Problem and the Deferred Prosecution

        Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    The Deferred Prosecution Agreement and the Indictment in This Case . . . . . . . . . . . . 26

    The Present Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        The Government's Initial Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        Prehearing Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        The Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    Ultimate Factual Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    I.     The Relationship Between KPMG and its Personnel With Respect to Advancement

          of Legal Fees and Defense Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

         A.     Indemnification and Advancement Generally . . . . . . . . . . . . . . . . . . . . . 34

         B.     KPMG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    II.    The Government Violated the Fifth and Sixth Amendments by Causing KPMG to

          Cut Off Payment of Legal Fees and Other Defense Costs Upon Indictment . . . 39

         A.     The Right to Fairness in the Criminal Process . . . . . . . . . . . . . . . . . . . . . 39

            1.    Nature of the Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

            2.    The Right to Fairness in the Criminal Process Is a Fundamental

                 Liberty Interest Entitled to Substantive Due Process Protection

                 Where, As Here, the Government Coerces a Third Party to Withhold

                 Funds Lawfully Available to a Criminal Defendant . . . . . . . . . 45

            3.    The Government's Actions Violated the Substantive Due Process

                 Right to Fairness in the Criminal Process . . . . . . . . . . . . . . . . . 48

         B.     The Sixth Amendment Right to Counsel . . . . . . . . . . . . . . . . . . . . . . . . . 54

            1.    The Nature and Scope of the Right to Counsel . . . . . . . . . . . . . . 54

                a.    Attachment of Sixth Amendment Rights . . . . . . . . . . . . 55

                b.    "Other People's Money" . . . . . . . . . . . . . . . . . . . . . . . . 56

            2.    The Thompson Memorandum and the Government's Implementation

                 Violated the KPMG Defendants' Sixth Amendment Right to Counsel

                 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

3.      The KPMG Defendants Are Not Obliged to Establish Prejudice, Which in Any Case Would Be Presumed Here . . . . . . . . . . . . . 60

III.    It is Premature to Consider the Government's Actions With Respect to Payment of Legal Expenses Incurred Before Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

IV.    The Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

      A.      Monetary Relief Against the Government Is Precluded by Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      B.      Monetary Relief May Be Available Against KPMG . . . . . . . . . . . . . . . 73

            1.      This Court Has Subject Matter Jurisdiction . . . . . . . . . . . . . . . . 74

            2.      Personal Jurisdiction, Even If It Does Not Already Exist, May Be Obtained Over KPMG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

      C.      Possible Dismissal and Other Remedies . . . . . . . . . . . . . . . . . . . . . . . . 79

V.    Some of the Actions of the USAO in Response to the Motion Were Not Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

LEWIS A. KAPLAN, *District Judge.*

The issue now before the Court arises at an intersection of three principles of American law.

The first principle is that everyone accused of a crime is entitled to a fundamentally fair trial.[1]  This is a central meaning of the Due Process Clause of the Constitution

The second principle, a corollary of the first, is that everyone charged with a crime is entitled to the assistance of a lawyer.[2]  A defendant with the financial means has the right to hire the best lawyers money can buy.  A poor defendant is guaranteed competent counsel at government expense.[3]  This is at the heart of the Sixth Amendment.

The third principle is not so easily stated, not of constitutional dimension, and not so universal.  But it too plays an important role in this case.  It is simply this: an employer often must reimburse an employee for legal expenses when the employee is sued, or even charged with a crime, as a result of doing his or her job.  Indeed, the employer often must advance legal expenses to an employee up front, although the employee sometimes must pay the employer back if the employee has been guilty of wrongdoing.

This third principle is not the stuff of television and movie drama.  It does not remotely approach *Miranda* warnings in popular culture.  But it is very much a part of American life.  Persons in jobs big and small, private and public, rely on it every day.  Bus drivers sued for accidents, cops sued for allegedly wrongful arrests, nurses named in malpractice cases, news reporters sued in libel cases, and corporate chieftains embroiled in securities litigation generally

---

[1]     U.S. CONST. amend. V (Due Process Clause).

[2]     U.S. CONST. amend. VI.

[3]     *Gideon v. Wainwright,* 372  U.S. 335 (1963).

have similar rights to have their employers pay their legal expenses if they are sued as a result of their doing their jobs. This right is as much a part of the bargain between employer and employee as salary or wages.[4]

Most of the defendants in this case worked for KPMG, one of the world's largest accounting firms. KPMG long has paid for the legal defense of its personnel, regardless of the cost and regardless of whether its personnel were charged with crimes. The defendants who formerly worked for KPMG say that it is obligated to do so here. KPMG, however, has refused.

If that were all there were to the dispute, it would be a private matter between KPMG and its former personnel. But it is not all there is. These defendants[5] (the "KPMG Defendants") claim that KPMG has refused to advance defense costs to which the defendants are entitled because the government pressured KPMG to cut them off. The government, they say, thus violated their rights and threatens their right to a fair trial.

Having heard testimony from KPMG's general counsel, some of its outside lawyers, and government prosecutors, the Court concludes that the KPMG Defendants are right. KPMG refused to pay because the government held the proverbial gun to its head. Had that pressure not been brought to bear, KPMG would have paid these defendants' legal expenses.

---

[4] The existence of this right is not a product of charitable instincts. The law long has recognized that litigation can be expensive and that it could prove difficult to obtain the services of competent employees unless they are protected against the cost of lawsuits that arise out of the employers' business. *E.g., Homestore, Inc. v. Tafeen,* 888 A.2d 204, 218 (Del. 2005) (advancement of legal expenses "is actually a desirable underwriting of risk by the corporation in anticipation of greater corporate-wide rewards for its shareholders. The broader salient benefits that the public policy . . . seeks to accomplish . . . will only be achieved if the promissory terms of advancement contracts are enforced by courts even when corporate officials . . . are accused of serious misconduct") (internal quotation marks and footnote omitted).

[5] All defendants previously employed by KPMG joined in the motion.

Those who commit crimes – regardless of whether they wear white or blue collars – must be brought to justice. The government, however, has let its zeal get in the way of its judgment. It has violated the Constitution it is sworn to defend.

*Facts*

*The Thompson Memorandum*

In June 1999, then-U.S. Deputy Attorney General Eric Holder issued a document entitled *Federal Prosecution of Corporations* (the "Holder Memorandum") to provide "guidance as to what factors should generally inform a prosecutor in making the decision whether to charge a corporation in a given case."[6] He took pains to make clear that the factors articulated in the memorandum were not "outcome-determinative" and that "[f]ederal prosecutors [we]re not required to reference these factors in a particular case, nor [we]re they required to document the weight they accorded specific factors in reaching their decision." Nevertheless, the language that plays a central role in the present controversy first was found in the Holder Memorandum.

The Holder Memorandum set forth some common sense considerations. Prosecutors, in deciding whether to indict a company, should pay attention to things like the nature and seriousness of the offense, the pervasiveness of wrongdoing within the entity, the company's efforts to remedy past misconduct, the adequacy of other remedies, and the like. It mentioned also:

> "the corporation's timely and voluntary disclosure of wrongdoing *and its willingness to cooperate in the investigation of its agents*, including, if necessary, the waiver of the corporate attorney-client and work product protection . . ."[7]

---

[6] http://www.usdoj.gov/criminal/fraud/policy/Chargingcorps.html (last visited June 23, 2006).

[7] Holder Memorandum § II, ¶ 4 (emphasis added).

Section VI elaborated on what was meant by cooperation. The general principle was that "[i]n gauging the extent of the corporation's cooperation, the prosecutor may consider the corporation's willingness to identify the culprits within the corporation, including senior executives, to make witnesses available, to disclose the complete results of its internal investigation, and to waive attorney-client and work-product privileges."[8] The memorandum then set out several paragraphs of commentary, the most relevant for present purposes being this:

> "Another factor to be weighed by the prosecutor is whether the corporation appears to be protecting its culpable employees and agents. Thus, while cases will differ depending upon the circumstances, a corporation's promise of support to culpable employees and agents, either *through the advancing of attorneys fees,* through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation."[9]

A footnote to the comment concerning the advancing of attorneys' fees read:

> "Some states require corporations to pay the legal fees of officers under investigation prior to a formal determination of their guilt. Obviously, a corporation's compliance with governing law should not be considered a failure to cooperate."[10]

Thus, the Holder Memorandum made clear that advancing of attorneys' fees to personnel of a business entity under investigation, except where such advances were required by law, might be viewed by the government as protection of culpable individuals and might contribute to a government decision to indict the entity.

---

The Court, with the consent of the parties, takes judicial notice of the Holder Memorandum.

[8]    *Id.* § VI, ¶ A.

[9]    *Id.* ¶ B (emphasis added).

[10]    *Id.* ¶ B, n.3.

As noted, the Holder Memorandum was not binding. Federal prosecutors were free to take it into account, or not, as they saw fit. But the corporate scandals of the earlier part of this decade changed that.

In late 2001, Enron, Global Crossing, Tyco International, Adelphia Communications and ImClone, among other companies, found themselves in worlds of trouble, much of it apparently of their own making. Bankruptcies and criminal prosecutions followed including, notably, the indictment of Enron's auditors, Arthur Andersen LLP – an indictment that resulted in the collapse of the firm, well before the case was tried.[11] And on July 9, 2002, the President issued Executive Order 13271, which established a Corporate Fraud Task Force (the "Task Force") headed by United States Deputy Attorney General Larry D. Thompson.

On January 20, 2003, Mr. Thompson issued a document entitled *Principles of Federal Prosecution of Business Organizations* (the "Thompson Memorandum") which, in many respects, was a modest revision of the Holder Memorandum. Indeed, the language concerning cooperation and advancing of legal fees by business entities was carried forward without change. Unlike its predecessor, however, the Thompson Memorandum is binding on all federal prosecutors.[12] Thus, all United States Attorneys now are obliged to consider the advancing of legal fees by business entities, except such advances as are required by law, as at least possibly indicative

---

[11] *Amici* point out that no major financial services firm has ever survived a criminal indictment. Brief for The Securities Industry Ass'n *et al.* at 6 [docket item 470] (quoting Ken Brown, *et al.*, *Called to Account: Indictment of Andersen in Shredding Case Puts Its Future in Question,* WALL. ST. J., Mar. 15, 2002, at A1).

[12] U.S. DEP'T OF JUSTICE, CRIMINAL RESOURCE MANUAL § 163 (2005) ("The Thompson Memorandum sets forth nine factors that federal prosecutors must consider in determining whether to charge a corporation or other business organization.") (available online http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/crm00163.htm) (last visited June 23, 2006).

of an attempt to protect culpable employees and as a factor weighing in favor of indictment of the entity.[13]

*KPMG Gets Into Trouble and "Cleans House"*

While all of this was going on, the Internal Revenue Service ("IRS") began investigating tax shelters, including a number that are subjects of the indictment in this case. In early 2002, it issued nine summonses to KPMG, which was less than fully compliant. Accordingly, on July 9, 2002, the government filed a petition in the United States District Court for the District of Columbia to enforce them.[14]

A few months later, the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs "began an investigation into the development, marketing and

---

[13]   Mr. Thompson was quoted in the press as having defended pressuring companies to cut off payment of defense costs for their employees on the ground that "they [the employees] don't need fancy legal representation" if they do not believe that they acted with criminal intent. Laurie P. Cohen, *In the Crossfire: Prosecutors' Tough New Tactics Turn Firms Against Employees,* WALL. ST. J., June 4, 2004, A1. Naturally, the Court does not consider it in deciding this matter, as it is not in evidence. It notes, however, that such a view, whether held by Mr. Thompson or anyone else, would be misguided, to say the least.

The innocent need able legal representation in criminal matters perhaps even more than the guilty. In addition, defense costs in investigations and prosecutions arising out of complex business environments often are far greater than in less complex criminal matters. Counsel with the skills, business sophistication, and resources that are important to able representation in such matters often are more expensive than those in less complex criminal matters. Moreover, the need to review and analyze frequently voluminous documentary evidence increases the amount of attorney time required for, and thus the cost of, a competent defense. Thus, even the innocent need substantial resources to minimize the chance of an unjust indictment and conviction.

[14]   *United States v. KPMG LLP,* 316 F. Supp.2d 30, 31-32 (D. D.C. 2004).

It appears that the IRS was conducting also a penalty promoter audit of KPMG. Tr. (Neiman) 270:8-11.

implementation of abusive tax shelters by accountants, lawyers, financial advisors, and bankers."[15] This led to public hearings in November 2003 at which several senior KPMG partners or former partners – three of them now defendants here – testified.[16]

The firm's reception at the hearing was not favorable. Senator Coleman, the subcommittee chair, for example, opened the hearing by saying that "the ethical standards of the legal and accounting profession have been pushed, prodded, bent and, in some cases, broken, for enormous monetary gain."[17] At another point, Senator Levin, the ranking minority member, in obvious exasperation at a KPMG witness, suggested that the witness "try an honest answer."[18]

Eugene O'Kelly, then KPMG chair,[19] was concerned about the Senate hearing and the IRS proceedings.[20] He retained Skadden Arps Slate Meagher & Flom ("Skadden"), and particularly Robert S. Bennett, "to come up with a new cooperative approach."[21] One aspect of that new approach was a decision to "clean house" – a determination to ask Jeffrey Stein, Richard Smith, and Jeffrey Eischeid, all senior KPMG partners who had testified before the Senate and all now defendants here – to leave their positions as deputy chair and chief operating officer of the firm, vice

---

[15]   STAFF OF THE PERMANENT SUBCOMM. ON INVESTIGATIONS OF THE S. COMM. ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS, THE ROLE OF PROF. FIRMS IN THE U.S. TAX SHELTER INDUS. 1 (Comm. Print 2005) ("SENATE REPORT").

[16]   *Id.* at 1-2.

[17]   *U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals, Hearings Before the Permanent Subcomm. on Investigation of the S. Comm. on Governmental Affairs,* 108th Cong. 2 (2003).

[18]   *Id.* at 43.

[19]   Mr. O'Kelly is deceased.

[20]   Tr. (Neiman) 270:8-16.

[21]   *Id.*

chair – tax services, and a partner in personal financial planning, respectively.[22]

Given Mr. Stein's senior position and his relationship with Mr. O'Kelly,[23] his departure was cushioned substantially, although many of the facts have come to light only recently. He "retired" from the firm with a $100,000 per month, three-year consulting agreement. He agreed to release the firm and all of its partners, principals, and employees from all claims.[24] He and KPMG agreed also that Mr. Stein would be represented, at KPMG's expense, in any suits brought against KPMG or its personnel and himself, by counsel acceptable to both him and the firm or, if joint representation were inappropriate or if Mr. Stein were the only party to a proceeding, by counsel reasonably acceptable to Stein.[25]

Despite KPMG's effort to stave off trouble by "cleaning house," much damage already had been done. In the early part of 2004, the IRS made a criminal referral to the Department

---

[22]    U113, ¶¶ 8, 28-29; *see* SENATE REPORT 2.

Mr. Eischeid was placed on administrative leave and Mr. Smith transferred.  Tr. (Neiman) 274:16-20.

[23]    Mr. O'Kelly had selected Mr. Stein as deputy chair of KPMG.  *See* Tr. (Loonan) 169:17-21. Although he felt compelled to ask Mr. Stein to retire, he personally negotiated the very generous terms of the severance.  *Id.* 167:16-21; 169:23-170:7.  Mr. Loonan, who worked out the terms of the written agreement with Mr. Stein's counsel (whose fee for doing the agreement ultimately was borne by KPMG), described the negotiation as "very friendly." *Id.* 168:23-169:16.

[24]    DX 6A, ¶¶ 7, 9(a).

There were limited exceptions that are not relevant here.

[25]    DX 6, ¶ 13.

The agreement provided also that, "[n]otwithstanding any other provision of [the] Agreement," if Mr. Stein were named as a defendant in any action based on his activities with the firm, KPMG would indemnify him "(through its Professional Indemnity Insurance Program)," except as to "wilful or intentional unlawful acts," to the same extent it would have done had he remained with KPMG.  DX 6B, ¶ 22.

of Justice ("DOJ"), which in turn passed it on to the United States Attorney's Office for this district ("USAO").[26]

*KPMG's Policy on Payment of Legal Fees*

KPMG's policy prior to this matter concerning the payment of legal fees of its partners and employees is clear. While KPMG's partnership agreement and by-laws are silent on the subject, the parties have stipulated as follows:

> "1.    Prior to February 2004, . . . it had been the longstanding voluntary practice of KPMG to advance and pay legal fees, without a preset cap or condition of cooperation with the government, for counsel for partners, principals, and employees of the firm in those situations where separate counsel was appropriate to represent the individual in any civil, criminal or regulatory proceeding involving activities arising within the scope of the individual's duties and responsibilities as a KPMG partner, principal, or employee.

---

[26]    The United States Attorneys' Manual explains the process as follows:

"The IRS' Criminal Investigation Division (CID) is responsible for investigating violations of the criminal provisions of the internal revenue laws, including cases falling within the General Enforcement Plea Program . . . and related violations of the criminal provisions of 18 U.S.C. CID special agents are responsible for conducting administrative investigations . . . of alleged criminal violations arising under the internal revenue laws.

"Upon concluding an administrative investigation, a special agent recommending prosecution must prepare a special agent's report (SAR) that details the investigation and the agent's recommendations. After review within CID, the SAR, together with the exhibits, is reviewed by District Counsel. . . When prosecution is deemed warranted, District Counsel prepares a criminal reference letter (CRL) and refers the matter . . . either to the Tax Division or, in those circumstances when direct referral of certain classes of cases is authorized, to the United States Attorney. . . The CRL discusses the nature of the crime(s) for which prosecution is recommended, the evidence relied upon to prove it, technical aspects and anticipated difficulties of prosecution, and the prosecution recommendations themselves."  U.S. Dep't of Justice, United States Attorneys' Manual § 6-4.110 (1997) (hereinafter " United States Attorneys' Manual"). *See also id.* § 6-4.122.  It appears that the decision whether to prosecute complex tax matters referred by the IRS is made by the Tax Division of the DOJ. *Id.* 6-4.212, subd. 1.

"2.     This practice was followed without regard to economic costs or considerations with respect to individuals or the firm.

