# EXHIBIT 4

<u>**Personal and Confidential: For Use of Members Only**</u>

**PARTNERSHIP AGREEMENT**

**OF**

**KPMG LLP**

**(Amended and Restated as of October 1, 2003)**

NY1 5456042v3

## TABLE OF CONTENTS

Page

1.  Certain Definitions ..................................................................................................1
    1.1.   Accounting Policies and Procedures .............................................................1
    1.2.   Accrual Account ..............................................................................................1
    1.3.   Advances .........................................................................................................1
    1.4.   Allocable Net Income or Net Loss ................................................................2
    1.5.   Allocable Operating Profit or Operating Loss .............................................2
    1.6.   Allocation ........................................................................................................2
    1.7.   Base Compensation ........................................................................................2
    1.8.   Board of Directors ..........................................................................................2
    1.9.   By-laws ............................................................................................................2
    1.10.  Capital Account ..............................................................................................2
    1.11.  Claims .............................................................................................................2
    1.12.  Class A Members ...........................................................................................2
    1.13.  Class A Partners .............................................................................................2
    1.14.  Class A Principals ..........................................................................................2
    1.15.  Class B Members ............................................................................................3
    1.16.  Class B Partners .............................................................................................3
    1.17.  Class B Principals ..........................................................................................3
    1.18.  Code ................................................................................................................3
    1.19.  Confidential Information ...............................................................................3
    1.20.  Contributed Capital ........................................................................................3
    1.21.  Deposit Account .............................................................................................3
    1.22.  Directors .........................................................................................................3
    1.23.  Drawing Accounts ..........................................................................................3
    1.24.  Entire Board of Directors ..............................................................................3
    1.25.  *Ex Officio* Member .......................................................................................3
    1.26.  Financial Interest ...........................................................................................3
    1.27.  Fiscal Year .....................................................................................................3
    1.28.  Guaranteed Compensation .............................................................................4
    1.29.  Incentive Compensation .................................................................................4
    1.30.  Independence ..................................................................................................4
    1.31.  Issuer ..............................................................................................................4
    1.32.  Majority of the Members Voting ...................................................................4
    1.33.  Members .........................................................................................................4
    1.34.  Member's Accrual Basis Allocation .............................................................4
    1.35.  Member's Cash Basis Allocation ..................................................................4
    1.36.  Net Income and Net Loss ..............................................................................4
    1.37.  Operating Profit and Operating Loss ............................................................5
    1.38.  Partners ...........................................................................................................5
    1.39.  Plurality of the Members ...............................................................................5
    1.40.  Preliminary Profits .........................................................................................5
    1.41.  Principals ........................................................................................................5
    1.42.  Public Accounting ..........................................................................................6

i

1.43.   Public Company Accounting Oversight Board..............................6
1.44.   Regulation S-X...............................................................6
1.45.   Required Deposit .............................................................6
1.46.   Reserve........................................................................6
1.47.   Retirement Allowance Plan ...............................................6
1.48.   Sarbanes-Oxley ..............................................................6
1.49.   Securities Exchange Act ...................................................6
1.50.   Separated Member ..........................................................6
1.51.   Separation ....................................................................6
1.52.   Subordinated Loan Accounts...............................................6
1.53.   Supplemental Retirement Allowance Plan ...............................7
1.54.   Two-thirds of the Members Voting ......................................7
1.55.   Undesignated Capital Account ............................................7
1.56.   Use of Pronouns, Singular and Plural ...................................7
1.57.   Cross-References ............................................................7

2.    Organizational Matters..........................................................7
2.1.   Name of Firm ................................................................7
2.2.   Executive Office .............................................................7
2.3.   Registered Agent and Registered Office..................................7
2.4.   Registered Limited Liability Partnership .................................7
2.5.   By-laws .......................................................................7

3.    Firm Governance. ...............................................................8
3.1.   Board of Directors...........................................................8
3.2.   Chairman......................................................................9
3.3.   Deputy Chairman..........................................................10
3.4.   Management Committee ..................................................11
3.5.   Board Committees .........................................................11
3.6.   General Counsel ............................................................11
3.7.   Other Officers ..............................................................12
3.8.   Removal of Officers........................................................12
3.9.   Removal Standard ..........................................................12

4.    Accounts; Interest. ..............................................................12

5.    Partnership Accounting. ........................................................12
5.1.   Partnership Accounting....................................................12
5.2.   Guaranteed Compensation and Advances ..............................12
5.3.   Allocations..................................................................12
5.4.   Incentive Compensation ..................................................13
5.5.   Tax Matters .................................................................13

6.    Claims. ............................................................................14

7.    Meetings...........................................................................14
7.1.   Meetings of Members. .....................................................14
7.2.   Meetings of the Board of Directors ......................................15

NY1 5456042v3

8.    Admission of New Members. ...........................................................................15
      8.1.   Election of Members ...........................................................................15
      8.2.   Members' Prior Affiliation with Audit Clients ...................................16
9.    Death. ...............................................................................................................16
10.   Withdrawal. ......................................................................................................16
      10.1.  Voluntary Withdrawal .......................................................................16
      10.2.  Requested Withdrawal ........................................................................16
      10.3.  Review ..................................................................................................16
      10.4.  Involuntary Withdrawal ......................................................................17
      10.5.  Bankruptcy ...........................................................................................17
      10.6.  Temporary Withdrawal .......................................................................17
11.   Effect of Separation. ........................................................................................17
      11.1.  Upon Separation ...................................................................................17
      11.2.  Allocation Upon Separation. ...............................................................17
      11.3.  Liquidation and Distribution of Accounts .........................................18
      11.4.  No Dissolution, Termination ..............................................................18
      11.5.  Other Payments ....................................................................................18
12.   Covenants of Withdrawing or Retiring Members. ..........................................18
      12.1.  Positions with Clients After Separation. .............................................18
      12.2.  No Solicitation of Clients, Members or Employees. ..........................19
      12.3.  Remedies of the Firm for Breach. .......................................................20
      12.4.  Effect of Adjudication ..........................................................................21
13.   Proprietary Information. ...................................................................................22
14.   Termination of the Firm. ..................................................................................22
15.   Duties of Members and Separated Members. ..................................................23
      15.1.  Partnership Relationship .....................................................................23
      15.2.  Duties of Members to Each Other .......................................................23
      15.3.  Compliance ...........................................................................................23
      15.4.  Obligations or Liabilities .....................................................................23
      15.5.  Independence ........................................................................................23
      15.6.  Duty of Loyalty .....................................................................................23
      15.7.  Books of Account .................................................................................24
      15.8.  Tax Returns ...........................................................................................24
      15.9.  Consents ................................................................................................24
      15.10. Waiver ....................................................................................................24
16.   Annual Financial Reports. ................................................................................24
17.   Arbitration. ........................................................................................................25
18.   Power of Attorney. ............................................................................................25
19.   General Provisions. ...........................................................................................26
      19.1.  Amendment ...........................................................................................26
      19.2.  Governing Law ......................................................................................26

iii

19.3.   Captions ........................................................................26
19.4.   Successors and Non-Assignability..................................26
19.5.   Severability .....................................................................26
19.6.   Survival ...........................................................................27
19.7.   Entire Agreement; No Third Party Beneficiaries...........27
19.8.   Counterparts ....................................................................27
19.9.   Construction .....................................................................27

Appendix 1    ............................................................................ A-1

NY1 5456042v3

# PARTNERSHIP AGREEMENT

PARTNERSHIP AGREEMENT OF KPMG LLP, amended and restated as of October 1, 2003 (this "Agreement"), by and among the parties who at the date hereof comprise the partnership of KPMG LLP or who shall hereafter become parties hereto as herein provided.

## PREAMBLE:

WHEREAS, the parties hereto are conducting the practice of Public Accounting (as defined below) under the firm name of KPMG LLP (the "Firm"); and

WHEREAS, the Firm has been operating in the form of a limited liability partnership registered under the Delaware Uniform Partnership Law (6 Del. C. § 1501, et seq.) (as amended from time to time and any successor statute thereto, the "Act"), pursuant to an amended and restated Partnership Agreement, effective as of April 15, 2002 (the "2002 Existing Agreement"), the 2002 Existing Agreement having replaced a prior partnership agreement, dated February 13, 2001 (the "2001 Partnership Agreement"); and

WHEREAS, the parties hereto desire to amend and restate the 2002 Existing Agreement in its entirety, effective as of October 1, 2003 (the "Effective Date"), except (i) as otherwise required to be effective with respect to such matters as are set forth in Appendix 1 hereto, which is incorporated by reference herein, and (ii) as otherwise specifically provided herein;

NOW, THEREFORE, in consideration of the premises and the mutual promises hereinafter contained, effective as of the Effective Date, except as otherwise specifically provided herein, it is agreed as follows:

1.      Certain Definitions

Certain capitalized terms used herein shall have the meanings assigned below:

1.1.    Accounting Policies and Procedures. The term "Accounting Policies and Procedures" shall have the meaning ascribed to such term in Section 5.1 hereof.

1.2.    Accrual Account. The term "Accrual Account" shall mean the cumulative difference between a Member's Accrual Basis Allocation and such Member's Cash Basis Allocation. (The balances of a Member's Accelerated Cost Recovery System Deferral and Interest in Unrealized Receivables accounts held as of June 30, 2000 under the partnership agreement that existed prior to the 2001 Partnership Agreement have been transferred to such Member's Accrual Account.)