"3.     With the exception of the instant matter, KPMG is not aware of any current or former partner, principal or employee who has been indicted for conduct arising within the scope of the individual's duties and responsibilities as a KPMG partner, principal, or employee since [two partners] were indicted and convicted of violation of federal criminal law in 1974.   Although KPMG has located no documents regarding payment of legal fees in that case, KPMG believes that it did pay pre- and post-indictment legal fees for the individuals in that case."

The Court infers and finds that KPMG in fact paid the pre- and post-indictment legal fees for the individuals in the 1974 criminal case.  Moreover, the extent to which KPMG has gone is quite remarkable.  In one recent situation involving KPMG's relationship with Xerox Corporation, it paid over $20 million to defend four partners in a criminal investigation and related civil litigation brought by the Securities and Exchange Commission.[27]

*The Initial Discussion between the USAO and Skadden*

When the referral reached the USAO on February 5, 2004, it came under the supervision of Shirah Neiman, who was chief counsel to the United States Attorney, the USAO's liaison to the IRS, a participant in the drafting of the Holder Memorandum, and a very experienced prosecutor.[28]  The USAO notified Skadden of the referral, and a meeting was scheduled for February 25, 2004.

In the meantime, on February 9, 2004, the USAO prepared "subject" letters – letters advising the recipient that he or she "is a person whose conduct is within the scope of [a] grand

---

[27]     Tr. (Loonan) 129:23-130:18.

[28]     Tr. (Neiman) 264:9-266:6, 268:3-9.

jury's investigation"[29] – to between 20 and 30 KPMG partners and employees, including all but five of the defendants in this case.[30]

In preparation for the meeting, Ms. Neiman, Assistant United States Attorneys ("AUSA") Weddle and Okula, and other members of the prosecution team conferred. They decided to ask Skadden whether KPMG was paying the legal fees of individuals under investigation.[31] Accordingly, the government prepared a document headed "Skadden Meeting Points" setting forth matters that the government intended to discuss at the meeting.[32] The first page of the three-page list contained an item that read:

> "● Is KPMG paying/going to pay the legal fees of employees? Current or former?
> What about taxpayers?
>
> Who?
>
> ♦ Any agreements or other obligations to do so? What are they?"[33]

The meeting was attended by Mr. Bennett, Ms. Neiman, and many others on both sides. Mr. Weddle began by telling Skadden that the government was there to hear what Skadden had to say and that it had a few questions. Mr. Bennett explained that Skadden had been hired in view of Mr. O'Kelly's concern about the controversy with the IRS and the Senate hearings and that

---

[29] UNITED STATES ATTORNEYS' MANUAL § 9-11.151.

[30] Tr. (Okula) 85:22-25, 92:25-93:12; K159-84; Docket item 524 (letter, Stanley J. Okula, May 22, 2006). It appears that the letters were hand-delivered between February 18 and 26, 2004, with most delivered by February 20, 2004. *Id.*

[31] Tr. (Okula) 66:15-19.

[32] *Id.* 63:23-64:21; *see id.* (Neiman) 282:17-283:16.

[33] U6; U98.

KPMG had decided to clean house and change the atmosphere at the firm. He reported that the firm had taken high-level personnel action already, that it would cooperate fully with the government's investigation, and that the object was to save KPMG, not to protect any individuals. In an obvious reference to the fate of Arthur Andersen, he said that an indictment of KPMG would result in the firm going out of business.[34]

After a discussion of the structure of KPMG and of potential conflicts of interest, Mr. Weddle "got to the subject of legal fees and asked whether KPMG was obligated to pay fees and what their plans were."[35] Mr. Bennett tested the waters to see whether KPMG could adhere to its practice of paying its employees'[36] legal expenses when litigation loomed. He asked for government's view on the subject.[37] Ms. Neiman said that the government would take into account KPMG's legal obligations, if any, to advance legal expenses, but referred specifically to the Thompson Memorandum as a point that had to be considered.[38]

At or about that point, Messrs. Bennett and Bialkin told the USAO that KPMG's "common practice" had been to pay legal fees. They added that the partnership agreement was vague and that Delaware law gave the company the right to do whatever it wished, but said that KPMG still was checking on its legal obligations. It would not, however, pay legal fees for

---

[34]     *Id.* (Neiman) 269:19-271:12.

[35]     *Id.* 271:13-272:10.; *id.* (Pilchen) 23:4-7, 32:25-33:2; U113 ¶ 23.

        Mr. Weddle asked also for copies of KPMG's partnership agreement and by-laws. K313; U105.

[36]     The Court includes KPMG partners in the term "employees" for ease of expression.

[37]     *Id.;* Tr. (Pilchen) 23:8-12; K313.

[38]     *Id.* 23:12-15; *id.* (Okula) 75:20-76:1.

employees who declined to cooperate with the government, or who took the Fifth Amendment, as long as it had discretion to take that position.[39]

The conversation then shifted briefly to a discussion of the personnel changes that KPMG had made.[40] Mr. Bennett reported that Messrs. Stein, Eischeid, and Smith had been asked to leave, but explained that neither KPMG nor Skadden had done an internal investigation to determine who were "bad guys" or whether any crime had been committed.[41] Almost immediately, Mr. Weddle reverted to the subject of attorneys' fees, asking Mr. Bennett to determine KPMG's obligations in that regard.[42] Ms. Neiman then said that "misconduct" should not or cannot "be rewarded" and referred to federal guidelines.[43]

There is no dispute, and the Court finds, that this comment came immediately on the heels of a statement by Mr. Bennett relating to lawyers for KPMG partners.[44] There are disputes, however, about precisely what Ms. Neiman said about "guidelines" and what she meant by it.[45] The

---

[39] K313; U105; U116 ¶¶ 24-25; Tr. (Neiman) 273:13-17; *id.* (Pilchen) 24:6-19.

[40] U116, ¶¶ 27-30; Tr. (Neiman) 274:4-25.

[41] Tr. (Neiman) 274:3-8; *id.* (Okula) 110:3-5; U106, ¶ 26; U116, ¶ 28.

[42] U117, ¶ 31; K313.

[43] U117, ¶ 31; U106, ¶ 27; K313

[44] *E.g.,* Tr. (Neiman) 275:3-10; *id.* (Pilchen) 21:12-23:16: *id.* (Okula) 114:13-115:2.

[45] According to Ms. Neiman, she said "that the federal sentencing guidelines specifically address in its corporate compliance section the issue of providing discipline for people who engage in misconduct, and [that KPMG] can't reward misconduct and you have to be mindful of that." (Tr. (Neiman) 275:3-10) The Court assumes that this was what went through her mind and does not question the sincerity of the testimony. The contemporaneous notes and subsequent memorandum of the government's designated note taker and the contemporaneous notes of a Skadden partner, however, do not refer to corporate compliance and contain the word "guidelines" without specifying sentencing guidelines or the Thompson Memorandum. U106, ¶ 28; U117, ¶ 31; K313. The Court is not

parties have focused in particular on whether Ms. Neiman intended her remark to be directed to the legal fee issue – *i.e.,* to be a statement to the effect that payment by KPMG of employee legal fees could be viewed as rewarding misconduct – or to be directed instead at any severance arrangements between KPMG and Messrs. Stein, Eischeid, and Smith. Ms. Neiman testified that her intent was the latter.[46] But the Court finds it unnecessary to decide Ms. Neiman's subjective purpose in making the remark because what is more important is how her comment was understood.

As Ms. Neiman's remark came immediately after a statement concerning whether KPMG would be paying for lawyers for its personnel, it would have been quite natural to understand

_____

persuaded that Ms. Neiman, whatever she had in mind, referred to the sentencing guidelines or to corporate compliance. She said, without elaboration, that misconduct cannot or should not be rewarded under federal guidelines. It is no stretch to conclude that this remark was taken by those who heard it as a reference to the Thompson Memorandum. In fact, KPMG's present chief legal officer, former U.S. District Judge Sven Erik Holmes, referred in a different context to the Thomson Memorandum as the "Thompson Guidelines" in a civil deposition. Docket item 544, Ex. B, at 74-75.

[46] The government's post-hearing brief attempts to support Ms. Neiman's claim that she referred to the federal sentencing guidelines, not to the Thompson Memorandum, and that she was speaking at the time of corporate compliance programs. It maintains that "Ms. Neiman consistently refers to the Sentencing Guidelines when lecturing on the issues of corporate compliance programs and cooperation" and appends a copy of a lecture she gave on the subject that referred to the sentencing guidelines. Docket item 510 at 20; *id.* Ex. A. It attaches also a copy of an interview with former Deputy Attorney General Comey regarding waiver of privileges by corporate entities under the Thompson Memorandum. In light of these materials, it maintains, the Court should find that Ms. Nieman referred to the sentencing guidelines and that her warning against rewarding misconduct was intended to encourage KPMG to take appropriate personnel actions against culpable employees and not as a reference to payment of legal fees. *Id.* at 21-23; *id.* Ex. B.

The Court declines to consider the appended material. The government could have sought to examine Ms. Neiman about her lecture at the hearing and could have called Mr. Comey as a witness. It did neither. To consider these materials, first submitted after the conclusion of the hearing, would deprive the KPMG Defendants of the right to cross-examine. Even more important, the documents are not probative, and at least no strongly so, of what Ms. Neiman said to KPMG in the February 25, 2004 meeting and what KPMG understood from her comment. Accordingly, they would not alter the result even if the Court considered them.

the comment as having been directed at payment of legal fees.  And that is exactly what happened:

- The IRS agent's handwritten notes, taken at the meeting, state:

   "BB - [illegible]  Skadden may recommend lawyers for this.  Wants lawyers who understand cooperation is the best way to go in this type of case.

   He feels it is in the best interests of KPMG for its people to get attorneys that will cooperate with Go[vt].  Want to save the firm.

   "Per SN

   Fees – under Federal Guideline
   – Misconduct C/N Be rewarded.

   JW - figure out firms obligations ~~and~~ [illegible]"[47]

- The IRS agent's typewritten memorandum, prepared from her notes, state:

   "31.    AUSA Weddle finally asked Mr. Bennett to find out what KPMG's obligations would be.  Shirah Neiman further advised them that under the federal guidelines misconduct can not be rewarded."[48]

- Skadden's Mr. Pilchen recorded:

   "SP -    No decisions made.  No counsel have been recommended – we have had discussions @ what the firm does in typical situations - but no final decisions made.

   "SN -   misconduct shdn't be rewarded."[49]

- Not long afterward, Mr. Pilchen told a lawyer for a KPMG employee that the government had implied that it preferred that KPMG not pay employee legal

---

[47]     U106.

[48]     U117.

[49]     K313.

fees.[50]

- AUSA Okula testified:

"Q     In response to the topic of cooperation, isn't it a fact that Shirah Neiman goes back to the fees and says, well, remember, we're looking at that under federal guidelines.  Yes or no?

"A     Yes.

"Q     And that was about fees, wasn't it?

"A     Fees, yes, that's what it says.

"Q     It wasn't about terminating Eischeid or Stein or anybody else.  It was about paying fees and cooperation.  Correct?

"A     Correct."[51]

---

[50]     K316-17; *cf.* Tr. (Michael) 44:9-45:17.

[51]     Tr. (Okula) 124:24-125:13.

This testimony was given with respect to the IRS agent's note of Ms. Neiman's remark to the effect that misconduct should not be rewarded.  U106.  That note came immediately after a note of a statement by Mr. Bennett that he felt it was "in the best interests of KPMG for it's [*sic*] people to get attorneys that will cooperate with Go[vt]" and that he wanted to "save the firm."  *Id.*

Elsewhere in his testimony, Mr. Okula implied that he believed that Ms. Neiman's remark was a comment on the fact that Mr. Stein had been "let go with a severance package that exceeded $8 million or $10 million," which Mr. Okula thought inconsistent with an attempt by Skadden to claim credit for taking aggressive personnel action.  Tr. (Okula) 115:3-13.  This testimony, the Court finds, was mistaken.

The parties have stipulated that KPMG did not produce Mr. Stein's severance agreement to the government until recently.  Tr. 181:18-24; *see also* Weddle Decl. [docket item 435] ¶ 7.  Moreover, at an August 4, 2004 meeting, Karen Seymour, chief of the criminal division of the USAO, told Skadden that "KPMG's employment actions to grant rich severance packages without making statements to the public, or privately to its employees, of the wrongdoing that went on" was a "troubling issue under the 'Thompson Memo.'"  U72; *see* Tr. (Loonan) 154:22-155:20.  Notes of the meeting produced by the government indicate that Mr. Weddle was "very upset about this."  U51.

It is difficult to see why the size of Mr. Stein's severance package would have provoked such

In sum, Ms. Neiman's comment that "misconduct" cannot or should not "be rewarded" under "federal guidelines," whatever went through her mind when she said it, was understood by both KPMG and government representatives as a reminder that payment of legal fees by KPMG, beyond any that it might legally be obligated to pay, could well count against KPMG in the government's decision whether to indict the firm. And if there were any doubt that this was the message conveyed, the doubt quickly was dispelled by Mr. Weddle. As Mr. Pilchen's notes recorded, he followed up Ms. Neiman's comment by saying:

> "JW – if u have discretion re fees – we'll look at that under a microscope."[52]

Thus, while the USAO did not say in so many words that it did not want KPMG to pay legal fees, no one at the meeting could have failed to draw that conclusion.[53]

### KPMG Gets the Message

Shortly after the February 25, 2004 meeting, Mr. Bennett got back to Mr. Weddle on the legal fee issue. He reported that KPMG did not think it had any binding legal obligation to pay

---

a response in August 2004 if, as Mr. Okula suggested, its terms had been disclosed in February. In all the circumstances, the Court finds that the government was unaware at the time of the February 25, 2004 meeting of the financial arrangements between Mr. Stein and KPMG.

[52] K314 (emphasis in original).

This comment appears only in Mr. Pilchen's notes, and no witness at the hearing had any present recollection of it. Nevertheless, Mr. Pilchen testified that his notes were an effort "to record [his] impressions and recollections of what was being said." Tr. 19:16-17. The notes specifically attribute the remark to Mr. Weddle, which is not consistent with their being a recordation of a subjective thought by Mr. Pilchen. Mr. Pilchen underlined them. In light of the memorable language and these additional circumstances, the Court finds that Mr. Weddle made the comment.

[53] Mr. Okula frankly admitted that it was his personal view that KPMG should not pay the fees. Tr. (Okula) 69:1-4.

legal fees,[54] but that "it would be a big problem" not to do so because the firm was a partnership. He said that KPMG was planning on putting a cap, or limit, on fees and conditioning their payment for any given partner or employee on that individual "cooperating fully with the company and the government."[55] Apparently satisfied with the government's response, KPMG began to implement the policy.

On March 4, 2004, Mr. Pilchen of Skadden spoke to Mr. Townsend, an attorney for defendant Carolyn Warley. He told Townsend that KPMG would pay his fees so long as Ms. Warley cooperated with the government. For example, he said, no fees would be paid if Ms. Warley invoked her privilege against self-incrimination under the Fifth Amendment.[56]

---

[54] KPMG was blatantly self-interested on this point. While the Thompson Memorandum countenances compliance with legal obligations to advance fees, KPMG had an interest in avoiding advancement of fees if its legal obligation to do so might be questioned, as the government might view advancement of fees as protecting culpable personnel. Those of its partners and employees who were or might become subjects of the investigation, on the other hand, had an interest in taking the broadest possible view of KPMG's legal obligations.

In these circumstances, it is of more than passing interest that the government, which knew or at least was chargeable with knowledge of this obvious fact, appears to have made no effort to verify KPMG's claim beyond asking for and presumably reading the partnership and by-laws. There is no evidence, for example, that it ever inquired into exactly what KPMG's practices had been in this regard.

Nor did the government question the obvious conflict of interest manifest in Skadden's offer to recommend as counsel to targeted KPMG employees "law firms that were familiar with these types of proceedings and who understood that cooperation with the government was the best way to proceed." U119, ¶ 56; U106. Cooperation may have been the best way for KPMG to proceed, but it was not necessarily best for its employees. Skadden's effort to curry favor with the government by offering to seek to compromise the interests of KPMG's employees by inducing them to retain counsel who would serve KPMG's interest in cooperating and the government's apparent failure to take issue with it both are quite disturbing.

[55] U30.

[56] U316-17; Tr. (Michael) 41:16-44:8.

On March 11, 2004, the Skadden team had a conference call with the USAO. Mr. Bennett assured the USAO that KPMG would be "as cooperative as possible" so that the office would not exercise its discretion to indict the firm. Mr. Weddle urged that KPMG tell its people that they should be "totally open" with the USAO, "even if that [meant admitting] criminal wrongdoing." He commented that this would give him good material for cross-examination,[57] a statement that strongly indicates that at least the lead line AUSA on the case expected, even at this stage, to prosecute individuals.

The actions of the USAO, coupled with the Thompson Memorandum, had the desired effect. On the same date, Skadden's Mr. Rauh wrote to the USAO, enclosing among other things a form letter that Skadden was sending to counsel for the KPMG Defendants then employed by KPMG who had received subject letters from the government or otherwise appeared to be under suspicion.[58] The form letter stated that KPMG would pay an individual's legal fees and expenses, up to a maximum of $400,000, on the condition that the individual "cooperate with the government and . . . be prompt, complete, and truthful."[59] Importantly, however, it went even further. It made clear that *"payment of . . . legal fees and expenses will cease immediately if . . . [the recipient] is charged by the government with criminal wrongdoing."*[60] In addition, on March 12, 2004, Joseph Loonan, then KPMG's deputy general counsel, sent an advisory memorandum to a broader audience

---

[57]    U318-19; Tr. (Michael) 45:22-50:12.

[58]    K5-16.

[59]    *Id.* at 15-16.