1.3.    Advances. The term "Advances" shall have the meaning ascribed to such term in the By-laws.

1.4.    <u>Allocable Net Income or Net Loss</u>. The term "Allocable Net Income or Net Loss" for any Fiscal Year shall mean the Net Income or Net Loss for such Fiscal Year adjusted for non-allocable items as provided in this Agreement, the By-laws and the Accounting Policies and Procedures.

1.5.    <u>Allocable Operating Profit or Operating Loss</u>. The term "Allocable Operating Profit or Operating Loss" for any Fiscal Year shall mean the Operating Profit or Operating Loss for such Fiscal Year adjusted for non-allocable items as provided in this Agreement, the By-laws and the Accounting Policies and Procedures.

1.6.    <u>Allocation</u>. The term "Allocation" shall have the meaning ascribed to such term in Section 5.3(i) hereof.

1.7.    <u>Base Compensation</u>. The term "Base Compensation" means the sum of a Member's Guaranteed Compensation, if any, and his or her Member's Cash Basis Allocation, if any.

1.8.    <u>Board of Directors</u>. The term "Board of Directors" shall have the meaning ascribed to such term in Section 3.1(i) hereof.

1.9.    <u>By-laws</u>. The term "By-laws" shall mean the by-laws (as amended from time to time as provided herein and therein) of the Firm as in effect in accordance with Section 2.5 hereof.

1.10.    <u>Capital Account</u>. The term "Capital Account" shall have the meaning ascribed to such term in the By-laws.

1.11.    <u>Claims</u>. The term "Claims" shall have the meaning ascribed to such term in the By-laws.

1.12.    <u>Class A Members</u>. The term "Class A Members" shall mean the Class A Partners and the Class A Principals.

1.13.    <u>Class A Partners</u>. The term "Class A Partners" shall mean the Partners designated as such pursuant to Section 8 hereof. Class A Partners shall have the same rights as Class B Partners except that Class A Partners shall be (i) entitled to such Guaranteed Compensation for services rendered to the Firm as determined pursuant to the By-laws, (ii) subject to the restriction on holding Director positions, as provided for in this Agreement, and (iii) subject to such other restrictions as otherwise provided for in this Agreement.

1.14.    <u>Class A Principals</u>. The term "Class A Principals" shall mean the Principals designated as such pursuant to Section 8 hereof. Class A Principals shall have the same rights as Class B Principals except that Class A Principals shall be (i) entitled to such Guaranteed Compensation for services rendered to the Firm as determined pursuant to the By-laws, (ii) subject to the restriction on holding Director positions, as provided for in this Agreement, and (iii) subject to such other restrictions as otherwise provided for in this Agreement.

2

1.15.   <u>Class B Members</u>. The term "Class B Members" shall mean the Class B Partners and the Class B Principals.

1.16.   <u>Class B Partners</u>. The term "Class B Partners" shall mean the Partners other than the Class A Partners.

1.17.   <u>Class B Principals</u>. The term "Class B Principals" shall mean the Principals other than the Class A Principals.

1.18.   <u>Code</u>. The term "Code" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

1.19.   <u>Confidential Information</u>. The term "Confidential Information" shall have the meaning ascribed to such term in Section 13 hereof.

1.20.   <u>Contributed Capital</u>. The term "Contributed Capital" shall mean the amount each Partner is required to keep in his or her Capital Account, as provided in the By-laws.

1.21.   <u>Deposit Account</u>. The term "Deposit Account" shall have the meaning ascribed to such term in the By-laws.

1.22.   <u>Directors</u>. The term "Directors" shall have the meaning ascribed to such term in Section 3.1(i) hereof.

1.23.   <u>Drawing Accounts</u>. The term "Drawing Accounts" shall have the meaning ascribed to such term in the By-laws.

1.24.   <u>Entire Board of Directors</u>. The term "entire Board of Directors" shall mean the total number of Directors that the Firm would have if there were no vacancies on the Board of Directors, except as otherwise specifically provided herein.

1.25.   <u>*Ex Officio* member</u>. The term "*ex officio* member" shall mean a person who is a member of a committee by virtue of his or her office; such member shall have all privileges and rights of any other member of the committee of which he or she is a member (including, without limitation, the right to vote on all matters brought before the committee).

1.26.   <u>Financial Interest</u>. The term "Financial Interest" shall mean any financial interest or investment in, or arrangement with, the Firm that, in the sole determination of the Firm, would impair the Independence of the Firm in relation to any entity.

1.27.   <u>Fiscal Year</u>. The term "Fiscal Year" shall mean a period of one year ending on September 30; provided, however, that if the Board of Directors determines that it is necessary or desirable to adopt a different Fiscal Year, the Board of Directors is authorized to change the Fiscal Year of the Firm, in which case the term "Fiscal Year" shall mean such new date (which may include a period other than twelve (12) calendar months).

3

1.28. <u>Guaranteed Compensation</u>. The term "Guaranteed Compensation" shall have the meaning ascribed to such term in Section 5.2 hereof.

1.29. <u>Incentive Compensation</u>. The term "Incentive Compensation" shall have the meaning ascribed to such term in Section 5.4 hereof.

1.30. <u>Independence</u>. The term "Independence" shall mean the independence that auditors are required to have from their Audit Clients, as such term is defined in Regulation S-X, in accordance with any and all applicable laws (including, without limitation, Sarbanes-Oxley), any and all applicable rules and regulations of the American Institute of Certified Public Accountants, Securities and Exchange Commission, PCAOB, NASDAQ, national securities exchanges, state boards of accountancy, and any other relevant regulatory bodies and the independence policies of the Firm.

1.31. <u>Issuer</u>. The term "Issuer" shall mean any company that is a reporting company under the Securities Exchange Act or that is otherwise included in the definition of "Issuer" in Section 10A(f) of the Securities Exchange Act.

1.32. <u>Majority of the Members Voting</u>. The term "Majority of the Members Voting" shall mean the Members whose Contributed Capital and Required Deposits constitute in the aggregate more than 50% of the total then existing Contributed Capital and Required Deposits of those Members voting on a matter; <u>provided</u> that the Contributed Capital and Required Deposits of those Members voting on a matter constitute in the aggregate at least a majority of the total then existing Contributed Capital and Required Deposits of all the Members. Notwithstanding any computation, allocation or payment of Incentive Compensation, Guaranteed Compensation or Allocations for any Fiscal Year, the Members' respective Contributed Capital or Required Deposits for such Fiscal Year shall remain the sole basis for Firm votes during such Fiscal Year.

1.33. <u>Members</u>. The term "Members" shall mean the Partners and the Principals.

1.34. <u>Member's Accrual Basis Allocation</u>. The term "Member's Accrual Basis Allocation" shall mean the amount of Allocable Operating Profits or Operating Loss allocated to a Member by the Management Committee as provided in Section 5.3 hereof.

1.35. <u>Member's Cash Basis Allocation</u>. The term "Member's Cash Basis Allocation" shall mean the amount of Allocable Net Income or Net Loss allocated to a Member by the Management Committee as provided in Section 5.3 hereof.

1.36. <u>Net Income and Net Loss</u>. The terms "Net Income" and "Net Loss" shall mean net income or net loss of the Firm determined on the basis of the cash receipts and disbursements method of accounting in accordance with the Accounting Policies and Procedures, adjusted for Reserves and depreciation and amortization expense computed primarily on the same basis as is used for federal income tax reporting purposes, such adjustments to be as approved by the Board of Directors. Guaranteed Compensation paid to Members pursuant to Section 5.2 hereof and the By-laws, and interest paid to Members pursuant to Section 4 hereof and the By-laws and Incentive Compensation determined pursuant to Section 5.4 hereof shall be

4

treated as expenses of the Firm and subtracted from income in arriving at Net Income or Net Loss.

      1.37.  <u>Operating Profit and Operating Loss</u>. The terms "Operating Profit" and "Operating Loss" shall mean the net income or net loss of the Firm determined in accordance with the Accounting Policies and Procedures, primarily utilizing the accrual method of accounting, as approved by the Board of Directors. Guaranteed Compensation paid or payable to Members pursuant to Section 5.2 hereof and the By-laws, and interest paid or payable to Members pursuant to Section 4 hereof and the By-laws, and Incentive Compensation pursuant to Section 5.4 hereof shall be treated as expenses of the Firm and subtracted from income in arriving at Operating Profit and Operating Loss.

      1.38.  <u>Partners</u>. The term "Partners" shall mean the parties hereto other than Principals.

      1.39.  <u>Plurality of the Members</u>. The term "Plurality of the Members" shall mean the Members whose Contributed Capital and Required Deposits, in the aggregate, constitute the greatest amount of the total Contributed Capital and Required Deposits of those Members voting on a particular matter.

      1.40.  <u>Preliminary Profits</u>. The term "Preliminary Profits" shall mean the Allocable Operating Profit of the Firm computed before any adjustment for Incentive Compensation.

      1.41.  <u>Principals</u>. The term "Principals" shall mean the parties hereto who are not Certified Public Accountants. Principals shall have all the rights, privileges and liabilities of Partners, except as follows:

      (i)    Principals shall not be held out, or hold themselves out, to the public as "partners;" the title "Principal" must accompany all mention of their names in directories and in other publications and correspondence so that it is clear that they are not Partners of the Firm;

      (ii)   Principals shall not sign the Firm's name on any report expressing an opinion on a client's financial statements;

      (iii)  Principals shall not comprise more than 49% of the entire Board of Directors;

      (iv)  Principals shall not be designated as a Managing Partner of any operating office of the Firm from which opinions on financial statements are issued;

      (v)   Principals shall not be elected to the position of Chairman; and

      (vi)  Principals shall not contribute to or have any interest in the capital of the Firm other than making subordinated loans to the Firm in the form of Deposit Accounts.