[60]    *Id.* at 16 (emphasis added).

of KPMG personnel regarding potential contacts by the government.[61] The memorandum urged full cooperation with the investigation. But it advised also that recipients had a right to be represented by counsel if they were contacted by the government, mentioned some advantages of consultation with counsel, and stated that KPMG had arranged for independent counsel for those who wished to consult them.[62]

The USAO took no issue with KPMG's announcement that it would cut off payment of legal fees for anyone who was indicted and that it would condition the limited preindictment payments on cooperation with the government. The advisory memorandum, on the other hand, upset Mr. Weddle and Kevin Downing, another member of the prosecution team.[63] They immediately advised Skadden that it was "disappointed with [its] tone" and allegedly "one-sided presentation of potential issues" and demanded that KPMG send out a supplemental memorandum in a form they proposed.[64] The only significant point of difference between the memorandum that the government demanded and Mr. Loonan's original memorandum was the language in the government's proposal italicized below:

---

[61]     Skadden sent a copy to the government on the same day. K270.

[62]     K271-73; Tr. (Loonan) 145:2-149:22.

        The memorandum indicated also that KPMG would "be responsible for the payment of reasonable fees and related expenses in connection with . . . representation regarding this investigation." K271-73, at 272. The failure to indicate that payment of legal fees would cease if the recipient were charged or to refer to the $400,000 cap apparently is attributable to the fact that those limitations were contained in letters sent to counsel for persons who already had received subject letters from the government while the advisory memorandum went to a broader group.

[63]     Tr. (Loonan) 149:23-150:1.

[64]     K275-77.

"Employees are not required to use this counsel, or any counsel at all. Rather, employees are free to obtain their own counsel, *or to meet with investigators without the assistance of counsel. It is entirely your choice.*"[65]

In due course, KPMG capitulated to the USAO demand. It put out in "Q & A" format a document containing the following language:

*"Do I have to be assisted by a lawyer?*

"**Answer:** No. Although we believe that it is probably in your best interests to consult with a lawyer before speaking to government representatives, whether you do so is entirely your choice. *As we said in the March 12 OGC [Office of General Counsel] memorandum, you may deal directly with government representatives without counsel.* In any event, the Firm expects you to cooperate fully with the government representatives and provide complete and truthful information to them."[66]

This exchange is revealing. No one suggests that either the original KPMG advice or the government's subsequent proposal misstated the law. The difference was one of emphasis. But it is entirely plain that the government's purpose in demanding the supplement was to increase the chances that KPMG employees would agree to interviews without consulting or being represented by counsel, whether provided by KPMG or otherwise.

---

[65] U276 (emphasis added).

[66] U294-308, at U299 (emphasis added).

The USAO's demand was a focus of a meeting or telephone call with Skadden on March 29, 2004. Mr. Bennett protested that it had sent out memoranda such as those that had been sent on behalf of KPMG in other matters without objection. He emphasized that KPMG would not even pay attorneys' fees unless its personnel agreed to cooperate and that it would cut off payments to KPMG personnel who invoked the Fifth Amendment. Nevertheless, he ultimately acquiesced in the government's demands, stating that KPMG was in the process of sending out in "Q & A format" a "more balanced approach." K321.

*The Government Presses Its Advantage*

The KPMG lawyers met again with the USAO on March 29, 2004. In an effort to demonstrate that KPMG was cooperating, Skadden asked the government to notify it if any current or former KPMG employee refused to meet with prosecutors or otherwise failed to cooperate.[67]

From that point forward, the government took full advantage. It repeatedly notified Skadden when KPMG personnel failed to comply with government demands.[68] In each case, Skadden promptly advised the attorney for the individual in question that the payment of legal fees would be terminated "[a]bsent an indication from the government within the next ten business days that your client no longer refuses to participate in an interview with the government."[69] In some cases, the individuals in question relented under pressure of the threats from KPMG and submitted to interviews with the government. In others, they did not, whereupon KPMG terminated their employment and cut off the payment of legal fees.[70]

*The Conclusion of the Investigation, KPMG's Stein Problem and the Deferred Prosecution Agreement*

As the matter unfolded, meetings between KPMG and its counsel and the USAO continued, with KPMG seeking a resolution short of an indictment of the firm and the government

---

[67] U32; *see also, e.g.,* K30; K43.

[68] *See, e.g.,* K30; K43; K44.1; K47; K49; K55; K56; K60; K66; K81; K127; K268; *see also* K68.

[69] *See, e.g.,* K42-43; K44-44.1; K45; K51; K57-58; K61-62; K68; K76-77; *see also* K129 (suspending payment of legal fees and warning that payment would be discontinued entirely absent indication of cooperation from the government); K134 (same).

[70] *See, e.g.,* K54; K68; K93; K126; K132-33; K186-90.

pressing for admissions of extensive wrongdoing, a great deal of money, and changes in KPMG's business.

On August 4, 2004, the KPMG executives and lawyers met with Karen Seymour, then chief of the criminal division of the USAO, and other prosecutors. In the course of the meeting, Ms. Seymour said that the government had learned that KPMG had granted rich severance packages to certain executives and that this raised a "troubling issue under the 'Thompson Memo.'"[71] Mr. Bennett deflected the issue, agreeing that severance packages were "high in one or two cases" but reiterating that KPMG's "expectation" was that legal fees of individuals would be paid only up to $400,000 and only on condition that recipients cooperated with the government.[72] But the Stein severance agreement was not produced.

As time went by, KPMG came to view the Stein severance agreement as something of a ticking bomb. For one thing, KPMG had not adhered in Mr. Stein's case to the $400,000 pre-indictment legal fee cap that it had adopted in response to government pressure. It passed that figure by late October 2004,[73] and so was at odds with its representation to the government.[74] For another,

---

[71]    U69-77, at U72.

[72]    *Id.*

[73]    Docket item 512, Att. A, ¶ 6.

[74]    KPMG sought to explain this by suggesting that it had paid $646,000 in fees for both the criminal investigation and for civil litigation and that its representations to the government therefore may not have been inaccurate. Tr. (Loonan) 182:19-185:13. In fact, however, the parties later stipulated that KPMG paid $646,757.80 in Mr. Stein's legal fees for the criminal investigation alone. Docket item 512, Att. A, ¶ 5.

it had known since August 2004 that the USAO was unhappy that rich severance packages had been given to senior executives.[75]

Notwithstanding this problem, KPMG repeatedly tried to convince the USAO not to indict the firm, touting its cooperation with the investigation and its limitation of attorneys' fees for individuals. In meetings in March 2005 with David N. Kelley, then United States Attorney, however, this approach did not yield the desired result. Indeed, On March 2, 2005, Mr. Kelley interrupted Mr. Bennett's claim that the firm had cooperated by saying, "Let me put it this way. I've seen a lot better from big companies."[76] That meeting, in the words of KPMG's Mr. Loonan, was "not particularly encouraging,"[77] and a subsequent meeting in New York went no better.

With the scene about to shift to Washington and a last ditch effort to prevent an indictment by an appeal at the highest levels of the Justice Department, KPMG's objective was "to be able to say at the right time with the right audience, we're in full compliance with the Thompson Guidelines."[78] It concluded that the Stein situation involved too great a risk. So on May 5, 2005, eight days before KPMG was to meet with U.S. Deputy Attorney General James Comey to plead its case, KPMG unilaterally terminated the consulting services portion of the severance agreement

---

[75] The record is unclear as to exactly when the government learned the economic terms of the severance packages with Messrs. Stein and others, although it certainly was aware by August 2004 of the fact that they were sizeable. KPMG's Mr. Loonan testified that the government at some point was told the size of Mr. Stein's package, but he did not say when. In any case, his testimony leaves considerable doubt as to whether he had personal knowledge of the facts. Tr. (Loonan) 180:17-25.

[76] U334-36, at 336.

[77] Tr. (Loonan) 187:15-17.

[78] Docket item 544, Ex. B, at 74-75.

This civil deposition was received in evidence in this matter. Docket item 558.

and cut off payment of Mr. Stein's attorneys' fees.[79]  It did so, as Mr. Loonan candidly admitted, "because [KPMG] thought it would help [the firm] with the government."[80]

Having dealt, as best it could, with the Stein problem, KPMG turned to attempting to persuade Deputy Attorney General Comey not to indict the firm.  The meeting took place on June 13, 2005.  Once again, Mr. Bennett relied upon KPMG's cooperation with the government, in addition of course to other arguments.  A Skadden memorandum of the meeting recounts some of his remarks as follows:

> "In addition, it [KPMG] had done something 'never heard of before' – conditioned the payment of attorney's fees on full cooperation with the investigation. 'We said we'd pressure – although we didn't use that word – our employees to cooperate.  We told employees that attorney fees would not be paid unless they fully cooperated with the investigation.'  He noted that whenever an individual indicated he or she would not cooperate, 'Justin [Weddle] or Stan [Okula] would tell us,' and KPMG took action.  He went on to note that 'what played out' was that current or former personnel who otherwise would not have cooperated did cooperate, and those who did not had their fees cut off and, in two instances, were separated from the firm.  This process exhibited 'a level of cooperation that is rarely done.'

> \* \* \*

> "He noted that what was really 'precedent-setting' about the case was the conditioning of payment of legal fees on cooperation."[81]

This time, KPMG was more successful.

---

[79]     DX 7; Tr. (Loonan) 190:22-191:4.

[80]     *Id.* 196:13-23.

KPMG unpersuasively sought to explain the payment of almost $650,000 in legal fees as an oversight and the termination of payments as consistent with the severance agreement. It has offered no justification for terminating the consulting payments.  Nor does the Court credit its benign excuses for cutting off payment of the legal fees.  It did so purely to create a response for use in the event the government were to discover that KPMG had exceeded the cap on legal costs that it had told the government it had imposed.

[81]     U347-51, at 349-51.

*The Deferred Prosecution Agreement and the Indictment in This Case*

On August 29, 2005, KPMG and the government entered into a Deferred Prosecution Agreement ("DPA"). KPMG agreed, among other things, to waive indictment, to be charged in a one-count information, to admit extensive wrongdoing, to pay a $456 million fine, and to accept restrictions on its practice. The government agreed that it will seek dismissal of the information if KPMG complies with its obligations.[82] In a nutshell, KPMG stands to avoid a criminal conviction if it lives up to its part of the bargain.

One additional aspect of the DPA is noteworthy in the present context. The DPA obliges KPMG to cooperate extensively with the government, both in general and in the government's prosecution of this indictment. It provides in part:

> "7. KPMG acknowledges and understands that its cooperation with the criminal investigation by the Office [USAO] is an important and material factor underlying the Office's decision to enter into this Agreement, and, therefore, *KPMG agrees to cooperate fully and actively with the Office, the IRS, and with any other agency of the government designated by the Office ('Designated Agencies') regarding any matter relating to the Office's investigation about which KPMG has knowledge or information.*

> "8. KPMG agrees that its continuing cooperation with the Office's investigation shall include, *but not be limited to,* the following:

> "(a) Completely and truthfully disclosing all information in its possession to the Office and the IRS about which the Office and the IRS may inquire, including but not limited to all information about activities of KPMG, present and former partners, employees, and agents of KPMG;

> \* \* \*

> "(d) Assembling, organizing, and providing, in responsive and prompt fashion, and, upon request, expedited fashion, all documents, records, information,

---

[82] *United States v. KPMG LLP,* 05 Crim. 0903 (LAP), docket item 4 (filed Aug. 29, 2005).

and other evidence in KPMG's possession, custody, or control as may be requested by the Office or the IRS;

"(e)     Not asserting, in relation to the Office, any claim of privilege (including but not limited to the attorney-client privilege and the work product protection) as to any documents, records, information, or testimony requested by the Office related to its investigation . . . [; and]

"(f)     Using its reasonable best efforts to make available its present and former partners and employees to provide information and/or testimony as requested by the Office and the IRS, including sworn testimony before a grand jury or in court proceedings, as well as interviews with law enforcement authorities . . .

"9.     KPMG agrees that its obligations to cooperate will continue even after the dismissal of the Information, and *KPMG will continue to fulfill the cooperation obligations set forth in this Agreement in connection with any investigation, criminal prosecution or civil proceeding brought by the Office* or by or against the IRS or the United States relating to or arising out of the conduct set forth in the Information and the Statement of Facts and relating in any way to the Office's investigation."[83]

The cooperation provisions of the DPA thus require KPMG to comply with demands by the USAO in connection with this prosecution, with little or no regard to cost. If it does not comply, it will be open to the risk that the government will declare that KPMG breached the DPA and prosecute the criminal information to verdict. Anything the government regards as a failure to cooperate, in other words, almost certainly will result in the criminal conviction that KPMG has labored so mightily to avoid, as the admissions that KPMG now has made would foreclose a successful defense.

At about the same time, the government filed the initial indictment in this case. True to its word, KPMG cut off payments to the defendants of legal fees and expenses.

---

[83]     *Id.* ¶¶ 7-9 (emphasis added).

*The Present Motion*

        *The Government's Initial Response*

On January 19, 2006, the KPMG Defendants moved to dismiss the indictment or for other relief on the ground that the government had interfered improperly with the advancement of attorneys' fees by KPMG in violation of their constitutional and other rights.

The government filed its memorandum in opposition to this and other motions on March 3, 2006.[84] It represented:

> "With respect to the facts[,] KPMG, which determined that it had no obligation under either Delaware partnership law or contract to advance legal fees at all, *decided of its own volition* that it would in fact advance such fees, but subject them to certain limitations. That KPMG, an entity that by its own admission engaged in a breathtaking tax fraud conspiracy with and through the defendants and others, may have made that decision as a matter of good partnership governance and in order to better position itself with prosecutors, does not detract from the fact that *it was KPMG's decision alone.* Tellingly, the defendants have not – and indeed cannot – point to any evidence supporting their spurious claims that the United States 'coerc[ed]' or 'bull[ied]' KPMG into making its decision to limit the advancement of fees."[85]

The motion was heard on March 30, 2006. In the course of the argument, the government, for the first time, took the position that it had "no objection whatsoever to KPMG exercising its free and independent business judgment as to whether to advance defense costs . . . and that if it were to elect to do so the government would not in any way consider that in determining whether [KPMG] had complied with the DPA."[86] Nevertheless, the Court expressed

---

[84]    The memorandum bore the names of Messrs. Weddle and Okula and two other AUSAs, in that order.

[85]    Docket item 346, at 164 (emphasis added).

[86]    Tr., Mar. 30, 2006, at 37.

concern about the impact of the Thompson Memorandum on KPMG's decision with respect to the payment of legal fees and ultimately invited the defendants to make a written submission as to the precise factual issue(s) as to which they sought an evidentiary hearing.[87]

The government sought to avoid a hearing. It responded to the defendants' submission with a declaration by Mr. Weddle and a letter brief.

Mr. Weddle's declaration stated in relevant part:

"2.     On February 25, 2004, legal counsel for KPMG met with me and other representatives of the United States Attorney's Office for the first time in connection with this investigation. At this meeting, among other things:

*   *   *

"d.     KPMG's lawyers stated that they were looking into the issue of their obligations to pay fees, and indicated that if it was within KPMG's discretion whether to pay fees, KPMG would not pay fees for individuals who do not cooperate.

"e.     *The Government did not instruct or request KPMG to implement that plan or to implement a contrary plan.*

"3.     *   *   *   *Once again, in this call [March 2, 2004], the Government did not tell KPMG's counsel that KPMG's decision to pay legal fees was improper, nor did we instruct or request KPMG to change its decision about paying fees, capping the payment of fees, or conditioning of fees on an employee's or a partner's cooperation.*"[88]

The letter brief[89] stated:

---

[87]     Tr., Mar. 30, 2006, at 128:19-129:7.

[88]     Weddle Decl., docket item 435 (emphasis added).

[89]     Docket item 432. The letter brief was signed by Mr. Weinstein. As he was not present at the February 25, 2004 meeting with Skadden and there is no evidence that he was involved in the later communications with Skadden described above, the Court assumes that his letter brief simply repeated the facts set out in Mr. Weddle's declaration and prior submissions.

*"The Government did not instruct or request KPMG to implement that plan* [*i.e.*, KPMG's plan to advance fees subject to a cap and a requirement of cooperation with the government] *or to implement a contrary plan.*

* * *

"Once again, the Government did not tell KPMG that its decision to pay legal fees was improper. *Nor did the Government instruct or request KPMG to change its decision about paying fees, capping the payment of fees, or conditioning the payment of fees on an employee's or a partner's cooperation.*

* * *

"In sum, during the course of its dealings with KPMG, *the United States Attorney's Office did not instruct KPMG whether KPMG should pay legal fees, whether KPMG should cap the payment of legal fees, or whether KPMG should condition the payment of legal fees.*"[90]

*Prehearing Proceedings*

On April 12, 2006, the Court ordered an evidentiary hearing and limited discovery on the motion and, particularly, on "whether the government, through the Thompson Memorandum or otherwise, affected KPMG's determination(s) with respect to the advancement of legal fees and other defense costs to present or former partners and employees with respect to the investigation and prosecution of this case and such subsidiary issues as relate thereto."[91]  The order granted the KPMG Defendants leave to serve a Rule 17(c) subpoena on KPMG for documents.

Without getting into unnecessary detail, it is fair to say that KPMG's participation from that point on was more extensive than simply responding to the subpoena.  It sought to block or, at least, delay issuance of the subpoena while it tried to broker stipulations between defendants and the government in an effort to limit the scope of discovery from KPMG and testimony by its

---

[90]     Docket item 432, at 2, 3 (emphasis added).

[91]     Docket item 436, at 2.

personnel.[92]  It sought and obtained, for its own convenience, a delay of the hearing.[93]  And it obtained leave for its counsel appear not only for the purpose of responding to the subpoena "in this matter," but "for any purposes relating to this matter that the Court may so [*sic*] order."[94]

### *The Hearing*

The Court conducted an evidentiary hearing on May 8-10, 2006.   Counsel for KPMG were present throughout.  At the conclusion of argument by other counsel, the Court addressed counsel for KPMG:  "You certainly have notice that a remedy is being sought against your client, and I'm now making it clear in words of one syllable.  You will have a chance to be heard if you want it."[95]  It went on to emphasize that it would welcome any submission on behalf of KPMG and that KPMG could "make whatever reservation of rights [it wished] in submitting."[96]

KPMG ultimately submitted a memorandum of law.  It did not seek to offer any evidence, to question any witnesses, or to make any offer of proof.

---

[92]      Docket item 547.