1.42.   Public Accounting. The term "Public Accounting" shall mean the practice of public accounting and such other business as may be conducted by the Firm in the United States, its territories and possessions and such other geographic locations as may be determined from time to time.

1.43.   Public Company Accounting Oversight Board. The term "Public Company Accounting Oversight Board" or "PCAOB" shall mean the regulatory body established pursuant to Section 101 of Sarbanes-Oxley, to oversee the audit of public companies that are subject to the securities laws and related matters.

1.44.   Regulation S-X. The term "Regulation S-X" shall mean the Securities and Exchange Commission's regulation (together with the Financial Reporting Releases as such term is used in Regulation S-X) that sets forth the form, content of and requirements for financial statements required to be filed as a part of the Securities Act of 1933, the Securities Exchange Act, the Public Utility Holding Act of 1935 and the Investment Company Act of 1940, except as otherwise specifically provided in the forms that are to be used for registration and reporting under these acts, as such regulation may be amended from time to time. References in this Agreement to Regulation S-X and any rules thereunder shall include any amendments thereto and any successor provisions thereof.

1.45.   Required Deposit. The term "Required Deposit" shall mean the amount each Principal is required to keep in his or her Deposit Account, as provided in the By-laws.

1.46.   Reserve. The term "Reserve" shall have the meaning ascribed to such term in Section 5.5(iv) hereof.

1.47.   Retirement Allowance Plan. The term "Retirement Allowance Plan" shall mean the Firm's Retirement Allowance Plan, as amended from time to time, which is incorporated herein by reference and made a part of this Agreement.

1.48.   Sarbanes-Oxley. The term "Sarbanes-Oxley" shall mean the Sarbanes-Oxley Act of 2002.

1.49.   Securities Exchange Act. The term "Securities Exchange Act" shall mean the Securities Exchange Act of 1934, as such act may be amended from time to time.

1.50.   Separated Member. The term "Separated Member" shall have the meaning ascribed to such term in Section 11.1 hereof.

1.51.   Separation. The term "Separation" shall have the meaning ascribed to such term in Section 11.1 hereof.

1.52.   Subordinated Loan Accounts. The term "Subordinated Loan Accounts" shall have the meaning ascribed to such term in the By-laws.

6

1.53.    Supplemental Retirement Allowance Plan. The term "Supplemental Retirement Allowance Plan" shall mean the Firm's Supplemental Retirement Allowance Plan, as amended from time to time, which is incorporated herein by reference and made a part of this Agreement.

1.54.    Two-thirds of the Members Voting. The term "Two-thirds of the Members Voting" shall mean the Members voting whose Contributed Capital and Required Deposits constitute in the aggregate at least two-thirds of the total Contributed Capital and Required Deposits of those Members voting on a matter, provided that the Contributed Capital and Required Deposits of those Members voting on a matter constitute in the aggregate at least a majority of the total then existing Contributed Capital and Required Deposits of all the Members.

1.55.    Undesignated Capital Account. The term "Undesignated Capital Account" has the meaning ascribed thereto in Article VI of the By-laws.

1.56.    Use of Pronouns, Singular and Plural. All masculine pronouns shall be deemed to include the feminine and neuter, and all terms used in the singular shall be deemed to include the plural, unless the context shall otherwise require.

1.57.    Cross-References. The terms "herein," "hereto," "hereby" and "hereunder," and any other term of similar import, shall refer to this Agreement as a whole, and not to any Section, clause or other part hereof unless explicitly provided.

2.    Organizational Matters.

2.1.    Name of Firm. The name of the continuing Firm is KPMG LLP.

2.2.    Executive Office. The executive office of the Firm shall be in the City of New York, State of New York.

2.3.    Registered Agent and Registered Office. The name and address of the registered agent for service of process on the Firm in the State of Delaware is RL&F Service Corp., One Rodney Square, Tenth Floor, Wilmington, New Castle County, Delaware 19801. The address of the registered office of the Firm in the State of Delaware is c/o RL&F Service Corp., One Rodney Square, Tenth Floor, Wilmington, New Castle County, Delaware 19801. The Chairman, in his or her sole discretion, may, at any time and from time to time, change such registered agent or registered office of the Firm.

2.4.    Registered Limited Liability Partnership. The Firm has registered as a registered limited liability partnership under the Act and shall continue as a registered limited liability partnership under the Act by the execution and filing by the Chairman (or his or her designee) of appropriate renewal applications with the Secretary of State of the State of Delaware.

2.5.    By-laws. The Firm, as hereinafter provided, shall adopt By-laws establishing additional requirements for, and procedures to be followed in taking, the decisions and actions specified below in this Agreement to be taken by any of the Members, the Board of Directors, the Chairman, the Deputy Chairman, the other officers of the Firm or the Management

7

Committee and may adopt By-laws with respect to other matters relating to the conduct of the business and affairs of the Firm including, without limitation, (i) the rights, powers or privileges of Members, the Board of Directors, the Chairman, the Deputy Chairman, the other officers of the Firm, the Management Committee or other committees of the Firm (including, without limitation, constraints on the exercise thereof and provisions for the delegation of authority and responsibility with respect to the exercise thereof), (ii) the procedures for action by any of them and (iii) the interpretation or application of any provision of this Agreement (including, without limitation, the definition of any term used in this Agreement and any supplement to a term defined herein); provided, however, that (A) no By-law shall be contrary to the provisions of this Agreement and (B) except as provided by a By-law adopted by a Majority of the Members Voting, no By-law shall constrain the exercise, by vote of a majority of the Board of Directors, of the authority of the Board of Directors under Section 3.1 hereof to direct the policies of the Firm and to oversee the management of the business and affairs of the Firm. The By-laws of the Firm as of the Effective Date shall be the By-laws approved by the Board of Directors as of the Effective Date. By-laws may from time to time be repealed or additional By-laws adopted either by affirmative vote of a majority of the entire Board of Directors or by the affirmative vote of a Majority of the Members Voting; provided, however, that any By-law adopted by the Board of Directors may be amended or repealed by the Members, that any By-law adopted by vote of a Majority of the Members Voting may provide that it may not be amended or repealed by the Board of Directors and that in the event of any inconsistency between any provision of a By-law adopted by the Members and any provision of any By-law adopted by the Board of Directors, the former shall prevail. The General Counsel shall keep a complete and correct copy of (i) the By-laws as in effect from time to time after the Effective Date and (ii) any proposed amendment or repeal of the By-laws or proposed additional By-law that has been proposed by any Member in accordance with Section 7.1 hereof (until such time as the Members shall have voted thereon). Any Member shall be entitled to receive a copy of any of the above at any time upon reasonable request to the General Counsel. Each Member shall be bound by the provisions of the By-laws to the same extent as if such provisions were set forth in this Agreement.

    3.    <u>Firm Governance</u>.

    3.1.    <u>Board of Directors</u>.

    (i)    The business, property and affairs of the Firm shall be managed under the direction of a Board of Directors established in accordance with the provisions of this Agreement (the "<u>Board of Directors</u>") which, subject to the powers of the Members as provided herein, shall have full authority to act for the Firm on all matters. The Board of Directors shall be responsible for the policies of the Firm and the oversight of the Firm's management and shall also have such specific duties as may be provided for in the By-laws. Members of the Board of Directors (other than the Chairman and Deputy Chairman) shall not be eligible for membership on the Management Committee while they are serving on the Board of Directors. The number of directors ("<u>Directors</u>") constituting the entire Board of Directors shall consist of such number of Class B Members, which shall include the Chairman and Deputy Chairman of the Firm, as is designated from time to time in the By-laws or by the Board of Directors; provided, however, that (A) such number shall not be less than fifteen (15) or more than twenty-one (21) and (B) at all times a majority of the Directors in office shall be Class B Partners.

8

(ii)     The Directors other than the Chairman and Deputy Chairman (for purposes of the remainder of this Section 3, the term "Directors" shall not include the Chairman or the Deputy Chairman, except as the context otherwise requires) shall be divided into three classes, equal in number insofar as practicable, as shall be further provided for in the By-laws. Directors shall be elected by a Majority of the Members as provided for in the By-laws. Except as otherwise set forth below, Directors shall be elected for a term of three (3) years which shall expire at the annual meeting of the Members in the third succeeding Fiscal Year following such election and when their successors shall have been elected and qualified. No incumbent Director may be elected to more than two consecutive three-year terms; provided, however, that such restriction on re-election shall not apply to an incumbent Director who has served as a Director less than two full consecutive terms; and provided, further, that if at least one year has elapsed since the end of a former Director's second consecutive term of office, he or she may again be elected as a Director.

(iii)    Directors may be removed from office at any time by the affirmative vote of Members whose Contributed Capital and Required Deposits constitute in the aggregate more than 50% of the total then existing Contributed Capital and Required Deposits of all the Members only upon a proposal submitted to Members at the request of Members whose Contributed Capital and Required Deposits constitute in the aggregate more than 10% of the total then existing Contributed Capital and Required Deposits of all the Members.