[93]      Docket item 448.

[94]      Docket item 450, 455.

[95]      Tr., May 10, 2006, at 426:24-427:2.

[96]      *Id.* at 427:15-430:23.

*Ultimate Factual Conclusions*

Several broad conclusions follow from the foregoing.

*First,* the Thompson Memorandum caused KPMG to consider departing from its long-standing policy of paying legal fees and expenses of its personnel in all cases and investigations even before it first met with the USAO. As a direct result of the threat to the firm inherent in the Thompson Memorandum, it sought an indication from the USAO that payment of fees in accordance with its settled practice would not be held against it.

*Second,* the USAO did not give KPMG the comfort it sought. To the contrary, it deliberately, and consistent with DOJ policy, reinforced the threat inherent in the Thompson Memorandum. It placed the issue of payment of legal fees high on its agenda for its first meeting with KPMG counsel, which emphasized the prosecutors' concern with the issue. Mr. Weddle raised the issue and then repeatedly focused on KPMG's "obligations," thus clearly implying – consistent with the language of the Thompson Memorandum – that compliance with legal obligations would be countenanced, but that anything more than compliance with demonstrable legal obligations could be held against the firm. Ms. Neiman's statement, in response to a comment about payment of legal fees by KPMG, that misconduct should not be rewarded quite reasonably was understood in the same vein, whatever its intent. And Mr. Weddle's colorful warning that the USAO would look at any discretionary payment of fees by KPMG "under a microscope" drove the point home.

*Third,* the government conducted itself in a manner that evidenced a desire to minimize the involvement of defense attorneys. This objective arguably is inherent, to some degree, in the Thompson Memorandum itself. But there is considerably more proof, specific to this case, here. The *contretemps* with KPMG over its Advisory Memorandum demonstrated the

government's desire, wherever possible, to interview KPMG witnesses without their being represented by lawyers. The USAO's ready acceptance of KPMG's offer to cut off payment of legal fees for anyone who was indicted speaks for itself. It speaks even more eloquently when one considers that the USAO accepted KPMG's assurance that it had no legal obligation to pay legal fees, knowing that (1) KPMG's "common practice" had been to make such payments, (2) KPMG was extremely anxious to curry favor with the USAO by demonstrating how cooperative it could be, and (3) KPMG had an obvious conflict of interest with its present and former personnel on the question whether it had a legal obligation to pay fees. Had the government been less concerned with punishing those it deemed culpable right from the outset, it would not have accepted KPMG's word on this point.

*Fourth,* KPMG's decision to cut off all payments of legal fees and expenses to anyone who was indicted and to limit and to condition such payments prior to indictment upon cooperation with the government was the direct consequence of the pressure applied by the Thompson Memorandum and the USAO. Absent the Thompson Memorandum and the actions of the USAO, KPMG would have paid the legal fees and expenses of all of its partners and employees both prior to and after indictment, without regard to cost.[97]

---

[97]    In a brief on another motion, filed after this one was taken under submission, the government points to the Statement of Facts attached to the DPA as evidence that KPMG made the decision concerning legal fees "on its own initiative" and argues that "this decision [w]as one reached by the firm for its own reasons, not at the request or direction of the Government." Docket item 569, at 15 n.5. Even if one put aside the fact that the government failed to offer this in evidence or make this argument on the present motion, the argument would be without merit. There is no inconsistency between KPMG making the decision "for its own reasons" and the decision having been a product of government pressure. The government pressure in fact was the reason that KPMG made the decision.

*Discussion*

I.      *The Relationship Between KPMG and its Personnel With Respect to Advancement of Legal Fees and Defense Costs*

    A.      *Indemnification and Advancement Generally*

The issue of employer payment of legal expenses incurred by their employees as a result of doing their jobs arises in a context that dates back many years.

In the nineteenth century, Justice Story stated what already was an established proposition: "if an agent has, without his own default, incurred losses or damages in the course of transacting the business of his agency, or in following the instructions of his principal, he will be entitled to full compensation therefor" from the employer.[98]  The modern common law rule is the same.  And it extends to payment of expenses incurred by an employee or other agent in defending a lawsuit on a claim with respect to which the employee is entitled to indemnity.[99]

The success of the corporation as a business form brought growing pains.  Lawsuits against corporate directors became ever more common.  By the early part of the last century, the situation had become what one commentator described as "open season on directors."[100]  The question whether directors who successfully defended such suits were entitled to be reimbursed for the expenses of defending such suits despite the fact that they often were not employees began to arise.

---

[98]      JOSEPH STORY, STORY ON AGENCY § 339, at 413 (Charles P. Greenough ed. 1882).

[99]      *E.g.,* RESTATEMENT (SECOND) OF AGENCY § 438(2) & cmt. e (1958).

[100]     Joseph W. Bishop, Jr., *Current Status of Corporate Directors' Right to Indemnification,* 69 HARV. L. REV. 1057, 1058 (1956) (hereinafter "Bishop").

At least one early decision favored reimbursement, commonly called indemnification.[101] In the 1930s, however, courts in Ohio and New York came to the opposite conclusion.[102] These decisions gave rise to a "not unnatural cry for legislation."[103] Taking the view that "[i]ndemnification encourages corporate service by capable individuals by protecting their personal financial resources from depletion [as a result of] . . . litigation that results by reason of that service,"[104] legislatures all over the country responded.

Today, all states have statutes addressing the indemnification of corporate directors, officers, employees, and other agents.[105] Many have adopted also statutes providing for indemnification of members and employees of partnerships as well as of members, officers, and agents of newer forms of business organization such as limited partnerships and limited liability

---

[101]   *Figge v. Bergenthal,* 130 Wis. 594, 109 N.W. 581 (1907).

[102]   *New York Dock Co. v. McCollum,* 173 Misc. 106, 16 N.Y.S.2d 844 (Sup. Ct. Onondaga Co. 1939); *Griesse v. Lang,* 37 Ohio App. 553, 175 N.E. 222 (1931).

[103]   Bishop, 69 HARV. L. REV. at 1068-69; *accord,* 2 AMERICAN LAW INSTITUTE, PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.20, Reporter's Note 1, at 278 (1994) (hereinafter "ALI"); *see also Baker v. Health Mgmt. Sys., Inc.,* 98 N.Y.2d 80, 85, 745 N.Y.S.2d 741, 744 (2002) (New York corporate indemnification statute enacted to overrule *New York Dock*).

[104]   *Homestore, Inc.,* 888 A.2d at 211.

[105]   3A WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 1344.10 (2002 rev. vol.) (hereinafter "FLETCHER").

companies.[106]  Still others also protect employees with statutes relating specifically to the employment relationship.[107]

These statutes take different forms.  Some require indemnification.  Some permit indemnification where the corporation or other business entity elects to provide it.[108]  A few provide the exclusive vehicle for indemnification while most permit indemnification as a matter of contract or otherwise as well as pursuant to statute.[109]  Many provide for indemnification, at least in some circumstances, for the cost of defending employment-related criminal charges.[110]  All or virtually all, however, share an additional characteristic.  As the Delaware Supreme Court recently put it, "the right to indemnification cannot be established . . . until after the defense to legal proceedings has been 'successful on the merits or otherwise.'"[111]

This has been viewed as a problem.  Persons who are sued can be subjected to "the personal out-of-pocket financial burden of paying the significant ongoing expenses inevitably

---

[106]  There has been a parallel development with respect to indemnification of public officials and employees.  As *New York Dock* pointed out, liability for suits and legal expenses incurred in their defense original was a risk of assuming public office.  173 Misc. at 111, 16 N.Y.S.2d at 849.  New York and doubtless other states have enacted statutes addressing the subject of indemnification for public officers and employees.  *E.g.,* N.Y. Pub. Officers L. §§ 17-18 (McKinney 2001); *see* N.Y. Legislative Annual 158-59 (1981).

[107]  *See, e.g.,* Calif. Labor C. § 2802.

[108]  *See* 3A Fletcher § 1344.10, at 556-57.

[109]  ALI § 7.20, Reporter's Note 3, at 279.

[110]  *See, e.g.,* 8 West's Del. Code Ann. § 145(a); ALI § 7.20(a); *see generally* Pamela H. Bucy, *Indemnification of Corporation Executives Who Have Been Convicted of Crimes: An Assessment and Proposal,* 24 Ind. L. Rev. 279, 288-89 (1991).

[111]  *Homestore, Inc.,* 888 A.2d at 211 (quoting 8 West's Del. C. Ann. § 145(c)).

involved with investigations and legal proceedings."[112]   In consequence, many states authorize business entities to advance defense costs to their personnel, subject to the recipients' obligation to repay the money  in the event it ultimately is determined that they are not entitled to indemnity.[113] This has been described as "an especially important corollary to indemnification as an inducement for attracting capable individuals into corporate service."[114]  Advancement "fills the gap . . . so the [entity] may shoulder . . . interim costs," and its value "is that it is granted or denied while the underlying action is pending."[115]  As Judge Haight has written, it protects the "ability [of the employee] to mount . . . a defense . . . by safeguarding his ability to meet his expenses at the time they arise, and to secure counsel on the basis of such an assurance."[116]

Against this background, we turn to KPMG's relationship with the KPMG Defendants.

### B.     KPMG

The statute that governs KPMG gives it the authority "to indemnify and hold harmless any partner or other person from and against any and all claims and demands

---

[112]     *Id.*

[113]     *See, e.g., id.*; *Kaung v. Cole Nat'l Corp.,* 884 A.2d 500, 509-10 (Del. Sup. 2005); 8 WEST'S DEL. C. ANN. § 145(e); *see generally* 3A FLETCHER § 1344.10, at 560-61.

[114]     *Homestore, Inc.,* 888 A.2d at 211.

[115]     *Kaung,* 884 A.2d at 509.

[116]     *United States v. Weissman,* No. S2 94 Crim. 760 (CSH), 1997 WL 334966, at *16 (S.D.N.Y. June 16, 1997).

whatsoever."[117]   This includes the authority to advance defense costs prior to final judgment.[118]

KPMG had an unbroken track record of paying the legal expenses of its partners and employees

incurred as a result of their jobs, without regard to cost.  All of the KPMG Defendants therefore had,

at a minimum, every reason to expect that KPMG would pay their legal expenses in connection with

the government's investigation and, if they were indicted, defending against any charges that arose

out of their employment by KPMG.  Indeed, it appears quite possible that all had contractual and

other legal rights to indemnification and advancement of defense costs,[119] although the Court

---

[117]   KPMG is a limited liability partnership.  Its partnership agreement is governed by the law of Delaware. 6 WEST'S DEL. C. ANN. § 15-106 (2006); K248, ¶ 19.2.  The Delaware Revised Uniform Partnership Act provides that "a partnership may, and shall have the power to, indemnify and hold harmless any partner or other person from and against any and all claims and demands whatsoever" subject to such standards and restrictions as are set forth in its partnership agreement.  6 WEST'S DEL. C. ANN. § 15-110 (2006).  As the KPMG partnership agreement contains no such standards and restrictions, it is entirely free to indemnify its personnel.

[118]   *See, e.g., Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Holding Co. LLC,* 853 A.2d 124, 126 (Del. Ch. 2004); *Delphi Easter Partners L.P. v. Spectacular Partners, Inc.,* Civ. A. No. 12409, 1993 WL 32807, at *4-*5 (Del. Ch. Aug. 6, 1993).

[119]   All of the defendants save Stein, who has an express contract with KPMG, arguably are protected by a contract, implied in fact from KPMG's uniform past practice and the circumstances of the business, pursuant to which they are entitled to have their defense costs paid by KPMG.  *See, e.g., Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, 448 F.3d 573, 582* (2d Cir. 2006) (New York law); *Manchester Equip Co., Inc. v. Am. Way Moving & Storage Co., Inc.,* 176 F. Supp.2d 239, 245 (D. Del. 2001) (Delaware law); *Cal. Emergency Physicians Med. Group v. Pacificare of Cal.,* 111 Cal.App.4th 1127, 1134, 4 Cal.Rptr.3d 583, 592 (4th Dist. 2003) (California law). Stein's contract requires that KPMG retain on his behalf, and with his consent, "appropriate and qualified counsel" at the firm's expense if he is sued and joint representation is inappropriate, both of which are the case here.  Ex. 6, ¶ 13.  While KPMG argues that this obligation is limited by another provision of the contract, its position is questionable.

Quite apart from any question of contract, most of the KPMG California defendants appear to be entitled under California statutes to advancement of their defense costs.

Defendants Bickham and Larson were California employees, not partners.  To the extent the investigation and indictment arose in consequence of that employment, California statutes require KPMG to advance their defense costs and, unless their actions were both

declines to decide that in this ruling.

II.    *The Government Violated the Fifth and Sixth Amendments by Causing KPMG to Cut Off Payment of Legal Fees and Other Defense Costs Upon Indictment*

    A.    *The Right to Fairness in the Criminal Process*

        1.    *Nature of the Right*

"'No general respect for, nor adherence to, the law as a whole can well be expected without judicial recognition of the paramount need for prompt, *eminently fair* and sober criminal law procedures. The methods we employ in the enforcement of our criminal law have aptly been called the measures by which the quality of our civilization may be judged.'"[120]

The Supreme Court long has protected a defendant's right to fairness in the criminal process. It has grounded this protection primarily in the Due Process Clause[121] as well as more specific provisions of the Bill of Rights, including the Confrontation and Assistance of Counsel

---

unlawful and "believed by them to be unlawful"at the time, to indemnify them. Calif. Labor C. § 2802(a) (requirement of indemnification); Calif. Civ. C. § 2778 (indemnity includes defense costs); *Jacobus v. Krambo Corp.,* 78 Cal. App.4th 1096, 93 Cal. Rptr.2d 425 (1st Dist. 2000) (Labor C. § 2802 requires employer to defend or pay defense costs); *Alberts v. Amer. Cas. Co.,* 88 Cal.App.2d 891, 899, 200 P.2d 37, 42-43 (2d Dist. 1948) (indemnitee entitled to recover as soon as it becomes liable).

Defendant Hasting, who also was based in California, was a KPMG partner. Nevertheless, he arguably is covered by the same statutes. Hasting was a Class A partner of KPMG from July 1998 through October 2001. Under KPMG's by-laws, Class A partners were not entitled to share in the profit or required to bear a share of any losses of the firm and were ineligible to serve on the board of directors. (K0200, K0207) Thus, the fact that he bore the title "partner" may not be dispositive. *See, e.g., Clackamas Gastroenterology Assocs. v. Wells,* 538 U.S. 440, 446 (2003); *Hishon v. King & Spalding,* 467 U.S. 69, 80 n.2 (1984) (Powell, J., concurring).

[120]    *Douglas v. California,* 372 U.S. 353, 358 n.2 (1963) (quoting *Coppedge v. United States*, 369 U.S. 438, 449 (1962)) (emphasis added).

[121]    U.S. Const. amend. V, XIV.

Clauses of the Sixth Amendment.[122]  Whatever the textual source, however, the Court consistently has held that criminal defendants are entitled to be treated fairly throughout the process.  In everyday language, they are entitled to a fair shake.

This concern for the fairness of criminal proceedings runs throughout many of the Court's decisions regarding fair trials and access to the courts.  For example, in *Powell v. Alabama*,[123] in which the Court first held that a defendant in a capital case has the right to the aid of counsel, it reasoned that if a tribunal were "arbitrarily to refuse to hear a party by counsel[,] it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense."[124]  In other words, without counsel for the defense, a capital prosecution is presumptively unfair and therefore violates due process.  The implied converse is that due process requires fair proceedings.

One aspect of the required fairness protects the autonomy of the criminal defendant.  It rests on the common-sense truth that, at the end of the day, it is the defendant "who suffers the consequences if the defense fails."[125]  So proper respect for the individual prevents the government from interfering with the manner in which the individual wishes to present a defense."[126]  The

---

[122]     *Id.* amend. VI.

[123]     287 U.S. 45 (1932).

[124]     *Id.* at 64.

[125].    *Faretta v. California*, 422 U.S. 806, 820 (1975).

[126]     This general rule against government interference with the defense is based on a presumption that the criminal defendant, "after being fully informed, knows his own best interests and does not need them dictated by the State."  *Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 165 (Scalia, J., concurring).

underlying theme is that the government may not both prosecute a defendant and then seek to influence the manner in which he or she defends the case.

A defendant's right to control the manner and substance of the defense has several aspects. The defendant has the right to represent him- or herself,[127] even if such a decision objectively may appear to be unwise.[128] A defendant is guaranteed also "the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire"[129] – in other words, to use his or her own assets to defend the case, free of government regulation. Nor may the government interfere at will with a defendant's choice of counsel, as the Constitution "protect[s] . . . the defendant's free choice independent of concern for the objective fairness of the proceedings."[130] Similarly, a defendant is generally free, within the procedural constraints that govern trials generally, to adduce evidence without unjustified restrictions[131] and may choose which witnesses to present

---

[127]     *See, e.g., Faretta,* 422 U.S. at 820-21.

[128]     *See Martinez,* 528 U.S. at 165 (Scalia, J., concurring).

[129]     *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624 (1989).

[130]     *United States v. Panzardi Alvarez*, 816 F.2d 813, 818 (1st Cir. 1987) (internal citation and quotation omitted); *see also Wilson v. Mintzes*, 761 F.2d 275, 279 (6th Cir. 1985) ("[R]ecognition of the right [to counsel of choice] also reflects constitutional protection of the accused's free choice").

         *See also United States v. Laura*, 607 F.2d 52, 56 (3d Cir. 1979) (Higginbotham, J.) (" We would reject reality if we were to suggest that lawyers are a homogeneous group. Attorneys are not fungible, as are eggs, apples and oranges. Attorneys may differ as to their trial strategy, their oratory style, or the importance they give to particular legal issues. The differences, all within the range of effective and competent advocacy, may be important in the development of the defense. Given this reality, a defendant's decision to select a particular attorney becomes critical to the type of defense he will make and thus falls within the ambit of the sixth amendment.").