(iv)     Vacancies on the Board of Directors need not be filled unless the Board of Directors falls below fifteen (15) members or less than a majority of Directors remaining in office are Class B Partners. In such event, the vacancies shall be filled by vote of a majority of the remaining members of the Board of Directors, but only for the period extending until the next annual meeting when Directors are to be elected (even if the predecessors' three-year terms would have extended beyond that annual meeting). At that annual meeting, Members shall elect Directors to fill the vacancies for the remainder of the predecessors' three-year terms.

### 3.2.    Chairman.

(i)     There shall be a Chairman of the Firm, who shall be a Class B Partner. The Chairman shall be the chief executive officer of the Firm and Chairman of the Board of Directors and, if present and acting, shall preside at all meetings of the Board of Directors. Subject to the advice of and direction from the Board of Directors, and such restrictions as may be contained in the By-laws, the Chairman shall be responsible for the management of the business and affairs, and carrying out the policies, of the Firm, and may act on all matters on behalf of the Firm and delegate to other officers, committees or Members such powers. The Chairman (or his or her delegate or delegates) may appoint and remove administrative officers of the Firm, open bank accounts, borrow money, mortgage or pledge property, execute and deliver powers of attorney, contracts, bonds, and other obligations and instruments in the name and on behalf of the Firm, as the Chairman may deem necessary or appropriate. In addition, whenever it shall be necessary for all of the individual Members to join in the execution of any contract, statement or other written instrument or document entered into on behalf of the Firm or otherwise in connection with the ordinary operation of the Firm's business, such contract, statement or other written instrument or document may be executed by the Chairman (or the Chairman's designee) on behalf of each individual Member, and each Member shall be deemed

9

to have given and granted to the Chairman (or the Chairman's designee), full power and authority to execute, acknowledge, and deliver in the name of such individual Member, any such contract, statement, or other written instrument or document. In addition, the Chairman shall have such further duties and responsibilities as may be provided for in the By-laws.

(ii)    The Chairman shall be elected by the Board of Directors from among the Class B Partners for an initial term of six (6) years, subject to Member ratification of the joint election of the Chairman and the Deputy Chairman by a Majority of the Members Voting. The Chairman may, but need not have been, preceding election, a Director. Following the initial term, the Chairman shall be eligible for re-election by the Board of Directors for subsequent four-year terms, subject in each case to Member ratification by a Majority of the Members Voting.

(iii)    The Chairman may be removed from office at any time by the affirmative vote of two-thirds of the entire Board of Directors. Upon any such removal, the Chairman shall cease to be a member of the Board of Directors. His or her term as Chairman shall not prevent him or her from being considered for or serving as a Director for purposes of applying the limitation on re-election of Directors provided for by Section 3.1(ii) hereof.

(iv)    In the event of a vacancy in the Chairmanship (for any reason), the terms of the Chairman and Deputy Chairman shall automatically expire and the Board shall elect a new Chairman of the Firm and a new Deputy Chairman of the Firm, each of whom will commence new six-year terms, subject to Member ratification by a Majority of the Members Voting. Pending election and ratification of a new Chairman and a new Deputy Chairman, the Board of Directors shall appoint a Class B Partner to serve as acting Chairman. Nothing shall preclude the former Deputy Chairman from serving as the acting Chairman or being elected as the new Chairman (provided such former Deputy Chairman is a Class B Partner) or the new Deputy Chairman.

3.3.    Deputy Chairman.

(i)    There shall be a Deputy Chairman of the Firm, who shall be a Class B Member. The Deputy Chairman shall report to the Chairman and be the chief operating officer of the Firm and Vice Chairman of the Board of Directors and, if present and acting, shall preside at all meetings of the Management Committee. Subject to the advice of and direction from the Board of Directors, such restrictions as may be contained in the By-laws, and the supervision of the Chairman, the Deputy Chairman shall be responsible for the day-to-day operations and financial affairs of the Firm, and may act on all matters on behalf of the Firm and delegate to other officers, committees or Members such powers. In addition, the Deputy Chairman shall have such further duties and responsibilities as may be provided for in the By-laws.

(ii)    The Deputy Chairman shall be elected by the Board of Directors from among the Class B Members at the same time and for the same term as the Chairman is elected, subject to Member ratification of the joint election of the Chairman and the Deputy Chairman by a Majority of the Members Voting. The Deputy Chairman may, but need not have been, preceding election, a Director. In the event of a vacancy in the Chairmanship, the term of the

10

Deputy Chairman shall automatically expire in accordance with the provisions of Section 3.2(iv) hereof.

(iii)     The Deputy Chairman may be removed from office at any time by the affirmative vote of two-thirds of the entire Board of Directors. Upon any such removal, the Deputy Chairman shall cease to be a member of the Board of Directors but his or her service to the Board of Directors shall not prevent him or her from serving as a Director for purposes of applying the limitation on re-election of Directors provided for by Section 3.1(ii) hereof.

(iv)     In the event of a vacancy in the Deputy Chairmanship (for any reason), the Board of Directors, in accordance with the normal election requirements, shall elect a successor to serve for his or her predecessor's remaining term, subject to Member ratification by a Majority of the Members Voting. The term of the Chairman should not be affected by a vacancy in the Deputy Chairmanship.

(v)     Notwithstanding the forgoing, in the event applicable law or professional rules and regulations restrict the membership of the Board of Directors to those Members who are Certified Public Accountants, and the Deputy Chairman is not a Certified Public Accountant, then the Deputy Chairman shall be deemed not to be a member of the Board of Directors.

3.4.     Management Committee. There shall be a Management Committee of the Firm which shall consist of the Chairman and the Deputy Chairman, each of which shall be an *ex-officio* member, and such Members as appointed from time to time by the Chairman in accordance with such requirements and procedures as are provided in the By-laws, subject to the approval of the Board of Directors. Members of the Board of Directors (other than the Chairman and Deputy Chairman) shall not be eligible for membership on the Management Committee while they are serving on the Board of Directors. The Deputy Chairman shall be the chairman of the Management Committee, subject to the direction of the Chairman. Subject to the direction of the Chairman, the Management Committee shall be responsible for implementing Firm policies as promulgated by the Board of Directors, developing strategies and tactical and operational plans to support such policies and for the sound and profitable operations of the Firm. In addition, the Management Committee shall have such further duties and responsibilities as may be provided for in the By-laws.

3.5.     Board Committees. The Board of Directors shall establish a Nominating Committee, a Partner Rights Committee, an Audit and Finance Committee, a Compensation Committee, a Pension Committee and a Board Process and Evaluation Committee to assist it in the discharge of its responsibilities; the composition, operations and authority of such committees shall be provided for in the By-laws. The By-laws may provide for the creation by the Board of Directors of such additional committees, with such functions, authority and responsibilities consistent with this Agreement as may be provided for therein. The Chairman shall be an *ex-officio* member of all committees of the Board of Directors, other than the Partner Rights Committee.

3.6.     General Counsel. There shall be a General Counsel of the Firm, who shall be selected by the Chairman, shall be responsible for coordinating the legal affairs of the Firm, shall act for the Firm on all legal matters and shall perform all the duties incident to the office of

11

General Counsel, as well as such other duties as may be required from time to time by the Chairman or the Board of Directors. The General Counsel shall act on behalf of all Members, except where a dispute arises between an individual Member and the Firm, in which case the General Counsel shall act only on behalf of the Firm.

3.7.   Other Officers. The Chairman may appoint other officers (who may be Members or non-Members), with such titles, authority and responsibility as he or she deems appropriate and as are consistent with the provisions of this Agreement and the By-laws.

3.8.   Removal of Officers. Any officer of the Firm, other than the Deputy Chairman, may be removed from office by the Chairman.

3.9.   Removal Standard. Removal of a Director or officer as provided in this Section 3 shall not require a showing of cause.

4.   Accounts; Interest.

The provisions relating to Accrual Accounts, Undesignated Capital Account, Contributed Capital, Capital Accounts, Required Deposits, Deposit Accounts, Drawing Accounts, Subordinated Loan Accounts, and Interest shall be as provided for in the By-laws.

5.   Partnership Accounting.

5.1.   Partnership Accounting. The Firm shall keep its books using the methods of accounting as provided herein and in the By-laws, in compliance with any and all applicable laws, rules and regulations and in accordance with the Accounting Policies and Procedures approved by the Board of Directors from time to time, which Accounting Policies and Procedures may make such modifications to generally accepted accounting principles as the Board of Directors determines to be consistent with this Agreement and By-laws and otherwise to be appropriate (the "Accounting Policies and Procedures").

5.2.   Guaranteed Compensation and Advances. Members shall receive such Guaranteed Compensation as shall be provided for herein and in the By-laws. In addition, Class B Members shall be entitled to receive Advances to be charged against each Member's Allocation for such Fiscal Year as provided for in the By-laws. The Firm shall not be obligated to pay any such Guaranteed Compensation or Advances or make any payments with respect thereto if in doing so the Firm would be in violation of any Independence requirements.

5.3.   Allocations.

(i)   After the conclusion of each Fiscal Year, the Management Committee shall determine the Firm's Allocable Operating Profit or Operating Loss and Allocable Net Income or Net Loss for such year and, subject to the approval of the Board of Directors, the Members' Cash Basis Allocation and Accrual Basis Allocation payable to each Class B Member (together such Member's "Allocation").

(ii)   The Partners' Rights Committee shall hear grievances that any Class B Member may have with respect to such Member's Allocation pursuant to Section 5.3(i) hereof.

12

The Partners' Rights Committee shall consider such grievances and make recommendations to the Board of Directors. The decision of the Board of Directors shall be binding on said Class B Member and the Firm.