[131]     *See, e.g., Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) (error to foreclose defendant's efforts to adduce evidence about the circumstances of his confession; "In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant

or cross-examine.[132]  In short, fairness in criminal proceedings requires that the defendant be firmly in the driver's seat, and that the prosecution not be a backseat driver.[133]

The constitutional requirement of fairness in criminal proceedings not only prevents the prosecution from interfering actively with the defense, but also from passively hampering the defendant's efforts.  As the Court put it in *California v. Trombetta*,[134]

> "Under the Due Process Clause . . . , criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed what might loosely be called the area of constitutionally guaranteed access to evidence. Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system."[135]

---

of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing.") (internal citation and quotation omitted).

[132]  *See, e.g., Chambers v. Mississippi*, 410 U.S. 284, 295 (1973).

This is not to say, of course, that defendants are free of appropriate regulation of such matters as the order of proof, the offering of cumulative evidence, and the length of presentations.  *See United States v. Gonzalez-Lopez,* No. 05-352, 2006 U.S. LEXIS 5165, at *21-22 (June 26, 2006).

[133]  *See also, e.g., Mayer v. City of Chicago*, 404 U.S. 189, 195-96 (1971) (denial of free transcripts to indigent misdemeanor appellants violated due process); *Bounds v. Smith*, 430 U.S. 817 (1977) (due process required that prisoners have an adequate opportunity to present their claims fairly); *cf. Davis v. Alaska*, 415 U.S. 308, 319-20 (1974) (Confrontation Clause required that defendant be permitted to cross-examine witness as to his juvenile criminal record; unfair to "require the petitioner to bear the full burden of vindicating the State's interest in the secrecy of juvenile criminal records").

[134]  467 U.S. 479 (1984).

[135]  *Id.* at 485 (internal citations omitted).

Hence, the prosecution may not conceal exculpatory evidence or plea agreements with key government witnesses.[136]   In some instances, it may be required to disclose the identity of its undercover informants in possession of evidence critical to the defense.[137]

Prosecutors are required also by the Due Process Clause to conduct themselves fairly. They may not delay intentionally indictments to prejudice defendants.[138]  They may not obstruct defendants' access to a potential witness unless that is necessary to protect the witness's safety.[139] Nor may they knowingly offer perjured or false evidence.[140]  Entrapment by prosecutors and law enforcement officers is proscribed by the Due Process Clause.[141]  While prosecutors appropriately

---

[136]  *See Giglio v. United States,* 405 U.S. 150 (1972);  *Brady v. Maryland*, 373 U.S. 83, 87 (1963);  *see also United States v. Agurs*, 427 U.S. 97, 112 (1976) (prosecution has a constitutional duty to provide defendant with exculpatory evidence that would raise a reasonable doubt as to guilt).

[137]  *See Roviaro v. United States*, 353 U.S. 53 (1957).

[138]  *See, e.g., United States v. Lovasco,* 431 U.S. 783, 795 n.17 (1977); *United States v. Marion,* 404 U.S. 307, 324 (1971).

[139]  See *United States v. Gonzales,* 164 F.3d 1285, 1292 (10th 1999) (defendants have "a right to be free from prosecution interference with a witness' freedom of choice about whether to talk to the defense")*; Int'l Bus. Mach. Corp. v. Edelstein,* 526 F.2d 37, 44 (2d Cir. 1975) (supporting "wholeheartedly" the conclusion that "constitutional notions of fair play and due process dictate that defense counsel be free from obstruction, whether it come from the prosecutor in the case or from a state official or another state acting under color of law") (*quoting Coppolino v. Helpern,* 266 F. Supp. 930 (S.D.N.Y.1967)); *Gregory v. United States,* 369 F.2d 185, 188 (D.C. Cir. 1966) (defendant denied a fair trial where prosecutor advised witnesses to the alleged crime not to speak to defense counsel outside the prosecutor's presence); *see also United States v. Muirs,* 145 Fed. Appx. 208, 209 (9th Cir. 2005) ("[G]overnment interference with defense access to witnesses implicates due process."); .

[140]  *See, e.g., Briscoe v. LaHue,* 460 U.S. 325, 327 n.1 (1983); *Agurs,* 427 U.S. at 103 & nn. 8-9; *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *Pyler v. Kansas,* 317 U.S. 213, 216 (1942); *Mooney v. Holohan,* 294 U.S. 103, 112 (1935).

[141]  *See, e.g., Cox v. Louisiana,* 379 U.S. 559, 571 (1965); *Raley v. Ohio,* 360 U.S. 423, 426 (1959).

are given great latitude in the arguments they make to juries, they cross into unconstitutional territory when they "infect[] the trial with unfairness."[142]

Finally, the requirement of fairness in criminal proceedings applies to the structure and conduct of the entire criminal justice system. For example, the Court held that Dr. Sam Sheppard's due process rights were violated when the trial court failed to protect him from the firestorm of prejudicial publicity surrounding his trial.[143] It has recognized also the right to trial before an unbiased tribunal. In *Ward v. Village of Monroeville,*[144] for example, it held that a defendant was denied due process when he was tried for traffic offenses before the village mayor, who was responsible for village finances and whose court provided a substantial portion of village funds through fines, forfeitures, costs, and fees. Similarly, in *Tumey v. Ohio,*[145] the Court reversed a conviction because the judge was paid from fines levied in his court and therefore received payment only upon conviction. The Court said that such a system "deprives a defendant . . . of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case."[146]

---

[142]    *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)).

[143]    *See Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966).

[144]    409 U.S. 57 (1972).

[145]    273 U.S. 510 (1927).

[146]    *Id.* at 524; *see also Bracy v. Gramley,* 520 U.S. 899, 904-05 (1997) ("The Due Process Clause clearly requires a "fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case.") (internal citations and quotation marks omitted); *Johnson v. Mississippi,* 403 U.S. 212, 215-216 (1971) (due process violated where judge presided over a case in which one of the defendants was a previously successful litigant against him); *In re Murchison,* 349 U.S. 133, 137-139 (1955) (due process violated by a judge presiding over a criminal trial of a defendant who he had indicted under the state's one-man grand jury procedure).

The Court's jurisprudence thus makes clear that defendants have the right, under the Due Process Clause, to fundamental fairness throughout the criminal process.

> 2.    *The Right to Fairness in the Criminal Process Is a Fundamental Liberty Interest Entitled to Substantive Due Process Protection Where, As Here, the Government Coerces a Third Party to Withhold Funds Lawfully Available to a Criminal Defendant*

The Due Process Clause has been interpreted to provide not only procedural protection for deprivations of life, liberty, and property, but also substantive protection for fundamental rights – those that are so essential to individual liberty that they cannot be infringed by the government unless the infringement is narrowly tailored to serve a compelling state interest.[147]

"Only fundamental rights and liberties which are deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty qualify for such protection."[148] The right to fairness in criminal proceedings has not been explicitly so characterized by the Court.[149] The question here, then, is whether and to what extent it properly is regarded as fundamental for purposes of requiring strict scrutiny of alleged impingements.   A number of guides point the way.

To begin with, many of the Supreme Court's criminal due process decisions described above can be understood in modern terms most readily in the substantive due process and

---

[147]    *See, e.g., Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

[148]    *Chavez v. Martinez*, 538 U.S. 760, 775 (2003) (internal citations omitted).

[149]    The rights thus far explicitly characterized by the Supreme Court as fundamental in this specialized sense fall into five rough categories: the rights to freedom of association, to vote and participate in the electoral process, to travel interstate, to fairness in procedures concerning individual claims against governmental deprivation of life, liberty, or property, and to privacy relating to freedom of choice in matters relating to an individual's personal life. *See* 2 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 15.7 (1999) ("Rotunda & Nowak").

strict scrutiny framework. The requirement of an unbiased tribunal, for example, is not found in the explicit language of the Constitution. It rests instead on the proposition that a fair tribunal is "implicit in the concept of ordered liberty."[150] The state's legitimate interest in, for example, saving money by having the same person both run a town's finances and levy traffic fines is insufficient to justify infringing upon the right to a fair trial. Thus, the Supreme Court's repeated recognition of the constitutional mandate of fairness in criminal proceedings strongly suggests that this right is "fundamental" for substantive due process purposes, at least in some circumstances. Indeed, it would be difficult to conclude otherwise. Our concern with protection of the individual against the unfair use of the great power of the government is "deeply rooted in this Nation's history and tradition."[151] "[N]either liberty nor justice would exist" if fairness to criminal defendants were sacrificed.[152] Indeed, as one court put it, "What can be more basic to the scheme of constitutional rights precious to us all than the right to fairness throughout the proceedings in a criminal case?"[153]

These considerations have led the Second Circuit[154] and several other courts (often in *dicta*),[155] as well as respected commentators,[156] to conclude that the right to fairness in criminal

---

[150]    *Glucksberg,* 521 U.S. at 721 (internal citations and quotations omitted).

[151]    *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion).

[152]    *Glucksberg,* 521 U.S. at 721 (internal citations and quotations omitted).

[153]    *United States v. Curran*, 724 F. Supp. 1239, 1241 (C.D. Ill. 1989), *rev'd on other grounds*, *United States v. Spears*, 965 F.2d 262 (7th Cir. 1992), *cert. denied*, 506 U.S. 989 (1992).

[154]    *See Quill v. Vacco*, 80 F.3d 716, 724 (2d Cir. 1996) (recognizing the right to fairness in a criminal proceeding as a fundamental liberty interest subject to substantive due process analysis), *rev'd on other grounds*, 521 U.S. 793 (1997).

[155]    *See, e.g., Doe v. Taylor Independent Sch. Dist.*, 15 F.3d 443, 479 n.6 (5th Cir. 1994) (dissenting opinion) ("right to fair criminal process"); *Ryder v. Freeman*, 918 F. Supp. 157, 161 (W.D.N.C. 1996) ("fundamental fairness in the criminal process")*; Boyd v. Bulala*, 647 F. Supp. 781, 787 (W.D. Va. 1986) ("right to fairness in the criminal process"), *rev'd in*

proceedings is a fundamental liberty interest subject to substantive due process protection. But it is not necessary or, in this Court's view, appropriate, to go that far in order to decide this case. It is a venerable maxim of constitutional construction that courts should decide no more than is necessary.[157] And the only question now before the Court is whether a criminal defendant has a right to obtain and use in order to prepare a defense resources lawfully available to him or her, free of knowing or reckless government interference.[158] Given all that has been said above, this Court concludes that such a right is basic to our concepts of justice and fair play. It is fundamental.[159]

---

*part on other grounds*, 877 F.2d 1191 (4th Cir. 1989); *Grant v. City of Chicago*, 594 F. Supp. 1441, 1450 (D.C. Ill. 1984) ("[a]ccess to the complete criminal process"); *cf. Provident Mut. Life Ins. Co. of Philadelphia v. City of Atlanta*, 864 F. Supp. 1274, 1291 (N.D. Ga. 1994) (noting in equal protection analysis "the right to fairness in the criminal process").

[156] *See* 2 ROTUNDA & NOWAK § 15.7 (right to fairness in criminal process implicitly recognized by the Court as fundamental); *see also, e.g.*, Gregory F. Intoccia, *Constitutionality of the Death Penalty Under the Uniform Code of Military Justice*, 32 A.F. L. REV. 395, 399 (1990) ("The Court views the right to fairness in the criminal process as fundamental and deserving of significant judicial protection."). *Cf.* Brad Snyder, *Disparate Impact on Death Row: M.L.B. and the Indigent's Right to Counsel at Capital State Postconviction Proceedings*, 107 YALE L. J. 2211, 2215 ("The two most frequently recognized fundamental equal protection rights are the right to vote and participate in elections and the right of access to the criminal process.").

[157] *See, e.g., Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341 (1936) (Brandeis, J., concurring).

[158] Indigent criminal defendants are entitled to competent defense representation. Serious questions have been raised about whether the means available for providing quality defenses for indigents are sufficient to accomplish that goal. *See, e.g., New York County Lawyers' Ass'n v. New York*, 196 Misc.2d 761, 763, 763 N.Y.S.2d 397, 399 (Sup. Ct. N.Y. Co. 2003) (granting declaratory relief increasing the hourly compensation for counsel assigned to represent indigents in New York State criminal cases after finding that the state had "ignore[d] its constitutional obligation to the poor by failing to increase the assigned counsel rates, [resulting] in many cases, in the denial of counsel, delay in the appointment of counsel, and less than meaningful and effective legal representation"). If these criticisms are well-founded, remedial measures are not only desirable, but constitutionally may be required. But that is a question for another day.

[159] It is crucial to note that the Court deals here with extrajudicial action by the government that deliberately or recklessly tilts the playing field against a criminal defendant. Such actions

3.      The Government's Actions Violated the Substantive Due Process
        Right to Fairness in the Criminal Process

        a.      The Effect on the KPMG Defendants

The Thompson Memorandum and the USAO pressure on KPMG to deny or cut off

defendants' attorneys' fees necessarily impinge upon the KPMG Defendants' ability to defend

themselves.

This is by no means a garden-variety criminal case. It has been described as the

largest tax fraud case in United States history. The government thus far has produced in discovery,

in electronic or paper form, at least 5 million to 6 million pages of documents *plus* transcripts of 335

depositions and 195 income tax returns.[160] The briefs on pretrial motions passed the 1,000-page

mark some time ago.[161] The government expects its case in chief to last three months, while

defendants expect theirs to be lengthy as well.[162] To prepare for and try a case of such length

requires substantial resources.[163] Yet the government has interfered with the ability of the KPMG

---

have nothing in common with fair and neutral regulation of, for example, the conduct of a
criminal trial, which naturally are not subjected to strict scrutiny.

[160]    Anderson Decl. [docket item 561] ¶¶ 24, 27, 38-39, 41.

[161]    Tr., Mar. 30, 2006, at 9:10-14.

[162]    *See, e.g., United States v. Stein*, S1 05 Crim. 0888 (LAK), 2006 WL 1126807 (S.D.N.Y.
         Apr. 4, 2006).

[163]    If one were to assume a six-month trial of 117 days and that a defendant were represented
         by a single lawyer, who devoted eight hours for each trial day, the cost at $400 per hour
         simply to attend the trial would be almost $375,000, without taking into account such other
         expenses as transcripts, copying, travel expenses, and the like. That figure, moreover,
         would be misleadingly low, as it is difficult to imagine that this case could be defended
         competently without spending at least some of the 5 to 6 million
         pages of documents produced by the government and otherwise preparing as in attending
         the trial. It therefore is quite reasonable to assume that even a minimal defense of this case

Defendants to obtain resources they otherwise would have had. Unless remedied, this interference almost certainly will affect what these defendants can afford to permit their counsel to do. This would impact the defendants' ability to present the defense they wish to present by limiting the means lawfully available to them. The Thompson Memorandum and the USAO's actions therefore are subject to strict scrutiny.

       b.     *The Thompson Memorandum and the USAO's Actions Fail the Strict Scrutiny Test*

To survive strict scrutiny, government action must be narrowly tailored to achieve a compelling government interest.[164]

The portion of the Thompson Memorandum at issue here – the language that states that payment of legal fees for employees and former employees may be viewed as protection of culpable employees and thus cut in favor of indicting the entity – purportedly serves three goals. First, it is intended to facilitate just charging decisions concerning business entities by focusing on a consideration pertinent to gauging their degrees of cooperation. Second, it seeks to strengthen the government's ability to investigate and prosecute corporate crime by encouraging companies to pressure their employees to aid the government – recall Mr. Weddle's urging KPMG to tell its people to be "totally open" with the USAO, "even if that [meant admitting] criminal wrongdoing." Finally, it seeks to punish those whom prosecutors deem culpable – it attempts to justify depriving employees of corporate aid by characterizing it as "protecting . . . culpable employees and agents."

---

could well cost $500,000 to $1 million, if not significantly more.

[164]     *See, e.g., Glucksberg*, 521 U.S. at 721 (internal citations and quotations omitted).

The final justification may be disposed of quickly. The job of prosecutors is to make the government's best case to a jury and to let the jury decide guilt or innocence. Punishment is imposed by judges subject to statute. The imposition of economic punishment by prosecutors, before anyone has been found guilty of anything, is not a legitimate governmental interest – it is an abuse of power. The government's other points, however, are far more substantial.

Any government's interest in investigating and fairly prosecuting crime is compelling. The consequences for civilization of another government's failure to accomplish that basic end are on view on the evening news every day.

In order properly to accomplish that task, the government must have the ability to make just charging decisions and to prevent obstruction of its investigations. Hence, no one disputes the proposition that a willingness to cooperate with the government is an appropriate consideration in deciding whether to charge an entity. Nor does anyone suggest that an entity's obstruction of a government investigation – what the government has called "circling the wagons"[165] – should be ignored in a charging decision. Many remember the Watergate case, in which the legal fees of individuals who broke into the offices of the Democratic National Committee were paid, along with other "hush money," to buy the silence of the burglars and to protect higher-ups.[166] Corporate equivalents no doubt occur. But the devil, as always, is in the details.

The first difficulty is that the Thompson Memorandum does not say that payment of legal fees may cut in favor of indictment *only if* it is used as a means to obstruct an investigation.

---

[165] Tr. (Neiman) 292:21-293:22; *see also* Tr. 409:20-25.

[166] *See United States v. Haldeman,* 559 F.2d 31, 55-57 (D.C. Cir. 1976), *cert. denied,* 431 U.S. 916, 933 (1977). *See also, e.g., United States v. Locascio,* 6 F.3d 924, 931-34 (2d Cir. 1993) (organized crime figure's payment of legal fees for crime family members appropriate proof of criminal enterprise).