(iii)    The Firm shall not be obligated to make any such Allocation or make any payments with respect thereto if in doing so the Firm would be in violation of any Independence requirements.

5.4.    Incentive Compensation. The Management Committee, subject to the approval of the Board of Directors, shall, for each Fiscal Year determine the amount of the Firm's Preliminary Profits to be used to pay Incentive Compensation. The Management Committee, subject to the approval of the Board of Directors, also shall determine whether a Member will receive any Incentive Compensation and, if so, the amount thereof. Any Incentive Compensation shall be paid within ninety (90) days of the end of the Fiscal Year to which it relates and will be considered a deduction in determining Allocable Operating Profit or Operating Loss and Allocable Net Income or Net Loss for the Fiscal Year to which it relates. The Firm shall not be obligated to make any such payments if in doing so the Firm would be in violation of any Independence requirements.

5.5.    Tax Matters

(i)    The Board of Directors shall have absolute authority and discretion to determine, for income tax purposes, the allocation among the Members of Net Income and Net Loss and items of income, deduction, gain, loss or credit, including, without limitation, special allocations of gain or losses in connection with sales of interests in Firm subsidiaries or affiliates and discharge of obligations under the Retirement Allowance Plan and Supplemental Retirement Allowance Plan. In connection therewith, the Board of Directors may make such cash distributions to Members and former Members in addition to such Members' Cash Basis Allocation for such Fiscal Year as it deems appropriate to provide for payment by such Members or former Members of income taxes due by such Members or former Members on income specially allocated to them, including, without limitation, income specially allocated upon the sale of interests in Firm subsidiaries or affiliates or receipt of debt repayments from its subsidiaries.

(ii)    In exercising such authority, the Board of Directors shall make such allocations in a manner that is consistent with the terms of this Agreement, the Members' economic entitlements hereunder, and with the requirements of Sections 704(b) and (c) of the Code.

(iii)    In addition, the Board of Directors has absolute discretion to make whatever elections it deems advisable under Subchapter K of the Code.

(iv)    Each Fiscal Year, Net Income or Net Loss may be adjusted for an increase or decrease to a reserve (a "Reserve") for Claims. To the extent that the amount contributed to such Reserve in a given Fiscal Year does not result in a deduction for Federal and State income tax purposes in such amount in that Fiscal Year, a separate record shall be maintained for the benefit of each Member of his or her pro rata share of such amount. In any Fiscal Year thereafter,

13

when either a loss or legal costs and other expenses have been incurred which are charged to such Reserve, the resulting Federal and State income tax deductions in that Fiscal Year shall be allocated (subject to the limitations set forth in Article VII of the By-laws) first, to those Members having a pro rata share in the amount contributed by such Members to create such Reserve, up to the amount of their contribution; and thereafter to those Members having a pro rata share of the amount next contributed to such Reserve, up to the amount of their contribution, and so forth with respect to each year that Members contribute an additional amount to such Reserve up to the amount of their contributions.

    6.  <u>Claims</u>. The provisions relating to Claims shall be as provided for in the By-laws.

    7.  <u>Meetings</u>.

    7.1.  <u>Meetings of Members</u>.

    (i)  An annual meeting of the Members shall be held at least once each Fiscal Year to hear a report of the Chairman on the business and affairs of the Firm and such other reports as may be required by this Agreement or the By-laws or directed by the Board of Directors and for the discussion and consideration of, and action on, all matters affecting the Firm's business and affairs that may properly come before such meeting, and the election of Directors as provided in Section 3.1 hereof. The annual meeting may be a physical meeting in a single location on a single day, multiple physical meetings in multiple locations on different days, a telephonic meeting, an electronic meeting, a meeting conducted by ballot in lieu of a physical meeting, or such other and different format as may be designated by the Board of Directors. The date and place of such meeting (if a physical meeting is held), or the date that ballots are due (if voting is by ballot in lieu of an annual meeting), shall be fixed by the Board of Directors in accordance with such requirements and procedures as shall be <u>provided</u> for in the By-laws. Notice of an annual meeting shall be sent to each Member in accordance with such requirements and procedures as shall be provided for in the By-laws; provided, that at least sixty (60) days notice of a meeting shall be provided to all Members. A vote of the Members at an annual meeting shall be required on the written request signed by Members whose Contributed Capital and Required Deposits constitute in the aggregate 10% or more of the total then existing Contributed Capital and Required Deposits held by the Members, which request shall be submitted to the Chairman not less than thirty (30) days prior to the date of the annual meeting, but only for the purpose of (A) proposing an amendment of this Agreement or the By-laws or (B) the removal of any Director other than the Chairman or the Deputy Chairman. No matter may be proposed by Members for a Member vote at an annual meeting except in accordance with the preceding sentence.

    (ii)  A special meeting of the Members may be called at any time by the Board of Directors. The date and place of such meeting shall be fixed by the Board of Directors, in accordance with such requirements and procedures as shall be provided for in the By-laws. Notice of such meeting shall be sent to each Member in accordance with such requirements and procedures as shall be provided in the By-laws; <u>provided</u>, that at least thirty (30) days notice of a meeting shall be provided to all Members and the notice shall identify all matters to be voted on

14

at such meeting. No matter shall be voted on at a special meeting that has not been identified in the notice of meeting.

(iii)    A vote of the Members by ballot may be required at any time by the Board of Directors. In addition, the Chairman shall be required to call for a vote by ballot on the written request signed by Members whose Contributed Capital and Required Deposits constitute more than 10% of the total then existing Contributed Capital and Required Deposits of all the Members, within thirty (30) days following such request, but only for the purpose of (A) proposing an amendment of this Agreement or the By-laws or (B) the removal of a Director other than the Chairman or Deputy Chairman.

(iv)    Members whose Contributed Capital and Required Deposits constitute a majority of the total then existing Contributed Capital and Required Deposits held by the Members shall constitute a quorum for the transaction of business.

(v)    Unless otherwise expressly required herein, action by the Members on all matters put before the Members for a vote shall require the affirmative vote of a Majority of the Members Voting.

(vi)    All Member votes shall be by ballot, whether at a meeting or otherwise, in accordance with such requirements and procedures as shall be provided for in this Agreement or the By-laws.

(vii)    The conduct of meetings of Members or ballots shall be governed by such further rules and procedures as shall be provided for in the By-laws and, subject thereto, such rules and procedures that may be directed by the Board of Directors or, subject thereto, promulgated by the Chairman.

7.2.    Meetings of the Board of Directors. The Board of Directors shall meet in regular session at least quarterly. A special session of the Board of Directors may be called by the Chairman at any time, and shall be called by the Chairman upon the written request of any four (4) Directors. All votes of the Board of Directors shall be on a per capita basis and not based on Contributed Capital or Required Deposits. All meetings of the Board of Directors shall be governed by such further rules and procedures as shall be provided for in the By-laws.

8.    Admission of New Members.

8.1.    Election of Members. Class A Members and Class B Members, including changing a Class A Member to Class B status, shall be selected and admitted to the Firm by the affirmative vote of two-thirds of the entire Board of Directors, without a Member vote thereon. Prior to admitting a new Class B Member, the Board of Directors shall provide ten (10) business days' notice to the Class B Members for the purpose of affording Class B Members the opportunity to provide comments as to the proposed new Class B Member to the Board of Directors. Any person elected to Member status shall become a Member by executing a counterpart of this Agreement, as amended from time to time, effective on the date specified by the Board of Directors when voting on such admission.

15

8.2.   Members' Prior Affiliation with Audit Clients. In accordance with Rule 2-01 of Regulation S-X, if a newly admitted Member is a former officer, director or employee of an Audit Client, as such term is defined in Regulation S-X, the Firm will prohibit the new Member from participating in and influencing the audit of the financial statements of such Audit Client covering any period during which he or she was employed by or associated with that Audit Client.

9.   Death.

In the event of death of any Member prior to withdrawal, the balance of such Member's Accrual Account, Capital Account or Deposit Account, Drawing Account, and Subordinated Loan Account and the amount of his or her portion of the Firm's net profits determined as provided in Section 11 hereof shall be paid to the beneficiary last designated in writing by the Member, or if not so designated by the Member, to such deceased Member's estate, within a reasonable time, except that the Accrual Account shall be paid in the manner provided in the By-laws in accordance with any duly filed written notice. Upon the death of a Member, the Firm shall automatically terminate as to such deceased Member, the Member shall cease to be a Partner or Principal, and none of the spouse, estate or legal representatives of such deceased Member shall have any voice in the affairs of the Firm. A deceased Member or former Member, as well as the spouse, estate, or legal representative of the deceased Member or former Member shall have no further rights hereunder or under the By-laws except as otherwise specifically so provided herein or in the By-laws. Payments to be made on account of a deceased Member shall be in full settlement and in liquidation of such deceased Member's interest in the Firm and in full payment of all sums due or to become due to such deceased Member from the Firm, including any interest such deceased Member had in the assets of the Firm. The payments under this Section 9 shall not be construed to be payments on account of or in exchange for goodwill of the Firm.

10.   Withdrawal.

10.1.   Voluntary Withdrawal. Except in cases of involuntary withdrawal described in Sections 10.4 and 10.5 hereof, any Member may withdraw from the Firm on six (6) months prior written notice to the Firm. A withdrawing Member shall forfeit his or her vote at the time his or her written notice is submitted. Upon such withdrawal, the Firm shall thereupon terminate as to the withdrawing Member, the Member shall thereupon no longer be a Partner or Principal, and the Member shall be entitled to no further rights hereunder or under the By-laws except as otherwise specifically so provided herein or in the By-laws.