Indeed, the text strongly suggests that advancement of defenses costs weighs against an organization independent of whether there is any "circling of the wagons."[167]

The USAO, possibly concerned with the breadth of the Thompson Memorandum, seeks to deal with this by asserting that, in practice, it considers the payment of legal fees as a negative factor only when payments are used to impede.[168]  Perhaps so.  But whatever the government may do in the privacy of U.S. Attorneys' offices and in the DOJ's Criminal Division is not what defense lawyers see.  They see the Thompson Memorandum.  Few if any competent defense lawyers would advise a corporate client at risk of indictment that it should feel free to advance legal fees to individuals in the face of the language of the Thompson Memorandum itself. It would be irresponsible to take the chance that prosecutors might view it as "protecting . . . culpable employees and agents."  As KPMG's new chief legal officer, former U.S. District Judge Sven Erik Holmes, testified, he thought it indispensable (as would any defense lawyer) "to be able to say at the right time with the right audience, we're in full compliance with the Thompson Memorandum."[169]

The bottom line is plain enough.  If the government means to take the payment of legal fees into account in making charging decisions only where the payments are part of an

---

[167]    The Thompson Memorandum's assessment of whether a company is cooperating includes an examination of whether "the corporation, while purporting to cooperate, has engaged in conduct that impedes the investigation."  Thompson Memo at VI(A).  The payment of legal fees is treated in a separate paragraph that focuses entirely on "whether the corporation appears to be protecting its culpable employees and agents."  *Id.* at VI(B).

[168]    Tr. 409:20-25.

[169]    Docket item 544, Ex. B, at 74-75.

obstruction scheme – and thereby narrowly tailor its means to its ends – it would be easy enough to say so. But that is not what the Thompson Memorandum says.

The concerns do not end here. The argument that payment of legal fees to employees and former employees is relevant to gauging the extent of a company's cooperation also is problematic. There is no necessary inconsistency between an entity cooperating with the government and, at the same time, paying defense costs of individual employees and former employees. An entity may pay out of a judgment that extending this benefit will aid it in keeping and hiring competent and honest employees. It may pay in recognition that an employee caught up in an investigation, or even charged with a crime, because the employee did his or her job for the company has at least some claim to assistance, even in the absence of a legal right. In either case, however, a company may pay at the same time that it does its best to bare its corporate soul, stands at the government's beck and call to provide information and witnesses, and does a myriad of other things to aid the government and clean the corporate house. So it simply cannot be said that payment of legal fees for the benefit of employees and former employees necessarily or even usually is indicative of an unwillingness to cooperate fully. This is especially unlikely after employees have been indicted and fired, as is the situation here.

For these reasons, this aspect of the Thompson Memorandum is not narrowly tailored to achieve a compelling objective. It discourages and, as a practical matter, often prevents companies from providing employees and former employees with the financial means to exercise their constitutional rights to defend themselves. It does so in the face of state indemnification statutes that expressly permit businesses entities to provide those means because the states have determined that legitimate public interests may be served. It does so even where companies obstruct

nothing and, to the contrary, do everything within their power to make a clean breast of the facts to the government and to take responsibility for any offenses they may have committed. It therefore burdens excessively the constitutional rights of the individuals whose ability to defend themselves it impairs and, accordingly, fails strict scrutiny. The legal fee advancement provision violates the Due Process Clause.[170]

### c.      The Actions of the USAO

The actions of the USAO in this case compounded the problem that the Thompson Memorandum created.

The Thompson Memorandum says that the payment of legal fees (beyond any legal obligation) may be held against a business entity if the government views the payments as protection of "culpable employees" or as evidence of a lack of full and complete cooperation. The USAO took advantage of that uncertainty by emphasizing the threat.

Within days of receiving the criminal referral on February 5, 2004, the USAO put the payment of employee legal fees near the top of the government's agenda for the very first meeting with KPMG's lawyers. On February 25, 2004, Mr. Bennett reported that KPMG had

---

[170]     It makes no difference that the Thompson Memorandum is a policy of the DOJ and implemented by the USAO rather than legislation enacted by Congress. Due process requires that government action "through any of its agencies must be consistent with the fundamental principles of liberty and justice which lie at the base of our civil and political institutions, which not infrequently are designated as 'the law of the land.'" *DuBose v. Kelly,* 187 F.3d 999, 1004 (8th Cir. 1999) (quoting *Buchalter v. New York*, 319 U.S. 427, 429(1943)). The government cannot avoid strict scrutiny of actions that impinge upon the fundamental right of fairness in the criminal process simply by acting through DOJ policy rather than by statute or formal regulation. *See, e.g., Nicholson v. Williams,* 203 F. Supp.2d 153, 243 (E.D.N.Y. 2002) ("In considering the constitutionality of the policy or practice of a state agency rather than the specific acts of individual officers, it is appropriate to apply the higher standard and stricter analysis that is applied to legislation.").

cleaned house and pledged full cooperation with the government. But Mr. Weddle immediately raised the legal fee issue. When Mr. Bennett sought to elicit the USAO's view on that subject, the response was a reference to the Thompson Memorandum. This was followed later in the meeting by Ms. Neiman's statement, on the heels of a reference to payment of employee legal expenses, that misconduct should not be rewarded and Mr. Weddle's threat that the government would look at the payment of legal fees that KPMG was not legally obliged to pay "under a microscope." And it did all this despite the fact that it does not claim that KPMG obstructed its investigation, least of all by using the payment of legal fees to prevent employees or former employees from talking to the government or telling it the truth.

The individual prosecutors in the USAO acted pursuant to the established policy of the DOJ as expressed in the Thompson Memorandum. They understood, however, that the threat inherent in the Thompson Memorandum, coupled with their own reinforcement of that threat, was likely to produce exactly the result that occurred – KPMG's determination to cut off the payment of legal fees for any employees or former employees who were indicted and to limit and condition their payment during the investigative stage. Their actions cannot withstand strict scrutiny under the Due Process Clause because they too were not narrowly tailored to serving compelling governmental interests.

B.     *The Sixth Amendment Right to Counsel*

1.     *The Nature and Scope of the Right to Counsel*

Quite apart from the due process analysis, the KPMG Defendants argue that the Thompson Memorandum and its implementation by the government infringed their Sixth

Amendment right to counsel. They are correct.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence."[171]  As already has been demonstrated, however, this guarantees more than the mere presence of a lawyer at a criminal trial. It protects, among other things, an individual's right to choose the lawyer or lawyers he or she desires[172] and to use one's own funds to mount the defense that one wishes to present.[173]  Moreover, a defendant's exercise of his Sixth Amendment right to counsel is not to be feared or avoided by the government:

> "No system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise those rights. If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, there is something very wrong with that system."[174]

The government nevertheless argues that the KPMG Defendants have no Sixth Amendment rights at stake here for two principal reasons.

### a. Attachment of Sixth Amendment Rights

The government first argues that the Sixth Amendment right to counsel attaches only upon the initiation of a criminal proceeding. As the Thompson Memorandum was adopted and the USAO did its handiwork before the KPMG Defendants were indicted, it contends, there was no Sixth Amendment violation.

---

[171]    U.S. CONST. amend VI.

[172]    *See, e.g., Wheat,* 486 U.S. at 164.

[173]    *Caplin & Drysdale, Chartered,* 491 U.S. at 624.

[174]    *Escobedo v. Illinois,* 378 U.S. 478, 490 (1964).

It is true, of course, that the Sixth Amendment right to counsel typically attaches at the initiation of adversarial proceedings – at an arraignment, indictment, preliminary hearing, and so on.[175] But the analysis can not end there. The Thompson Memorandum on its face and the USAO's actions were parts of an effort to limit defendants' access to funds for their defense. Even if this was not among the conscious motives, the Memorandum was adopted and the USAO acted in circumstances in which that result was known to be exceptionally likely. The fact that events were set in motion prior to indictment with the object of having, or with knowledge that they were likely to have, an unconstitutional effect upon indictment cannot save the government. This conduct, unless justified, violated the Sixth Amendment.[176]

The government argues that this conclusion will open the door for future defendants to argue that all sorts of pre-indictment actions violate the Sixth Amendment and thus hamstring every investigation and prosecution. This is singularly unpersuasive. The government here acted with the purpose of minimizing these defendants' access to resources necessary to mount their defenses or, at least, in reckless disregard that this would be the likely result of its actions. In these circumstances, it is not unfair to hold it accountable.

b.      "Other People's Money"

The government next argues that the KPMG Defendants have no right, under the Sixth Amendment or otherwise, to spend "other people's money" on expensive defense counsel. The

---

[175]    *See Kirby v. Illinois*, 406 U.S. 682, 689-90 (1972); *see also, e.g., United States v. Ash*, 413 U.S. 300, 303 n.3 (1973).

[176]    *Cf. United States v. Harrison*, 213 F.3d 1206, 1207 (9th Cir. 2000) (holding that ongoing pre-indictment attorney-client relationship, of which the government was aware, invoked the Sixth Amendment as a matter of law upon indictment).

rhetoric is appealing, but the characterization of the issue – and therefore the conclusion – are wrong.

The argument is based on *Caplin & Drysdale, Chartered v. United States*[177] and *United States v. Monsanto*,[178] which held that the Sixth Amendment does not creates a right for those in possession of property forfeitable to the United States to spend that money on their legal defense. That is hardly surprising – the money belongs to the government. But that is not the issue here.

*Caplin & Drysdale* recognized that the Sixth Amendment does protect a defendant's right to spend his own money on a defense.[179] Here, the KPMG Defendants had at least an expectation that their expenses in defending any claims or charges brought against them by reason of their employment by KPMG would be paid by the firm. The law protects such interests against unjustified and improper interference.[180] Thus, both the expectation and any benefits that would have flowed from that expectation – the legal fees at issue now – were, in every material sense, their property, not that of a third party. The government's contention that the defendants seek to spend "other people's money" is thus incorrect.

---

[177] 491 U.S. at 619.

[178] 491 U.S. 600, 602 (1989).

[179] 491 U.S. at 624.

[180] The torts of interference with prospective economic advantage and inducement of breach of contract are well known. *See generally Kirch v. Liberty Media Corp.,* No. 04-5852-CV, 2006 WL 1523036, at *10 (2d Cir. June 5, 2006); *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 151 N.Y.S.2d 1 (1956). Interference with prospective economic advantage covers interference with the ability to pursue legal remedies against another party. *See, e.g., Reilly v. Natwest Mkts. Group, Inc.,* 178 F. Supp.2d 420, 429 (S.D.N.Y. 2001); *Ripepe v. Crown Equip. Corp.,* 293 A.D.2d 462, 463, 741 N.Y.S.2d 64, 66 (2d Dept. 2002); *Curran v. Auto Lab Svc. Ctr., Inc.,* 280 A.D.2d 636, 637, 721 N.Y.S.2d 662, 663 (2d Dept. 2001).

2.      *The Thompson Memorandum and the Government's Implementation
        Violated the KPMG Defendants' Sixth Amendment Right to Counsel*

The KPMG Defendants have established that the government's implementation of

the Thompson Memorandum impinged on their Sixth Amendment rights to counsel and to present

a complete defense.   Interference with these rights is improper if the government's actions are

"wrongfully motivated or without adequate justification."[181]   The remaining question, then, is

whether justification exists.

There is not much case law on the standard to be applied in making this

determination.  In comparable circumstances, federal courts often have looked to the common law

of torts to "enrich the [federal] jurisprudence"[182] and to provide "an appropriate starting point,"[183]

---

[181]    *Via v. Cliff*, 470 F.2d 271, 274-75 (3d Cir. 1972); *accord, United States v. Morrison*, 602
         F.2d 529, 531 (3d Cir. 1979), *rev'd on other grounds*, 449 U.S. 361 (1981).

[182]    *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 231-32 (1970) (Brennan, J., concurring and
         dissenting) ([W]here the wrong under [Section] 1983 is closely analogous to a wrong
         recognized in the law of torts, it is appropriate for the federal court to apply the relevant tort
         doctrines . . .").

[183]    *Carey v. Piphus*, 435 U.S. 247, 257-58 (1978); *see also, e.g., Wilson v. Garcia,*  471 U.S.
         261, 277 (1985) ("[W]e have found tort analogies compelling in establishing the elements
         of a cause of action under § 1983 . . . and in identifying the immunities available to
         defendants.") *superceded by statute on other grounds as recognized in Jones v. R.R.
         Donnelley & Sons Co.,* 541 U.S. 369 (2004); *Smith v. Wade,* 461 U.S. 30, 34 (U.S. 1983)
         ("In the absence of more specific guidance, we looked first to the common law of torts (both
         modern and as of 1871), with such modification or adaptation as might be necessary to carry
         out the purpose and policy of [Section 1983].");  *Imbler v. Pachtman,* 424 U.S. 409, 418
         (1976) ("[Section] 1983 is to be read in harmony with general principles of tort immunities
         and defenses, rather than in derogation of them.");  *Pierson v. Ray,* 386 U.S. 547, 556 (1967)
         ("[Section] 1983 should be read against the background of tort liability that makes a man
         responsible for the natural consequences of his actions.") (internal quotation marks omitted);
         *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir. 1995), *cert. denied,* 517 U.S. 1189
         (1996); *Cook v. Sheldon,* 41 F.3d 73, 79 (2d Cir. 1994) (borrowing the elements for a claim
         of malicious prosecution under Section 1983 from state tort law); *Raysor v. Port Authority
         of New York and New Jersey,* 768 F.2d 34, 39-40 (2d Cir. 1985), *cert. denied,* 475 U.S. 1027
         (1986); *All Aire Conditioning v. City of New York,* 979 F. Supp. 1010, 1020 n. 47 (S.D.N.Y.
         1997), *aff'd,* 166 F.3d 1199 (1998);  *C.A.U.T.I.O.N., Ltd. v. City of New York,* 898 F. Supp.
         1065, 1072 (S.D.N.Y. 1995).

always keeping in mind that we do so to inform our construction of the Constitution, not to apply state tort law.[184]

The common law tort of interference with prospective economic advantage necessarily deals with the issue whether a private actor is justified in interfering in the economic relations of another. In assessing claims of justification in private settings, courts look to a series of factors including the relative importance of the interests served by the plaintiff and the defendant.[185] Making appropriate adjustments for the fact that this analysis involves the public sector, the dispositive question is whether the government's law enforcement interests in taking the specific actions in question sufficiently outweigh the interests of the KPMG Defendants in having the resources needed to defend as they think proper against these charges.

Our nation made a deliberate choice more than two centuries ago. We determined that a person charged with a crime has "the right in an adversary criminal trial to make a defense as we know it."[186] That choice rests on the premise that "partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free."[187]

The Thompson Memorandum discourages and, as a practical matter, often prevents companies from providing employees and former employees with the financial means to exercise their constitutional rights to defend themselves. This is so even where companies obstruct nothing and, to the contrary, do everything within their power to make a clean breast of the facts to the

---

[184] *Monroe v. Pape,* 365 U.S. 167, 187 (1961).

[185] *See, e.g.,* RESTATEMENT (SECOND) OF TORTS § 767 (1979).

[186] *Faretta,* 422 U.S. at 818.

[187] *Herring v. New York,* 422 U.S. 853, 862 (1975).

government and to take responsibility for any offenses they may have committed.  It undermines the proper functioning of the adversary process that the Constitution adopted as the mode of determining guilt or innocence in criminal cases.  The actions of prosecutors who implement it can make matters even worse, as occurred here.

The Court holds that the fact that advancement of legal fees occasionally might be part of an obstruction scheme or indicate a lack of full cooperation by a prospective defendant is insufficient to justify the government's interference with the right of individual criminal defendants to obtain resources lawfully available to them in order to defend themselves, regardless of the legal standard of scrutiny applied.

3. *The KPMG Defendants Are Not Obliged to Establish Prejudice, Which in Any Case Would Be Presumed Here*

The government argues the KPMG Defendants' motion nevertheless should be denied because they have not shown prejudice under *Strickland v. Washington,*[188] which requires a defendant seeking to overturn his or her conviction based on ineffective assistance of counsel to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[189]  But the government is mistaken.

This conclusion follows from *United States v. Gonzalez-Lopez,*[190]  a case involving a deprivation of the defendant's right to counsel of his choice.  The Court there held that *Strickland* did not require a showing of prejudice in such a case because:

---

[188]     466 U.S. 668, 692 (1984).

[189]     *Id.* at 694.

[190]     2006 U.S. LEXIS 5165 at *4.

"Deprivation of the right [to counsel of choice] is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received. To argue otherwise is to confuse the right to counsel of choice – which is the right to a particular lawyer regardless of comparative effectiveness – with the right to effective counsel – which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed."[191]

Here, the violation is analogous to that at issue in *Gonzalez-Lopez*. The government has interfered with the KPMG Defendants' right to be represented as they choose, subject to the constraints imposed by the resources lawfully available to them. This violation, like a deprivation of the right to counsel of their choice, is complete irrespective of the quality of the representation they receive. Thus, *Strickland* has no bearing here.[192]

This result is consistent with common sense. Improper government conduct has created a significant risk that the KPMG Defendants' ability to present the defense they choose has been compromised. Corrective action now may well prevent that. There is, in consequence, a countervailing interest in *not* going blindly forward with a lengthy trial, which will consume vast judicial and party resources, without dealing with the issue. No one would set out to drive across a desert with half a tank of gas, knowing that one might run out before reaching the other side, without pausing first to fill up the tank. The prudent course is to avoid the problem at the outset – not to take a chance on being stranded and then having to try to figure out what to do about it.

---

[191] *Id.* at *15.

[192] This would have been so even before *Gonzalez-Lopez*. *Strickland* by its terms applies to "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction." *Strickland,* 466 U.S. at 687. Its requirement of a showing that the result of the trial that ended in conviction would have been different but for counsel's substandard performance would have no bearing here in any case, as no trial yet has occurred. Moreover, the requirement that a convicted defendant in an ineffective assistance case demonstrate prejudice stems at least in significant part from the Court's appropriate concern with preserving the finality of convictions and with society's need to "justify reliance on the outcome of the proceeding." *Id.* at 692. As there has been no trial yet, the interest in finality is not implicated.

The approach to cases involving criminal defense counsel burdened by conflicts of interest supports this conclusion. A district court that learns before trial of a possible conflict of interest between a defense attorney and a client is obliged to protect the defendant's Sixth Amendment right to unconflicted legal representation by immediately investigating the conflict and, if necessary, either obtaining a knowing or intelligent waiver from the defendant or disqualifying the conflicted attorney.[193] The rationale for doing so is simple. Prejudice is likely in conflict situations, and "such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent."[194] That rationale is fully applicable here.