10.2.   Requested Withdrawal. A Member who is requested to voluntarily withdraw from the Firm is entitled to severance as provided in the By-laws. Upon such withdrawal, the Firm shall thereupon terminate as to the withdrawing Member, the Member shall thereupon no longer be a Partner or Principal, and the Member shall be entitled to no further rights hereunder or under the By-laws except as otherwise specifically so provided herein or in the By-laws.

10.3.   Review. A Member who has been preliminarily advised that he or she may be required to withdraw from the Firm may request review of such decision by the Partner Rights

16

Committee prior to the final vote on the matter by the Board of Directors. Upon such a request, the Partner Rights Committee shall investigate the matter and make a recommendation to the Board of Directors. The decision of the Board of Directors shall be binding on said Member and the Firm.

10.4.    Involuntary Withdrawal. Upon the vote of two-thirds of the entire Board of Directors, the Board of Directors may, if it determines it is in the best interests of the Firm to do so, require any Member to withdraw from the Firm immediately. Upon such withdrawal, the Firm shall thereupon terminate as to the withdrawing Member, the Member shall thereupon no longer be a Partner or Principal, and the Member shall be entitled to no further rights hereunder or under the By-laws, except as otherwise specifically so provided herein or in the By-laws.

10.5.    Bankruptcy. In the event of the (i) adjudication of a Member as bankrupt or insolvent or of the voluntary taking of any proceeding for the liquidation of his or her affairs by arrangement or composition with his or her creditors, or (ii) attempt by any Member to sell, assign, mortgage, pledge or otherwise transfer his or her Capital Account, Deposit Account, or Subordinated Loan Account or any interest therein or in the Firm or its property, or any part thereof, unless otherwise authorized by the Board of Directors, such Member shall thereupon automatically withdraw, the Firm shall thereupon automatically terminate as to him or her, the Member shall thereupon no longer be a Partner or Principal, and the Member shall be entitled to no further rights hereunder or under the By-laws except as otherwise specifically so provided herein or in the By-laws.

10.6.    Temporary Withdrawal. In the event of withdrawal of a Member, if such withdrawal is intended to be only temporary for the purpose of enabling the withdrawing Member to accept for a limited time a public or other similar appointment, a special arrangement, if approved by the Board of Directors, may be made with such Member regarding the duration of the withdrawal and the amount of payment on account of his or her interest in the Firm accounts to be made to him or her at the time of or during his or her withdrawal.

11.    Effect of Separation.

11.1.    Upon Separation. Upon the retirement, voluntary, requested or involuntary withdrawal, bankruptcy or death (each a "Separation") of a Member (as such, a "Separated Member"), such Separated Member shall not be entitled to receive any assets or compensation except as set forth in Sections 9 and 10 hereof and this Section 11, as applicable. Notwithstanding anything in this Agreement to the contrary, no Member shall have any interest in any specific asset of the Firm.

11.2.    Allocation Upon Separation. In lieu of a Member's Allocation, if any, for the current Fiscal Year, a Member who (i) has died on or before the first day of the sixth month of the current Fiscal Year, or (ii) has given written notice on or before the first day of the sixth month of the current Fiscal Year of his or her intent to separate from the firm, on a date other than the last day of the current Fiscal Year, or (iii) has been requested, on or before the first day of the sixth month of the current Fiscal Year, to withdraw from the firm under the provisions of Sections 10.2, 10.4 or 10.5 hereof, on a date other than the last day of the current Fiscal Year, shall be paid Guaranteed Compensation calculated by determining the percentage that the

17

number of days from the beginning of such Fiscal Year to the date of Separation is of the number of days in the then current Fiscal Year, and then multiplying that percentage by the Member's Accrual Basis Allocation for the immediately preceding Fiscal Year. A Member who, after the first day of the sixth month of the current Fiscal Year (i) dies on a date other than the last day of the current Fiscal Year, or (ii) gives written notice of his or her intent to separate from the firm on a date other than the last day of the current Fiscal Year, or (iii) is requested to withdraw from the firm under the provisions of Sections 10.2, 10.4 or 10.5 hereof on a date other than the last day of the current Fiscal Year shall receive a Member's Allocation for the current Fiscal Year in an amount, determined by the Management Committee and subject to approval by the Board of Directors, not less than the amount calculated by determining the percentage that the number of days from the beginning of such Fiscal Year to the date of Separation is of the number of days in the then current Fiscal Year, and then multiplying that percentage by the Member's Accrual Basis Allocation for the immediately preceding Fiscal Year. In addition, a Member who has died, or a Member who has otherwise become separated, on a date other than the last day of a Fiscal Year shall be entitled to any other Guaranteed Compensation to which such Member was then entitled, calculated by determining the percentage that the number of days from the beginning of such Fiscal Year to the date of Separation is of the number of days in such Fiscal Year, and then multiplying that percentage by the Member's other such Guaranteed Compensation for such Fiscal Year. The resulting sum shall be credited to the separated Member's Drawing Account as of the date of Separation.

      11.3.  <u>Liquidation and Distribution of Accounts</u>. The balance of a Separated Member's Capital Account or Deposit Account, Drawing Account and Subordinated Loan Account shall be liquidated and distributed to the Member (or to such person as provided in Section 9 hereof in the case of a deceased Member) on or before the last day of the calendar quarter following the calendar quarter in which the Member separated from the Firm. Any amounts that the Separated Member owes to the Firm at the time of Separation shall be paid prior to or simultaneously with payment by the Firm of the above accounts. In addition, the Firm may withhold from payments to the Separated Member such amounts as it determines will be required to provide for payment of non-resident state income taxes attributable to the Allocation or Guaranteed Compensation credited to the Separated Member's Accounts or other liabilities to the Firm including any health, life or other insurance premiums or other benefit obligations due with respect to such Separated Member. The balance of a Separated Member's Accrual Account as of the end of the most recently completed Fiscal Year prior to or concurrent with the date of such Separation shall be liquidated in accordance with the provisions of the By-laws.

      11.4.  <u>No Dissolution, Termination</u>. The Separation of a Member from the Firm shall not effect a dissolution of the Firm or a termination of the Firm (except as to the Separated Member) or the creation of a new partnership.

      11.5.  <u>Other Payments</u>. In addition to the foregoing provisions of Sections 9 and 10 hereof and this Section 11, upon Separation, a Separated Member shall be entitled to receive such other payments and benefits as may be provided for in the By-laws.

      12.  <u>Covenants of Withdrawing or Retiring Members</u>.

      12.1.  <u>Positions with Clients After Separation</u>.

18

(i)     Prior to a Member's separation from the Firm and for the greater of (A) two years following a Member's separation from the Firm and (B) the period during which the Separated Member retains a Financial Interest in the Firm, a Member (or Separated Member, as the case may be) shall promptly report to the Firm if he or she intends to engage in employment negotiations with any entity, and shall neither negotiate for nor accept a "financial reporting oversight role" or "accounting role" (as such terms are defined in Rule 2-01 of Regulation S-X) or any other position with any entity that, in the Firm's sole determination, would cause the Firm to be in violation of any Independence requirement without the permission of the Chairman. Furthermore, after Separation, a Separated Member shall not accept a position with any entity if, in the Firm's sole determination, accepting this position would impair the Firm's Independence with respect to that entity.

(ii)    If the Firm determines, in its sole discretion, that by a Member's or former Member's acceptance of a position described in Section 12.1(i) hereof, its obligation to such Member or former Member under the Retirement Allowance Plan or the Supplemental Retirement Allowance Plan would cause the Firm to be in violation of any Independence requirements, the Firm, in its sole discretion, may, but shall not be required to, satisfy such obligation by transferring an amount, not in excess of the lump-sum present value of any remaining benefit payable to such Member or former Member under the Retirement Allowance Plan or the Supplemental Retirement Allowance Plan, determined under the actuarial assumptions then in use thereunder and at an interest rate of 6.25% per annum, whether or not such benefit already is being paid, to the trustee of a grantor trust subject to sections 671, et. seq., of the Code (known as a "rabbi trust") established by the Firm and used by the trustee thereof to purchase an annuity contract from an independent life insurance company containing the following terms. Such annuity contract shall provide a benefit, at the time and in the manner provided by the Retirement Allowance Plan or the Supplemental Retirement Allowance Plan, as the case may be, equal to the maximum benefit that can be provided by such annuity contract, based on the maximum amount available for purchase of such contract as described in the preceding sentence, but not in excess of the benefit that would have been payable under the Retirement Allowance Plan or the Supplemental Retirement Allowance Plan, as the case may be, but for this paragraph. If the amount of the benefit payable under such annuity contract is less than the amount of the benefit payable under the Retirement Allowance Plan or the Supplemental Retirement Allowance Plan, as the case may be, to such Member or former Member, as determined without regard to this paragraph, the amount of such benefit shall be reduced to the amount payable pursuant to such annuity contract and, notwithstanding any provision of this Agreement (including the Retirement Allowance Plan or the Supplemental Retirement Allowance Plan), the Firm shall have no further obligation to pay any amount to or on behalf of such Member or former Member under the Retirement Allowance Plan or the Supplemental Retirement Allowance Plan. The Firm, however, may choose to waive the requirements of this section if, in the Chairman's judgment, to do so would be in the best interests of the Partnership.