Even if prejudice were relevant at this stage of the proceedings, however, the government's argument still would fail. Although *Strickland* generally requires convicted defendants to demonstrate that the result of the trial probably would have been different but for the ineffective assistance of counsel, this requirement does not apply where a violation resulted in a "structural defect[] in the constitution of the trial mechanism"[195] that "affected – and contaminated – the entire criminal proceeding."[196] In other words, there are two distinct types of constitutional errors: trial errors, which occur during the presentation of evidence at trial, and structural errors,

---

[193]   *See, e.g., Wheat,* 486 U.S. at 160; *United States v. Perez,* 325 F.3d 115, 125-26 (2d Cir. 2003); *United States v. Schwarz,* 283 F.3d 76, 95-96 (2d Cir. 2002); *United States v. Levy,* 25 F.3d 146, 153 (2d Cir. 1994); *United States v. Fulton,* 5 F.3d 605, 612-13 (2d Cir. 1993); *United States v. Curcio,* 680 F.2d 881, 888-90 (2d Cir. 1982); *United States v. Scala,* No. S1 04 Cr. 0070 (LAK), 2006 WL 1589772, at *2-4 (S.D.N.Y. June 12, 2006).

[194]   *Strickland*, 466 U.S. at 692.

[195]   *Arizona v. Fulminante,* 499 U.S. 279, 309 (1991).

[196]   *Satterwhite v. Texas,* 486 U.S. 249, 257 (1988); *see also Brecht v. Abrahamson,* 507 U.S. 619, 629-30 (1993); *United States v. Cronic,* 466 U.S.648, 658 (1984).

which are overarching and permeate the entire proceeding.[197]  As trial errors occur during the presentation of a case to the jury, they "may . . . be quantitatively assessed in the context of other evidence presented in order to determine whether" their commission "was harmless beyond a reasonable doubt."[198]  Structural errors, on the other hand, "defy analysis by 'harmless-error' standards."[199]  They affect "[t]he entire conduct of the trial from beginning to end."[200]  Prejudice "is so likely that case-by-case inquiry into prejudice is not worth the cost."[201]

Structural defects exist – and prejudice must be presumed – where a defendant is actively or constructively denied counsel at a critical stage of the trial or where defense counsel is burdened by an actual conflict of interest.[202]  Structural errors "may be present [also] on some occasions when, although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."[203]  In *Powell v. Alabama,* for example, the trial court, on the day of the trial, appointed an attorney from a different state – who professed himself to be unfamiliar with the facts of the case and the local procedure – to represent defendants in a highly publicized capital case.  The Supreme Court held

---

[197]    *Fulminante,* 499 U.S. at 307-10.

[198]    *Id.* at 307-08.

[199]    *Id.* at 309.

[200]    *Id.* at 310.

[201]    *Strickland,* 466 U.S. at 692 (citing *Cronic,* 466 U.S. at 658); *accord, Fulminante,* 499 U.S. at 309-10; *see also Lainfiesta v. Artuz,* 253 F.3d 151, 157 (2d Cir. 2001).

[202]    *See, e.g., Cronic,* 466 U.S. at 659 & n.25 & n.28; *Fulminante,* 499 U.S. at 309-10; *Strickland,* 466 at 692; *Cuyler* v. *Sullivan,* 446 U.S. 335, 349-50 (1980).

[203]    *Cronic,* 466 U.S. at 659-60.

that the likelihood that counsel could have performed as an effective advocate in those circumstances was so remote as to render the trial inherently unfair, obviating the requirement that the defendants affirmatively demonstrate prejudice.[204]

Although the circumstances here differ from those in *Powell,* the government's conduct threatens to contaminate this proceeding. Properly defending this case, in all its complexity, has required, and will continue to require, substantial financial resources. The government has spent years investigating the case, presumably reviewing millions of pages of documents[205] and interviewing scores of witnesses if not more. The KPMG Defendants, however, have limited resources. Although each defendant is represented by retained counsel, the government's interference almost inevitably has affected at least some lawyer selections and, equally important, limited what the KPMG Defendants can pay their lawyers to do. At least most of them likely will be unable to afford to pay their attorneys to review all or even most of the documents the government has produced or, perhaps, to interview even a fraction of the witnesses the government has interviewed. They may not be able to afford tax experts to advise trial counsel and, if need be, answer those whom the government may present at trial.

In these circumstances, demonstrating prejudice after the fact would be all but impossible. In order to show that the trial outcome would have been different had a convicted defendant been able to afford better preparation before trial, the defendant's counsel, after conviction, would have to do the work that the defendant could not afford to have done in the first

---

[204]     287 U.S. at 53.

[205]     The government thus far has produced, in electronic or paper form, at least 5 to 6 million pages of documents *plus* transcripts of 335 depositions and 195 income tax returns. Anderson Decl. [docket item 561] ¶¶ 24, 27, 38-39, 41.

place. If the defendant could not afford to have the work done in the first place, the defendant certainly could not afford to have it done after conviction. And relying upon the possibility of counsel appointed under the Criminal Justice Act to do so, should a convicted defendant have become indigent, simply would be unrealistic. In any case, assessing the impact of pretrial omissions and errors could require extensive evidentiary proceedings. In consequence, it is difficult to imagine circumstances in which an error more properly could be said to threaten to taint an entire proceeding.

This conclusion too is supported by *Gonzalez-Lopez*. Speaking of a deprivation of the right to counsel of choice, the Supreme Court wrote:

> "We have little trouble concluding that erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error."' Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of those myriad aspects of representation, the erroneous denial of counsel bears directly on the 'framework within which the trial proceeds,' – or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe."[206]

The same reasoning applies here. Virtually everything the defendants do in this case may be influenced by the extent of the resources available to them. There simply would be no way to know, after the fact, whether the outcome had been influenced by limitations improperly placed upon the availability of resources.

---

[206]    2006 U.S. LEXIS 5165 at *18-19 (internal citations omitted).

Further, the government's interference in the KPMG Defendants' ability to mount a defense "creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general."[207] This injury to the criminal justice system is not dependent on whether or not the KPMG Defendants ultimately are convicted or – more to the point – whether they would have been convicted even if the government had not interfered with their constitutional right to counsel.

Accordingly, there is no need for a particularized showing of prejudice here. While a defendant does not have a constitutional right to the most expensive lawyer or to unlimited defense funds, government interference with those resources that a defendant does have or legally may obtain fundamentally alters the structure of the adversary process. As the late Judge Wyzanski explained, although "'a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators.'"[208]

The considerations that support a presumption of prejudice – the government's responsibility for the problem and the ease with which the trial court can detect and remedy that problem prior to trial – both are present here. The government is responsible for the infringement of the KPMG Defendants' rights. The problem has been detected, and it probably is susceptible of cure before trial. Were the Court to refrain from seeking to remedy the problem now, it would abdicate its responsibility to safeguard defendants' constitutional rights.

---

[207] *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 811 (1987); *see also Offutt v. United States,* 348 U.S. 11, 14 (1954) ("[J]ustice must specify the appearance of justice.").

[208] *Cronic,* 466 U.S. at 657 (quoting *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 640 (7th Cir. 1975).

*III.    It is Premature to Consider the Government's Actions With Respect to Payment of Legal Expenses Incurred Before Indictment*

The KPMG Defendants argue also that the government's actions with respect to advancement of legal fees interfered with their rights prior to indictment.  But the preindictment interference must be evaluated in a very different context.

To begin with, the legal analysis differs.  The Sixth Amendment attaches only upon indictment.   Actions by the government that affected only the payment of legal fees and defense costs for services rendered prior to the indictment therefore do not implicate the Sixth Amendment. Any relief must be grounded in the Due Process Clause alone.

Second, the impact of the government's actions was quite different.  KPMG paid attorneys' fees prior to indictment for all of the KPMG Defendants on condition that the employees cooperate with the government.  There is no suggestion that any defendant reached the $400,000 cap save Mr. Stein, and KPMG ignored the $400,000 ceiling in his case until very late in the day.   In consequence, there is no reason to suppose that the ability of any of the KPMG Defendants to undertake activities designed to ward off an indictment was impaired by the government's actions save in one respect – at least some of the KPMG Defendants made proffers to the government that they conceivably would not have made had they not induced to do so by the threat of having payment of their legal fees cut off.  These proffers are of significance only if they may be used at trial, either on the government's case in chief or, perhaps more importantly, to cross examine a defendant who testifies on the defense case. This has an important consequence.

The Supreme Court has made clear that remedies for constitutional violations "should be tailored to the injury suffered . . . and should not unnecessarily infringe on competing interests,"

including the interest in the administration of criminal justice.[209]  Its "approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial."[210]  Hence, if the government's pressure on KPMG ultimately resulted in improperly coerced statements, the matter may be fully redressed by suppression of the statements.

The question whether the statements should be suppressed is before the Court on another motion by the KPMG Defendants that has not yet been fully briefed.  Accordingly, it would be premature to address it here.

## IV.     The Remedy

The next question concerns the appropriate remedy for the violation of the KPMG Defendants' constitutional rights.  Defendants ask the Court to dismiss the indictment or to order payment of their legal fees either by the government or by KPMG.  The government argues that any relief should be limited to requiring KPMG to consider anew whether it wishes to advance expenses to the defendants, now free of the threat of government retaliation by virtue of the government's recent statement that it does not object to KPMG doing as it pleases.

The Court rejects the government's alternative.  The government's belated statement that KPMG may do as it wishes without government retribution is not sufficient to put the KPMG Defendants in the position they would have enjoyed had the government not interfered with the advancement of defense costs in the first place.  It ignores altogether the Court's finding that KPMG

---

[209]     *United States v. Morrison*, 449 U.S. at 365.

[210]     *Id.*

would have advanced defense costs absent the government's interference. It ignores KPMG's possible interest in not being seen to reverse course and thus as admitting that it caved in to government pressure in this respect at the expense of individual members and employees of the firm. It ignores also the fact that circumstances have changed dramatically since KPMG, under government pressure, decided in 2004 to cut off anyone who was indicted. KPMG has yielded to the government's demand that the firm pay a fine of $456 million. The individual defendants have been indicted on charges the full scope of which may not previously have been foreseeable to KPMG. Thus, the defense costs that KPMG is being asked to advance perhaps are larger than might earlier have been foreseeable. The resources available to pay them have been reduced. Accordingly, the Court is not persuaded that the damage the government has done can be remedied by now leaving KPMG to do as it pleases. So the Court moves on to the appropriate remedies for the government's actions.

As discussed above, remedies for constitutional violations should be tailored narrowly to the injury suffered.[211] Dismissal of an indictment on the grounds of prosecutorial misconduct is an "extreme and drastic sanction"[212] that should not even be considered unless it is otherwise "impossible to restore a criminal defendant to the position that he would have occupied" but for the misconduct.[213]

---

[211]  *Morrison,* 449 U.S. at 365.

[212]  *United States v. Rubio,* 709 F.2d 146, 152 (2d Cir. 1983) (internal citations omitted); *see also Morrison,* 449 U.S. at 366 n.3 (citing *United States v. Blue,* 384 U.S. 251, 255 (1966)); *United States v. Estrada,* 164 F.3d 619, 621 (2d Cir. 1998); *United States v. Fields,* 592 F.2d 638, 647-48 (2d Cir.1978), *cert. denied,* 442 U.S. 917 (1979).

[213]  *United States v. Artuso,* 618 F.2d 192, 196-97 (2d Cir. 1980), *cert. denied,* 449 U.S. 879 (1980); *see also Carmichael v. United States,* 216 F.3d 224, 227 (2d Cir. 2000).

The KPMG Defendants can be restored to the position they would have occupied but for the government's constitutional violation if defense costs already incurred and yet to be incurred are paid. Indeed, although the KPMG Defendants have not conceded that dismissal would be inappropriate as long as they are put in funds for their defense, they have devoted most of their attention to monetary relief. In consequence, consideration of dismissal of the indictment would be premature prior to exhaustion of all possible courses that could lead to that outcome.

### A. Monetary Relief Against the Government Is Precluded by Sovereign Immunity

The first avenue suggested is an order directing the government to pay. But the KPMG Defendants immediately run into the doctrine of sovereign immunity.

"Absent an express waiver of sovereign immunity, money awards cannot be imposed against the United States."[214] Only Congress may waive sovereign immunity, and it may do so only through unequivocal statutory language.[215]

The KPMG Defendants first contend that monetary sanctions against the government pursuant to the Court's supervisory powers would not be money damages and therefore are not barred by sovereign immunity. But they point to no statute that specifically waives sovereign immunity from monetary sanctions imposed pursuant to supervisory power of the federal courts. They imply instead that supervisory powers automatically trump sovereign immunity, even absent

---

[214] *McBride v. Coleman,* 955 F.2d 571, 576 (8th Cir. 1992); *see also Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685-686 (1983); *United States v. Bodcaw Co.,* 440 U.S. 202, 203 n.3 (1979); *United States v. Waksberg,* 112 F.3d 1225, 1227 (D.C. Cir. 1997)*; Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir. 1994).

[215] *See, e.g., United States v. King,* 395 U.S. 1, 5 (1969); *Samuels, Kramer & Co. v. Comm'r of Internal Revenue,* 930 F.2d 975, 983 (2d Cir. 1991).

a waiver.

       A number of federal courts have addressed the interplay between sovereign immunity and the judiciary's power to impose monetary sanctions for litigation abuse.[216]  Although the Second Circuit has not reached the precise question, the First Circuit's analysis in *United States v. Horn*[217] is instructive.  There, the district court had used its supervisory powers to order the government to pay the defendants' legal fees and costs as punishment for prosecutorial misconduct.  The First Circuit, however, reversed, explaining that "sovereign immunity ordinarily will trump supervisory power in a head-to-head confrontation" because

> "supervisory powers are discretionary and carefully circumscribed; [whereas] sovereign immunity is mandatory and absolute . . .   In other words, unlike the doctrine of supervisory power, the doctrine of sovereign immunity proceeds by fiat: if Congress has not waived the sovereign's immunity in a given context, the courts

---

[216]    *See, e.g., United States v. Woodley,* 9 F.3d 774, 782 (9th Cir. 1993) (noting that courts may impose monetary sanctions on the government – notwithstanding sovereign immunity – in order to remedy the violation of a recognized right and ensure that "government attorneys maintain ethical standards," but holding that monetary sanctions were inappropriate in this case and noting that other remedies are more appropriate); *Coleman v. Espy,* 986 F.2d 1184, 1191-92 (8th Cir. 1993) (sovereign immunity bars compensatory contempt sanctions against the United States); *McBride,* 955 F.2d at 576-77 (noting that the district court's imposition of compensatory contempt sanctions against the government likely violated the doctrine of sovereign immunity, but reversing on other grounds); *Barry v. Bowen,* 884 F.2d 442, 443-44 (9th Cir. 1989) (noting that the district court's imposition of compensatory contempt sanctions against the government likely violated the doctrine of sovereign immunity, but reversing on other grounds); *Yancheng Baolong Biochemical Prods. Co., Ltd. v. United States,* 343 F. Supp. 2d 1226, 1241 (Ct. Int'l Trade 2004) (collecting cases and holding that award of attorneys' fees against the government was barred by sovereign immunity); *United States v. Prince,* No. CR 93-1073 (RR), 1994 WL 99231, *1-*2 (E.D.N.Y. Mar. 10, 1994) (withdrawing assessment of jury costs against U.S. Attorney's Office under court's supervisory power, in the face of a motion for reconsideration arguing constraints imposed by sovereign immunity); *see also Waksberg,* 112 F.3d at 1227-28 (invoking the doctrine of constitutional avoidance to defer review of the district court's finding that sovereign immunity barred the award of compensatory damages against the United States).

[217]    29 F.3d 754, 767 (1st Cir. 1994).

are obliged to honor that immunity."[218]

This Court agrees. Accordingly, monetary sanctions do not overcome sovereign immunity.

The KPMG Defendants next argue that the Federal Tort Claims Act[219] (the "FTCA")
and the Administrative Procedure Act[220] (the "APA") waive sovereign immunity. Each, however,
waives sovereign immunity only for certain civil actions against the government.[221] Neither deals
with sanctions for prosecutorial misconduct. The KPMG Defendants point to no case law
suggesting that the FTCA and APA waivers apply in this context, and the Court is aware of none.
Given the Court's obligation to construe narrowly any statutory waiver of sovereign immunity,[222]

---

[218]    *Id.* at 764.

The *Horn* court noted also that courts have means apart from monetary sanctions by which
to punish prosecutorial misconduct, including public reprimand and other equitable relief.
*Id.* at 767.

[219]    28 U.S.C. § 1346.

[220]    5 U.S.C. § 702.

[221]

The FTCA waives sovereign immunity in "civil actions on claims against the United States,
for money damages, accruing on and after January 1, 1945, for injury or loss of property, or
personal injury or death caused by the negligent or wrongful act or omission of any
employee of the Government while acting within the scope of his office or employment,
under circumstances where the United States, if a private person, would be liable to the
claimant in accordance with the law of the place where the act or omission occurred." 28
U.S.C. § 1346(b).

The APA waives immunity in "action[s] in a court of the United States seeking relief other
than money damages and stating a claim that an agency or an officer or employee thereof
acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. §
702.

[222]    "Waivers of immunity must be construed strictly in favor of the sovereign and not enlarge[d]
. . . beyond what the language requires." *Ruckelshaus,* 463 U.S. at 686 (internal citations and
quotation marks omitted); *Lehman v. Nakshian,* 453 U.S. 156, 161 (1981). Courts must
strictly construe also any limitations or conditions imposed by Congress on a particular
waiver of immunity. *Id.* at 160-61.

it would be inappropriate to read the FTCA or the APA as waiving the government's immunity to monetary sanctions in this case.

Accordingly, sovereign immunity bars this Court from ordering the government to pay the KPMG Defendants' legal fees.[223]  This is not the end of the analysis, however.  As the First Circuit explained in *Horn,* "[t]he fact that sovereign immunity forecloses the imposition of monetary sanctions against the federal government in criminal cases does not leave federal courts at the mercy of cantankerous prosecutors. Courts have many other weapons in their armamentarium."[224]  The Court therefore turns to other options, addressing first the possibility of monetary relief against KPMG.

### B.  *Monetary Relief May Be Available Against KPMG*

The KPMG Defendants urge the Court to order KPMG to advance their defense costs. KPMG, which is not formally a party here but which has been heard in any case, resists on several grounds.