12.2.   No Solicitation of Clients, Members or Employees.

(i)     For purposes of this Section 12, (A) "Client" shall mean any individual or entity (1) for whose benefit, or at whose direction, Public Accounting services were performed during the three (3) years prior to the Termination Date of the Separated Member either by (x) the Separated Member or (y) an office or line of business of the Firm in which the Separated

19

Member practiced or over which the Separated Member had supervisory or management authority, or (2) that was actively solicited by the Firm as a potential client within one year prior to the Termination Date of such Separated Member, (B) "Termination Date" shall mean the date of Separation of a Member from the Firm and (C) "Solicit" shall mean to have contact with, or to lend assistance in any way to any person or entity in having contact with, a Member or employee of the Firm for the purpose of encouraging, enticing or persuading that person to leave the Firm to perform services for or on behalf of the Separated Member or a third party.

(ii)     Each Member understands and acknowledges that the Firm's Client relationships are an extremely valuable asset of the Firm and that in consideration of a Member's undertakings and promises herein, he or she has been entrusted with responsibility and knowledge regarding the Firm's valuable Client relationships and that it is fair and in the best interests of all Members that a Separated Member not be allowed to service Clients as provided in this Section 12. Accordingly, each Member agrees to undertake the following obligations which he or she acknowledges to be reasonably designed to protect the Firm's legitimate business interests without unnecessarily or unreasonably restricting the Member's ability to pursue a livelihood after Separation from the Firm. A Separated Member, or any person, firm or entity with which he or she is associated, shall not, for a period of two years after his or her Termination Date, directly or indirectly, solicit the Public Accounting work of any Client or agree to perform or perform Public Accounting services for any Client, nor shall a Separated Member assist any third party to do so.

(iii)     Each Member understands and acknowledges that the Firm's relationships and investments in its personnel are also an extremely valuable asset of the Firm and that by reason of a Member's undertakings and promises herein, he or she has been entrusted with certain responsibilities and knowledge regarding the Firm's personnel and that it is fair and in the best interests of all Members that a Separated Member not be allowed to Solicit or hire Firm personnel as provided in this Section 12. Accordingly, each Member agrees to undertake the following obligations which he or she acknowledges to be reasonably designed to protect the Firm's legitimate business interests without unnecessarily or unreasonably restricting the Member's ability to pursue a livelihood after Separation from the Firm. A Separated Member, or any person, firm or entity with which he or she is associated, shall not for a period of two years after his or her Termination Date, directly or indirectly Solicit, employ or retain any Member or employee of the Firm, including any former Member or employee of the Firm who separated from the Firm within a twelve-month period before or after the Separated Member's Termination Date, to perform services for or on behalf of the Separated Member or a third party, or to become affiliated with the Separated Member or a third party as an agent, employee, joint venturer, partner, shareholder or consultant, nor shall the Separated Member assist any third party to do so.

12.3.   Remedies of the Firm for Breach.

(i)     A Separated Member who performs services for a Client in violation of Section 12.2(ii) hereof shall pay to the Firm 50% of the gross fees paid to the Separated Member or to a third party for those services. Such obligation shall continue for a period of three (3) years beginning from the date services in violation of Section 12.2(ii) are first performed. Payments to the Firm pursuant to this Section 12.3(i) shall be due within thirty (30) days after any payment of fees is made by the Client. Such obligation shall be in addition to, and not in lieu of, any other

20

remedies available to the Firm under this Agreement, the By-laws or at law or in equity. Without limiting the generality of the foregoing, this obligation shall not be construed to preclude a showing of irreparable injury or any other element that may be necessary to secure injunctive relief.

(ii)     A Separated Member who retains or assists a third party in retaining any person in violation of Section 12.2(iii) hereof shall pay to the Firm an amount equal to 100% of the amount paid to such person as compensation for his or her last twelve (12) months of service to the Firm. Payments to the Firm pursuant to this Section 12.3(ii) shall be payable upon written demand. Such obligation shall be in addition to, and not in lieu of, any other remedies available to the Firm under this Agreement, the By-laws or at law or in equity. Without limiting the generality of the foregoing, this obligation shall not be construed to preclude a showing of irreparable injury or any other element that may be necessary to secure injunctive relief.

(iii)     In applying this Section 12 and the payment obligations of clauses (i) and (ii) of this Section 12.3, the wishes or preferences of a Client as to who shall perform its Public Accounting services, or the fact that the Client may also be a client of a third party with whom the Separated Member is associated, shall neither be relevant nor admissible as evidence in any dispute arising under this Section 12.

(iv)     The Board of Directors shall have the authority, by the vote of a majority of the entire Board of Directors, to terminate any rights that might otherwise be due a Separated Member under this Agreement, excluding benefits payable in accordance with the Retirement Allowance Plan or the Supplemental Retirement Allowance Plan, for non-compliance by such Member with his or her obligations under this Agreement or the By-laws, including, without limitation, violations of this Section 12, or actions by such Separated Member found to be detrimental to the interests of the Firm, subject, at the request of the affected Separated Member, to the prior review of the Partner Rights Committee. Upon such a request, the Partner Rights Committee shall investigate the matter and make a recommendation to the Board of Directors. The decision of the Board of Directors shall be binding on said Separated Member and the Firm. Notwithstanding and in addition to the foregoing, the Board of Directors shall have the authority, by the vote of a majority of the entire Board of Directors, to terminate any rights that might otherwise be due a Separated Member in accordance with the Retirement Allowance Plan, the Supplemental Retirement Allowance Plan and all Contributed Capital in the event of non-compliance by such Member with Section 12.1.

(v)     Remedies provided for in this Section 12.3 are not exclusive and are in addition to all other remedies available to the Firm elsewhere in this Agreement, in the By-laws, at law or in equity.

(vi)     The Chairman may, in his or her sole discretion, waive any provisions, other than provisions that would impair the Firm's Independence, of this Section 12.

12.4.     Effect of Adjudication. In the event any particular subsection or portion of this Section 12 shall be adjudicated to be invalid or unenforceable, or declared null and void or denied enforcement by any Court of competent jurisdiction, this Section 12 shall be deemed amended to delete therefrom the portion adjudicated to be invalid or unenforceable, but only

21

with respect to the operation of this Section 12 in the particular jurisdiction in which such adjudication is made and not with respect to the operation of this Section 12 in any other jurisdiction. No other subsection or portion of this Section 12 shall be affected thereby and all other parts hereof shall survive both in that jurisdiction and in all other jurisdictions.

13.     Proprietary Information.

Each Member acknowledges that the successful marketing, development and rendering of the Firm's professional services and products require substantial time and expense. Such efforts generate for the Firm valuable and proprietary information ("Confidential Information") which gives the Firm a business advantage over others who do not have such information. Confidential Information of the Firm includes, but is not limited to, the following: financial and compensation information, business strategies, plans, methodologies, client records, client lists, proposals, training materials and computer software. Each Member understands and acknowledges that, during the course of his or her relationship with the Firm, he or she will develop on behalf of the Firm and otherwise obtain knowledge of such Confidential Information. Accordingly, each Member agrees to undertake the following obligations which he or she acknowledges to be reasonably designed to protect the Firm's legitimate business interests without unnecessarily or unreasonably restricting the Member's ability to pursue a livelihood after Separation from the Firm. All Confidential Information furnished by the Firm or prepared by any Member during the course of his or her membership in, or employment by, the Firm are the property of the Firm or its clients and each Member or Separated Member will deliver to the Firm all such Confidential Information and all copies thereof and all other Firm property at any time that the Firm may request the same and in all events immediately upon his or her Separation from the Firm. A Member or Separated Member need not deliver to the Firm copies of his or her statements of account with the Firm, documents relating to his or her personal participation in the Firm or Firm materials generally available to the public. No Member or Separated Member shall use or disclose to any person, firm or entity any Confidential Information except when properly required to do so by law or with the express permission of the Chairman.

14.     Termination of the Firm.

The term of the Firm shall be automatically extended on the last day of each Fiscal Year, for periods of one year, unless otherwise terminated in accordance with this Section 14. The Firm may be terminated on the last day of any Fiscal Year upon the vote of Two-thirds of the Members Voting. Notice of such a vote shall be given in writing to each Member at least six (6) months prior to the last day of the Fiscal Year on which the Firm is to terminate. Upon the termination of the Firm, a full and general account of the assets, liabilities and transactions of the Firm shall be taken and, as soon as reasonably practicable, the assets and property of the Firm shall be realized, sold and disposed of in such manner as a Majority of the Members Voting shall agree, and the debts owing to the Firm shall be collected. The remainder of the proceeds of such dispositions and collections, after discharging the liabilities of the Firm and paying the amounts, if any, payable to retired or withdrawn Members and to the legal representatives of deceased Members pursuant to Sections 9, 10 and 11 hereof, or pursuant to the Retirement Allowance Plan or the Supplemental Retirement Allowance Plan, shall be distributed among all the then Members in the amounts to which they, respectively, shall at the time of termination of the Firm be entitled.

22

15.    Duties of Members and Separated Members.

15.1.   Partnership Relationship. Each Member, by executing this Agreement, acknowledges and agrees that the relationship created hereby between such Member and the Firm is intended to be that of a partner in a partnership, and the relationship created hereby between such Member and all other Members is intended to be that of a partnership. In furtherance of such intent, each Member agrees that such relationships, except as otherwise provided in this Agreement, shall be governed by the law, both statutory and common law, respecting partners and partnerships, and such Member covenants that he or she shall not take a position in connection with any claim, dispute, litigation or other controversy that is inconsistent with or disputes such relationship.