---

[223]  The KPMG Defendants attempt to avoid this conclusion by asking the Court to order the government to pay their defense costs out of the $256 million fine it already has received from KPMG or to order KPMG to pay the $200 million final installment of the fine into the registry of the Court, where so much as is required to pay the defense costs would be distributed to the KPMG Defendants and the balance to the government.  They appear to argue that either remedy would be injunctive in nature and not a monetary sanction against the government.  Sovereign immunity, however, "stands as an obstacle to virtually all direct assaults against the public fisc, save only those incursions from time to time authorized by Congress." *Horn,* 29 F.3d at 761.  The relief the KPMG Defendants have requested here would be no less an assault on the public fisc simply because it would be addressed to a fine already received by the government or monies to which the government already is entitled. Put another way, requiring the government to pay the money from a particular account or to forego revenues to which it is entitled would not make such relief any less a monetary sanction.

[224]  29 F.3d at 766.

### 1. This Court Has Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction. They have only such judicial power as is conferred upon them by statute and, in the case of the Supreme Court, Article III of the Constitution.[225]

The Court's subject matter jurisdiction in this case rests on Section 3231 of the Criminal Code,[226] which gives "[t]he district courts of the United States . . . original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." And it is well established that a district court having subject matter jurisdiction over a federal criminal case has ancillary jurisdiction over at least some related matters.[227]

Our Circuit recently addressed the scope of ancillary jurisdiction in criminal cases in *Garcia v. Teitler*.[228] The question there presented was whether a district court had jurisdiction to order an attorney who had appeared and then withdrawn as counsel for the defendants, and who was not a party to the action, to return a retainer the defendants had paid him so that the defendants could retain another attorney to defend the case. The Court held that it did, writing:

> "At its heart, ancillary jurisdiction is aimed at enabling a court to administer 'justice within the scope of its jurisdiction.' Without the power to deal with issues ancillary or incidental to the main action, courts would be unable to 'effectively dispose of the principal case nor do complete justice in the premises.' Along these lines, the Supreme Court has instructed that ancillary jurisdiction may be exercised 'for two separate, though sometimes related, purposes: (1) to permit disposition of claims that are, in varying respects and degrees, factually interdependent by a single

---

[225] *See, e.g., Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 701-02 (1982); *W.G. v. Senatore,* 18 F.3d 60, 64 (2d Cir. 1994).

[226] 18 U.S.C. § 3231.

[227] *See Garcia v. Teitler,* 443 F.3d 202, 208 (2d Cir. 2006).

[228] *Id.*

court, and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees."

"Whatever the outer limits of ancillary jurisdiction may be, we hold that resolving a fee dispute after an attorney withdraws . . . is within a district court's ancillary powers, as it relates to the court's ability to 'function successfully.' * * *

"Although [defendants] have been able to obtain new counsel, the record reflects that they are of limited means and that the funds paid to Teitler may be needed to pay their new counsel. In order to guarantee a defendant's right to choose his own counsel where, as here, his criminal case is ongoing, and to avoid the possibility of defendants becoming indigent and requiring the appointment of counsel, a district court must be able to exercise ancillary jurisdiction to resolve a fee dispute."[229]

So too here. While the KPMG Defendants all are represented by retained counsel, the cost of mounting their defenses in this complex case is potentially very large. In order to guarantee their right to choose their own counsel, to ensure that they can afford to pay those counsel to do what they think appropriate to defend the case, and to avoid the possibility of their becoming indigent and requiring the appointment of counsel, this Court has the power to exercise ancillary jurisdiction to resolve their right to the advancement of expenses by KPMG.[230] This is confirmed by *United States v. Weissman*,[231] cited with approval in *Garcia*, in which Judge Haight exercised ancillary jurisdiction to determine whether a company that formerly employed an individual who was facing criminal charges in this Court was obliged to continue to advance the defense costs.

---

[229]    *Id.* at 208, 209 (internal citations omitted).

[230]    The Court need not here decide whether its ancillary jurisdiction includes the power to determine whether KPMG is obliged to indemnify the KPMG Defendants or, if not, whether the KPMG Defendants would be obliged to repay any funds advanced to them. The immediate concern is with the Court's power to ensure that the KPMG Defendants, if they are entitled to it, have the means to finance the defense before this Court.

[231]    1997 WL 334966 at *9.

Accordingly, the Court holds that it has ancillary jurisdiction to determine the claims of the KPMG Defendants for advancement. As Judge Gleeson did in *Garcia,* the Court will direct the Clerk, as a matter of administrative convenience, to open a civil docket number for the claims of the KPMG Defendants against KPMG.[232]

### 2.   *Personal Jurisdiction, Even If It Does Not Already Exist, May Be Obtained Over KPMG*

The fact that the Court has subject matter jurisdiction is not alone sufficient to proceed with the claims. KPMG objects that it is not a party to this action and that the Court lacks jurisdiction over its person.

KPMG of course is not a defendant in this case.[233] Nevertheless, it long has been well aware of these proceedings. It attended the hearing and submitted papers. But it never has been served with a summons and complaint seeking advancement of legal fees.

There is reason to question whether the lack of a summons and complaint, which ordinarily would be fatal in a garden-variety civil case,[234] should have that consequence in the unique circumstances here.[235] But it is unnecessary to go down that path, which in any case would

---

[232]   *Garcia v. Teitler,* No. 04 Civ. 0832 (JG), 2004 WL 1636982, *1 n.2 (E.D.N.Y. July 22,2004), *aff'd,* 443 F.3d 202 (2d Cir. 2006).

[233]   It is a defendant in a related action in this district, that commenced by the filing of the information pursuant to the DPA. *United States v. KPMG LLP,* 05 Crim. 0903 (LAP) (filed Aug. 29, 2005).

[234]   *See, e.g., OSRecovery, Inc. v. One Group Int'l, Inc.,* 234 F.R.D. 59, 60-61 (S.D.N.Y. 2005).

[235]   Some states, at least in the past, held that a defendant who appeared in an action for any purpose consented to the exercise of personal jurisdiction, *See York v. Texas,* 137 U.S. 15 (1890). To amerliorate this rule, many adopted statutes or rules permitting a defendant who wished to challenge the exercise of personal jurisdiction to appear specially for that purpose alone without thereby appearing generally. *See id.* at 20; *see also, e.g., Orange Theatre*

threaten to complicate and perhaps delay the important determination that may lie within this

Court's province – whether KPMG must at least advance defense costs to the KPMG defendants.

The KPMG Defendants, if so advised, may file a complaint in the civil file opened

pursuant to this decision, obtain the issuance of a summons, and serve KPMG provided they do so

within 14 days of the date of this decision. The complaint may contain a prayer for declaratory relief

and a request for a speedy hearing,[236] which would be appropriate in any case in view of the fact that

the determination of rights to advancement is made in summary proceedings[237] in order to permit

---

*Corp. v. Rayherstz Amusement Corp.,* 139 F.2d 871, 874 (3d Cir. 1944). Even in such states, any action before the court beyond challenging the exercise of jurisdiction constitutes a general appearance and waives the jurisdictional objection. *See, e.g., Regents of the Univ. of Calif. v. Golf Mktg., LLC,* 92 Conn. App. 378, 381-82, 885 A.2d 201, 203 (2005) (party who seeks relief on any basis other than a motion to quash for lack of personal jurisdiction deemed to have made general appearance and waived all objections to defects in service, process, or personal jurisdiction) (California law) (quotation marks omitted); *Davis v. Eighth Jud. Dist. of Nevada,* 97 Nev. 332, 334-36, 629 P.2d 1209, 1211-12 (1981) (opposition to motion for leave to amend waived special appearance and subjected party to personal jurisdiction), *arbrogated by statute as recognized in Hansen v. Eighth Jud. Dist. of Nevada,* 116 Nev. 650, 655-56, 6 P.3d 982, 985 (2000); *Woods v. Billy's Automotive,* 622 S.E.2d 193, 197 (N.C. App. 2005) ("[I]f a party invoked the judgment of the court for any other purpose [than contesting service of process] he made a general appearance and by so doing he submitted himself to the jurisdiction of the court whether he intended to do so or not.") (citation and internal quotation marks omitted); *Lyren v. Ohr,* 271 Va. 155, 158-59, 623 S.E.2d 883, 884-85 (2006) (appearance for any purpose other than objecting to the jurisidiction is general appearance even if denominated "special"); *Maryland Cas. Co. v. Clintwood Bank, Inc.,* 155 Va. 181, 186, 154 S.E. 492, 494 (1930) (any action by defendant, except an objection to jurisdiction, recognizing a case as in court is general appearance). The Federal Rules of Civil Procedure, and many modern state codes, go further, abolishing the distinction between general and special appearances and permitting a defendant to preserve a personal jurisdiction objection by answer or timely motion to dismiss. These rules, however, do not apply in a criminal case. It therefore is arguable that KPMG's actions before the Court constituted a general appearance and thus waived any objection to personal jurisdiction.

[236] FED. R. CIV. P. 57.

[237] *See* 6 WEST'S DEL. CODE ANN. § 145(k) (2006); N.Y. BUS. CORP. L. §§ 724(a), 1319(a)(4) (McKinney 2003). *See generally* Steven A. Radin, *"Sinners Who Find Religion": Advancement of Litigation Expenses to Corporate Officials Accused of Wrongdoing,* 25 REV. LITIG. 251, 263-68 (2006) (hereinafter "Radin") (summarizing Delaware cases on

the issue to be decided while the underlying case is pending.[238]  Should that occur, the matter would

proceed expeditiously.[239]

---

summary nature of advancement proceedings).

The scope of an advancement proceeding "is limited to determining 'the issue of entitlement according to the corporation's advancement provisions and not to issues regarding the movant's alleged conduct in the underlying litigation.'" *Kaung,* 884 A.2d at 509 (Del. 2005) (quoting *Homestore, Inc. v. Tafeen,* 886 A.2d 502, 503 (Del. 2005)).  "Neither indemnification nor recoupment of sums previously advanced are appropriate for litigation in a summary proceeding" and necessarily would be reserved for subsequent proceedings, possibly in another forum.  Radin, 25 Rev. Litig. at 265-66.  In any case, although it is unnecessary to decide the issue now, it is questionable whether the Court's ancillary jurisdiction extends beyond determining the right to advancement.

There is no jurisdictional obstacle to a federal court determining advancement under state law.  *See, e.g., Truck Components Inc. v. Beatrice Co.,* 143 F.3d 1057, 1061 (7th Cir. 1998).

[238]  The Federal Rules of Criminal Procedure state that they "are to be interpreted for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay."  Fed. R. Crim. P. 2.  Likewise, the Federal Rules of Civil Procedure, which govern "all suits of a civil nature," are to "be construed and administered to secure the just, speedy, and inexpensive determination of every action."  Fed. R. Civ. P. 1.  Accordingly, the Court will treat the papers already filed by the KPMG Defendants as a motion for an order directing KPMG to advance the defense costs reasonably incurred and to be incurred by them from the date of the indictment forward.  It will consider the papers already filed by KPMG as an opposition to that motion.  KPMG may file such additional response as it wishes within 14 days after the date of service of any summons and complaint.

[239]  The Court is mindful of KPMG's contention that those of the KPMG Defendants who were partners in the firm are obliged by the partnership agreement to arbitrate the issue of advancement.  Assuming that the KPMG Defendants pursue relief against KPMG and that KPMG remains insistent upon its alleged arbitration remedy, the questions whether the arbitration clause properly is so construed and, if so, whether it is void as against public policy to the extent that it would foreclose an advancement determination in a criminal case by the court in which the indictment is pending will be addressed in any advancement proceeding the KPMG Defendants may bring pursuant to this decision.

C.      *Possible Dismissal and Other Remedies*

A summary advancement proceeding is not the only means by which the KPMG Defendants might be restored to the position they would have occupied had the government not interfered improperly with their prospects for advancement of defense costs.

The government has substantial influence and, almost certainly, power over KPMG by virtue of the cooperation clauses in the DPA.  It may well be in its interest to use that influence or power to cause KPMG to advance the defense costs.[240]

Nor is KPMG lacking in incentives, if it needs them, to aid the government in solving the problem the government created for itself.  The government now may seek to use its leverage against KPMG to cause KPMG to advance defenses costs in order to avoid any risk of dismissal of this indictment or other unpalatable relief.  Moreover, KPMG may conclude that obstruction of the efforts of its former partners and employees to obtain advancement of defense costs, or even a prompt adjudication of their right to such advancement, would not further its interest in recruiting and retaining top flight personnel.

Thus, there are at least two possibilities for resolving the issue of advancement of defense costs.  KPMG, either on its own or at the government's urging or insistence, may advance the defense costs.  Alternatively, the KPMG Defendants may succeed in obtaining an advancement

---

[240]      Among other avenues open to the government if it were disposed to seek to remedy the problem it has created might be to persuade KPMG to eliminate obstacles to prompt resolution of the advancement issue.  KPMG might, for example, waive any right that it may have to compel its former partners to arbitrate, or to claim a jury trial on, the question whether the KPMG Defendants are entitled to advancement of defense costs.  Such a waiver need not affect any claims by the KPMG Defendants for indemnification (as distinguished from advancement) by KPMG or any claims that KPMG may have against the KPMG Defendants, neither of which would be a proper subject of a summary advancement proceeding in any event.

order in a summary proceeding before this Court. In either event, the effect of the government's unconstitutional interference would have been remedied or, at least, mitigated substantially. Should that come to pass, the possibilities of dismissal of the indictment and other remedies likely would appear in a different light. In consequence, the Court declines to consider additional relief at this time, although it may do so in the future if KPMG does not, for one reason or another, advance defense costs.

*V.*     *Some of the Actions of the USAO in Response to the Motion Were Not Appropriate*

The foregoing discussion of remedies is addressed solely to the unconstitutional interference with the KPMG Defendants' prospects of obtaining advancement of defense costs from KPMG. One matter remains – the actions of the USAO in resisting this motion.

The Court begins from a widely held premise. We long have been well-served by the United States Attorney's office for this district and by the many lawyers who have served in it with great distinction. It is a model for the nation.[241] While the office's actions in this case with respect to the advancement of attorneys' fees contributed to an unconstitutional result, they were consistent with policies established in Washington. Moreover, they occurred at a time when the propriety of those policies had not previously been addressed by any court. The Court declines to chastise the office or its members further on the basis of those actions. There is, however, one matter that should be addressed.

---

[241]     *See generally* Lewis A. Kaplan, *Henry L. Stimson Award Ceremony: Remarks,* 54 RECORD OF THE ASS'N OF THE BAR OF THE CITY OF NEW YORK 420 (1999).

The government was economical with the truth in its early responses to this motion. It is difficult to defend even the literal truth of the position it took in its first memorandum of law. KPMG's decision on payment of attorneys' fees was influenced by its interaction with the USAO and thus cannot fairly be said to have been a decision "made by KPMG alone," as the government represented. The government's assertion that the legal fee decision was made without "coercion" or "bullying" by the government can be justified only by tortured definitions of those terms. And while it is literally true, as Mr. Weddle wrote in his later declaration, that the government did not "instruct" or "request" KPMG to do anything with respect to legal fees, that was far from the whole story. Those submissions did not even hint at Mr. Weddle's raising of the legal fee issue at the very first meeting, at Ms. Neiman's "rewarding misconduct" comment, at Mr. Weddle's statement that the USAO would look at the payment of legal fees "under a microscope," or at the government's use of KPMG's willingness to cut off payment of legal fees to pressure KPMG personnel to waive their Fifth Amendment rights and make proffers to the government. Those omissions rendered the declaration and the brief that accompanied it misleading.

Every court is entitled to complete candor from every attorney, and most of all from those who represent the United States. These actions by the USAO are disappointing. There should be no recurrence.

## Conclusion

The Thompson Memorandum's treatment of advancement of defense costs no doubt serves the government's interest in obtaining criminal convictions in complex business cases. So

too the actions of the USAO in this case. But the government's proper concern is not with obtaining convictions.

As a unanimous Supreme Court wrote long ago, the interest of the government "in a criminal prosecution is not that it shall win a case, but that justice shall be done."[242] Justice is not done when the government use the threat of indictment – a matter of life and death to many companies and therefore a matter that threatens the jobs and security of blameless employees[243] – to coerce companies into depriving their present and even former employees of the means of defending themselves against criminal charges in a court of law. If those whom the government suspects are culpable in fact are guilty, they should pay the price. But the determination of guilt or innocence must be made fairly – not in a proceeding in which the government has obtained an unfair advantage long before the trial even has begun.

The motions of the KPMG Defendants to dismiss the indictment or for other relief are granted only to the extent that:

1.     The Court declares that so much of the Thompson Memorandum and the activities of the USAO as threatened to take into account, in deciding whether to indict KPMG, whether KPMG would advance attorneys' fees to present or former employees in the event they were indicted for activities undertaken in the course of their employment interfered with the rights

---

[242]     *Berger v. United States,* 295 U.S. 78, 88 (1935); *see also, e.g., Brady*, 373 U.S. at 87 ("Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly under the federal domain: 'The United States wins a point whenever justice is done its citizens in the courts.'").

[243]     The indictment of Arthur Andersen LLP resulted in the effective demise of that large accounting firm, and the loss of many thousands of jobs of innocent employees, long before the case ever went to trial.

of such employees to a fair trial and to the effective assistance of counsel and therefore violated the Fifth and Sixth Amendments to the Constitution.

2.      The government shall adhere to its representation that any payment by KPMG of the defense costs of the KPMG Defendants is acceptable to the government and will not be considered in determining whether KPMG has complied with the DPA or otherwise prejudice KPMG.

3.      The Clerk shall open a civil docket number to accommodate the claims of the KPMG Defendants against KPMG for advancement of defense costs should they elect to pursue them. If they file a complaint within 14 days, the Clerk shall issue a summons to KPMG. The Court in that event will entertain the claims pursuant to its ancillary jurisdiction over this case.

The motions are denied insofar as they seek monetary sanctions against the government. The Court reserves decision as to whether to grant additional relief.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

Dated:      June 26, 2006

_____

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)