15.2.   Duties of Members to Each Other. Each Member shall be just and faithful to the other Members and each of them in all transactions relating to the business of the Firm and shall give a true account of such transactions to them or him or her when and so often as an account thereof shall be reasonably required. Each Member shall at all times duly and punctually pay and discharge his or her separate and private debts and obligations and keep the Members and its property indemnified against all and any of the same and against all expense and risk on account thereof. Each Member and Separated Member shall hold strictly in confidence the business and affairs of the Firm and of its clients.

15.3.   Compliance. Each Member and Separated Member understands and acknowledges that his or her rights under this Agreement and the By-laws are expressly conditioned upon compliance by the Member or Separated Member with his or her obligations under this Agreement, the By-laws and the requirements of Sarbanes-Oxley, including, without limitation, the obligations pertaining to Separated Members under Section 12 hereof, and upon his or her acting at all times in the best interests of the Firm. The decision of the Board of Directors with regard to such matters shall be binding on said Member and the Firm.

15.4.   Obligations or Liabilities. Except as specifically provided for herein or in the By-laws, no Member shall (i) sign the Firm's name to any negotiable instrument, or any contract, guaranty or other written instrument, or incur in the name of the Firm any indebtedness or liability whatsoever unless for and in furtherance of the Firm's business, or (ii) mortgage, assign or incorporate his or her interest in the capital, goodwill or profits of the Firm or any part thereof.

15.5.   Independence. Members and, consistent with the other provisions of this Agreement, Separated Members must comply with any and all applicable laws, rules, regulations and Firm policies relating to Independence.

15.6.   Duty of Loyalty. Except as otherwise approved by the Board of Directors, so long as any Member of the Firm shall continue as such, he or she shall (i) not carry on or be concerned or interested, directly or indirectly, in the practice of Public Accounting, except on account of and for the benefit of the Firm, (ii) devote all of his or her professional time and attention to the Firm's practice and diligently and faithfully employ himself or herself therein and carry on such practice for the greatest advantage of the Firm, (iii) not own or control, either directly or indirectly, any stocks, bonds or other securities, nor have investment in any

23

proprietorship, partnership, corporation or other entity competing directly or indirectly with the business of the Firm and (iv) comply with such other requirements and procedures as may be provided for in the By-laws.

15.7.    Books of Account. Each Member shall keep or cause to be kept proper accounts of all monies paid and received, of all contracts entered into and of all business transacted on account of the Firm and of all other matters of which accounts should be kept according to the usual and regular course of said business. Such accounts, together with all deeds, securities for monies and papers belonging to the Firm, shall at all reasonable times be open to the inspection by the Firm.

15.8.    Tax Returns. All Members shall file, and shall annually confirm such filings in a written statement furnished to the Firm, all such personal tax returns as may be required to be filed by law.

15.9.    Consents. The Firm is required to consent to cooperate and comply with any request for testimony or the production of documents made by PCAOB in furtherance of its authority and responsibilities under Title I of Sarbanes-Oxley and to secure and enforce similar consents from each of its associated persons as a condition of their continued employment or association. Each Member agrees, as a condition of his or her status with the Firm, to cooperate and comply with any requests for testimony and/or the production of documents made by PCAOB in furtherance of its authority and responsibilities under Title I of Sarbanes-Oxley.

15.10.    Waiver. Each Member agrees, as a condition of his or her status with the Firm, to waive his or her ability to seek to disqualify the General Counsel, any employee or Member of the Firm's Office of General Counsel or the Firm's outside counsel or any of its personnel from representing the Firm in connection with any investigation, dispute or proceeding at any point in time even if such counsel previously had represented the Firm and such Member jointly.

16.    Annual Financial Reports.

(i)    As soon as reasonably practicable after the end of each Fiscal Year, there shall be prepared and submitted to the then Members for inspection a statement of the accounts of the Firm for its preceding Fiscal Year prepared using the Accounting Policies and Procedures and the cash method of accounting used to calculate Net Income or Net Loss. At such times, each Member shall be advised of (A) the amount of the Cash Basis Allocation and the Allocable Net Income or Net Loss of the Firm for such year credited or charged to him or her on the books of accounts of the Firm and shall also be advised of (B) the amount of his or her Capital Account or Deposit Account, Drawing Account, Accrual Account, and Subordinated Loan Account, as applicable, at the end of such year.

(ii)    The statement of the accounts shall be approved by the Board of Directors. After such approval, every Member and every Separated Member shall be conclusively bound by such statement of the accounts as to (A) the amount of distributions of net profits or losses of the Firm credited or charged to him or her on the books of account of the Firm, and (B) the amount

of his or her Capital Account or Deposit Account, Drawing Account, Accrual Account, and Subordinated Loan Account, as applicable.

17.   Arbitration.

(i)      Any dispute between the Firm and any Member or Separated Member or between or among Members or Separated Members arising out of or relating to the Firm or the accounts or transactions thereof or the dissolution or winding up thereof, the construction, meaning or effect of any provision of this Agreement, or the rights or liabilities of a Member or Separated Member or such Member's or Separated Member's representatives ("Disputes"), shall be submitted for resolution by arbitration in accordance with the procedures set forth in this Section 17. All arbitrations hereunder shall be held either in the State and City of New York or in Wilmington, Delaware.

(ii)      Arbitrations shall take place before a panel of three arbitrators (the "Arbitration Panel"), which shall consist of one person selected by each of the two sides to the Dispute and the third person to be jointly selected by the two arbitrators previously selected.

(iii)      The Arbitration Panel shall have no authority to amend or modify the terms of this Agreement or to award punitive or exemplary damages.

(iv)      Judgment on any award rendered pursuant to this Section 17 may be entered in the Supreme Court of the State of New York, New York County, or in any other court having jurisdiction, or application may be made to such court for a judicial recognition of the award or an order of enforcement thereof, as the case may be.

(v)      Any costs, fees or taxes incident to enforcing an award shall, to the maximum extent permitted by law, be charged against the party resisting such enforcement.

(vi)      Notwithstanding anything in this Section 17 to the contrary, the Firm may seek provisional relief, including, without limitation, temporary restraining orders and preliminary injunctions, from a court of competent jurisdiction in aid of the arbitration, to prevent any award from being rendered ineffectual, to protect the Firm's Confidential Information or for any other purpose in the interests of the Firm. Seeking any such relief shall not be deemed a waiver of the Firm's right to compel arbitration. The Supreme Court of the State of New York, New York County, shall have jurisdiction over any proceeding relating to arbitrations under this Section 17.

18.   Power of Attorney. Each of the Members does constitute and appoint the Chairman or the Deputy Chairman (or their respective designee or designees), each acting singly, with full power of substitution, as his true and lawful representative and attorney-in-fact, in his name, place and stead to make, execute, sign, endorse, swear to and acknowledge, amend, file, record, deliver and publish in his or her name, place and stead in any way which he or she could if personally present to the extent permitted by law:

25

(i)      All certificates and other instruments necessary or advisable to qualify or continue the Firm, including, without limitation, any Continued Use of Business Name Certificate or any fictitious or assumed name certificate required or permitted to be filed by or on behalf of the Firm;

(ii)     All non-resident income tax returns, foreign income tax returns, claims for refund, waivers, consents or any other documents required under the laws of the United States of America or the laws of any state, territory or political subdivision thereof;

(iii)    Any checks received as refund of taxes paid as non-resident and for deposit of his or her account;

(iv)     All promissory notes, checks or drafts signed in the name of and on behalf of the Firm; and

(v)      Any other instrument which is now or which may hereafter be required by law to be filed for or on behalf of the Firm.

19.      General Provisions.

19.1.    Amendment. Notwithstanding anything to the contrary set forth herein, this Agreement may only be amended upon the written consent of not less than Two-thirds of the Members Voting; provided, however, that amendments to change (i) the name of the Firm, (ii) the jurisdiction under which the Firm is organized or authorized to do business or (iii) the law governing this Agreement shall only require approval of the Board of Directors.

19.2.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to conflict of laws principles.

19.3.    Captions. The captions appearing in this Agreement are inserted for convenience and reference only and in no way define, limit or describe the scope and intent of this Agreement or any of the provisions hereof.

19.4.    Successors and Non-Assignability. This Agreement shall bind and benefit the parties hereto and their respective successors, heirs, executors and administrators. A new Member shall be deemed a party to and bound by this Agreement as of the effective date of his or her admission to the Partnership. The acceptance of any benefit pursuant to this Agreement shall constitute acceptance an acknowledgment of all of its terms and obligations. However, this Agreement and the rights and obligations of a Member hereunder may not be assigned without the prior written consent of the Board of Directors, which may be given or withheld in its sole discretion.

19.5.    Severability. If any provision of this Agreement or the application thereof to any Member or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to Members or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

NY1 5456042v3

19.6.   <u>Survival</u>. The terms and conditions of this Agreement, including, without limitation, Sections 9, 10, 11, 12, 13, 15 and 17 hereof, shall survive and remain in full force and effect with respect to each Member following withdrawal, separation or other termination of his or her membership in the Firm.

19.7.   <u>Entire Agreement; No Third Party Beneficiaries</u>. This Agreement (i) constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, among the Members with respect to the subject matter hereof and (ii) except to the extent set forth herein, is not intended to confer upon any person other than the parties hereto any rights or remedies.

19.8.   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement.

19.9.   <u>Construction</u>. In the event of any ambiguity in the interpretation of this Agreement or the By-laws, the decision of the Board of Directors as to the meaning of the provision in question shall govern.

NY1 5456042v3