UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

              -against-

                                                   S1 05 Crim. 0888 (LAK)
                                                      06 Civ. 5007 (LAK)

JEFFREY STEIN, et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re

UNITED STATES OF AMERICA,

                    -against-

JEFFREY STEIN, et al.,

                              Defendants.

JEFFREY STEIN, et al.,

                              Plaintiffs,

                    -against-

KPMG LLP,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**OPINION**

          Appearances:

Justin S. Weddle
Kevin M. Downing
Stanley J. Okula, Jr.
Margaret Garnett
Assistant United States Attorneys
MICHAEL J. GARCIA
UNITED STATES ATTORNEY

Diana D. Parker
*Attorney for Larry DeLap*

John R. Wing
LANKLER SIFFERT & WOHL LLP
*Attorney for Larry DeLap on the indictment*

Charles A. Stillman
STILLMAN FRIEDMAN & SCHECHTMAN, P.C.
Robert S. Bennett
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP
*Attorneys for KPMG LLP*

David Spears
SPEARS & IMES LLP
*Attorney for Jeffrey Stein and, on the*
*advancement claim only, John Lanning*

Michael Madigan
Robert H. Hotz, Jr.
Christopher T. Schulten
AKIN GUMP STRAUSS HAUER
& FELD LLP
*Attorneys for John Lanning on the indictment*

Robert S. Fink
Caroline Rule
Fran Obeid
KOSTELANETZ & FINK, LLP
*Attorneys for Richard Smith*

Stanley S. Arkin
Joseph V. DiBlasi
Elizabeth A. Fitzwater
ARKIN KAPLAN RICE LLP
*Attorneys for Jeffrey Eischeid*

Ronald E. DePetris
Marion Bachrach
Dana Moskowitz
DEPETRIS & BACHRACH, LLP
*Attorneys for Philip Wiesner*

Steven M. Bauer
Karli E. Sager
LATHAM & WATKINS, LLP
*Attorneys for John Larson on the indictment*

John F. Kaley
DOAR RIECK KALEY & MACK
*Attorney for Steven Gremminger*

Cristina Arguedas
Ann Moorman
ARGUEDAS, CASSMAN & HEADLY,  LLP
Michael Horowitz
Michelle Seltzer
CADWALADER, WICKERSHAM &
TAFT LLP
*Attorneys for Gregg Ritchie on the indictment*

David Campbell Smith
MCNAMARA, SPIRA & SMITH
*Attorney for Gregg Ritchie on the*
*advancement claim*

George D. Niespolo
DUANE MORRIS LLP
*Attorney for Randall Bickham on the*
*indictment*

Marc Fenster
RUSS AUGUST & KABAT
*Attorney for Randall Bickham on the*
*advancement claim*

Michael S. Kim
Leif T. Simonson
KOBRE & KIM LLP
*Attorneys for Mark Watson*

John A. Townsend
TOWNSEND & JONES LLP
*Attorney for Carol Warley on the indictment*
*and the advancement claim*

James R. DeVita
BRYAN CAVE LLP
*Attorney for Carol Warley on the indictment*

ii

Stephen Willey
SAVITT & BRUCE, LLP
*Attorney for John Larson on the advancement claim*

David C. Scheper
Julio V. Vergara
OVERLAND BORENSTEIN SCHEPER
& KIM LLP
*Attorneys for Robert Pfaff*

Susan R. Necheles
HAFETZ & NECHELES
*Attorney for Richard Rosenthal*

Russell M. Gioiella
Richard M. Asche
LITMAN, ASCHE & GIOIELLA, LLP
*Attorneys for Carl Hasting*

David B. Pitofsky
Richard Mark Strassberg
GOODWIN PROCTOR  LLP
*Attorneys for David Greenberg on the indictment*

Leonard F. Lesser
SIMON LESSER P.C.
*Attorney for David Greenberg on the advancement claim*

TABLE OF CONTENTS

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    I.      The Advancement Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    II.     Agreements Between KPMG and Certain of the KPMG Defendants . . . . . . . . . . 5
          A.     The Pre-Criminal Referral Agreements Between KPMG and Messrs. Greenberg and Wiesner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          B.     The Fee Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
          C.     The Post-Fee Letter Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    III.    The Hasting Action and Related Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . 9

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    I.      This Court Has Ancillary Jurisdiction to Determine the Claims of the KPMG Defendants for Advancement of Legal Expenses For Defending this Criminal Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    II.     The KPMG Defendants Are Not Obliged to Arbitrate Their Claims for Advancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          A.     Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
          B.     There Is No Evidence that Nine of the KPMG Defendants Are Parties to Any Relevant Arbitration Agreement . . . . . . . . . . . . . . . . . . . . . . . . 19
          C.     In Any Case, Agreements Requiring Arbitration of Claims for Advancement of Legal Expenses to Defend this Criminal Case Are Void as Against Public Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    III.    The Implied Contract Claim Is Legally Sufficient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    IV.    KPMG's Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
          A.     The Merger Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
          B.     The Fee Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
          C.     The Alleged Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
               1.     The Greenberg Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
               2.     The Eischeid, Warley and Wiesner Agreements . . . . . . . . . . . . . 53
               3.     The Rosenthal Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    V.     KPMG's Procedural Objections Are Without Merit . . . . . . . . . . . . . . . . . . . . . . 55
          A.     Rule 57 Specifically Authorizes a Speedy Hearing . . . . . . . . . . . . . . . . . 57
          B.     KPMG's Due Process Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    VI.    The KPMG Defendants' Motion to Compel Advancement . . . . . . . . . . . . . . . . . 66

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

LEWIS A. KAPLAN, *District Judge.*

This is said to be the largest criminal tax case in our nation's history. The indictment charges nineteen defendants, seventeen of them formerly partners or employees of the giant accounting firm, KPMG, with conspiracy and tax evasion.[1]

The Court previously held that the government violated the Fifth and Sixth Amendment rights of the defendants formerly associated with KPMG (the "KPMG Defendants") by causing KPMG – under threat of indictment and destruction of the firm – to depart from its uniform prior practice of paying the legal expenses of KPMG personnel in all cases in which they were named in consequence of their activities on behalf of the firm. It found that KPMG would have paid those expenses – whether legally obliged to do so or not – but for the government's improper conduct, a finding that is binding as between the defendants and the government. The Court, however, deferred the request of the KPMG Defendants to dismiss the indictment based upon the government's misconduct, reasoning that dismissal might prove inappropriate if KPMG were obligated to advance the defense costs, in which case all or much of the harm caused and still threatened by the government's actions might be remedied or avoided. The Court held that it has ancillary jurisdiction over the claims against KPMG for advancement of defense costs and permitted the assertion of those claims in this case. In addition, it postponed the criminal trial for approximately four months, in part to afford KPMG – which already had participated in the criminal case insofar as the KPMG Defendants sought a remedy from KPMG – a fuller opportunity to defend against those claims.

---

[1]    One of the nineteen, a former KPMG employee, has pleaded guilty.

Three defendants are charged also with obstruction in violation of 26 U.S.C. § 7212 and 18 U.S.C. § 2.

2

The KPMG Defendants, as contemplated by the Court's previous opinion (*"Stein I"*),[2] served a summons and complaint on KPMG in the criminal case for advancement of defense costs. KPMG has moved to dismiss for lack of subject matter jurisdiction and on the merits.

KPMG's principal argument is that the complaint should be dismissed because the KPMG Defendants are obliged to arbitrate their claim for advancement of defense costs. But the argument is flawed. Even assuming that arbitration were a possibility where, as here, the dispute arises in a criminal case, KPMG has not established that at least nine of the sixteen KPMG Defendants are parties to any relevant arbitration agreement. In any event, and notwithstanding that courts ordinarily will enforce arbitration clauses, even with respect to claims for indemnification and advancement of legal fees, this is not an ordinary situation. In this context, enforcement of any applicable arbitration clause with respect to the issue of advancement of defense costs would compromise the Court's ability to

- ensure a speedy trial,

- protect the public interest by avoiding possible dismissal of the criminal charges for unconstitutional government interference with the defendants' rights where prompt adjudication of the advancement issue might provide a sufficient remedy,

- safeguard the defendants' rights to a fundamentally fair trial, and

- seek to avoid imposing defense costs on the taxpayers, which is what will occur to the extent that any of the KPMG Defendants go broke trying to defend

---

[2]

435 F. Supp.2d 330 (S.D.N.Y. 2006).

themselves.

Accordingly, after careful consideration, the Court has concluded that enforcement of any applicable arbitration clause, to the extent that it would require arbitration of claims for advancement of legal expenses in this case, would be against public policy.  This Court will resolve the advancement claims on the merits.

KPMG argues also that the advancement claims of a number of the KPMG Defendants are foreclosed by the KPMG partnership agreement and, in any case, have been released.  Its partnership agreement argument is without merit.  As one of the KPMG Defendants in fact may have released KPMG from any obligation to advance defense costs, however, the motion to dismiss as to him is converted into one for summary judgment on that issue.  In a number of other instances, the release issue presents a question of fact for trial.  In still others, it is without merit.

KPMG makes also a number of other arguments.  It attacks the subject matter jurisdiction of the Court and the legal sufficiency of the advancement complaint.  It raises as well a number of procedural contentions.  These arguments, however, all fail.  The advancement claims will proceed to a prompt trial except perhaps in the case of one KPMG Defendant whose claim may be subject to dismissal on summary judgment.

*Facts*

The Court assumes familiarity with *Stein I* and its subsequent opinion, which granted in part the KPMG Defendants' motion to suppress statements made to the government.[3]  These give the

---

[3]

*United States v. Stein,* No. S1 05 Crim. 0888 (LAK), 2006 WL 2060430 (S.D.N.Y. July 26, 2006) (*"Stein II"*).

4

background against which this matter arises.[4]  It suffices for present purposes to summarize briefly both the KPMG Defendants' complaint for advancement of defense costs and a number of agreements to which KPMG refers in its motion.  The Court summarizes also proceedings in the one arbitration that has been commenced concerning these issues.

I.      *The Advancement Complaint*

The advancement complaint contains three claims for relief.

The first alleges that there is an implied contract pursuant to which KPMG is obliged to advance the legal fees and expenses incurred by any KPMG employee[5] for the defense of legal proceedings against the employee arising from and within the scope of the performance of the employee's duties and responsibilities at KPMG.[6]  The second, on behalf of defendant Stein alone, alleges breach of the express written contract that is described in *Stein I.*[7]  Finally, KPMG Defendants Smith, Larson, DeLap, Ritchie, Bickham, Hasting, Rosenthal and Greenberg assert a third claim, as an

---

[4]

KPMG argues that the findings made in *Stein I* are not binding upon it.  It is not clear that this is correct, as KPMG participated to some extent in the proceedings that gave rise to that opinion.  But the point is academic, as the Court does not here rely on those findings in order to resolve the matters now before the Court.

[5]

For ease of expression, the Court uses the term "employee" to include partners, principals and employees.

[6]

Cpt. ¶¶ 40-42.

The complaint asserts, in the alternative, that the failure to advance defense costs is a breach of the implied covenant of good faith and fair dealing inherent in the KPMG partnership agreement.  *Id.* ¶ 41.

[7]

*Id.* ¶¶ 43-46.

5

alternative to the first, under Sections 2802(a) and 16401(a) of the California Labor and Corporations

Codes, respectively.[8]

All three claims seek the same relief – a declaratory judgment and an order directing

KPMG to pay defense costs incurred to date and to be incurred in the future.[9]

II.    *Agreements Between KPMG and Certain of the KPMG Defendants*

KPMG seeks dismissal on the merits on the basis of a number of agreements between

it and some of the KPMG Defendants.[10]

A.    *The Pre-Criminal Referral Agreements Between KPMG and Messrs. Greenberg*
       *and Wiesner*

KPMG entered into agreements with Messrs. Greenberg and Wiesner prior to being

informed that the Internal Revenue Service had made a criminal referral to the Justice Department.

On September 5, 2003, it concluded a Settlement Agreement and Release of Claims with

Mr. Greenberg (the "Greenberg Agreement") pursuant to which Greenberg released and discharged

KPMG, in pertinent part, "from any and all causes of actions, . . . contracts, . . . claims, liabilities, . . .

and demands, known or unknown, suspected to exist or not suspected to exist, anticipated or not

anticipated, . . . which Greenberg has or may have against [it] . . . by reason of any and all acts,

---

[8]

*Id.* ¶¶ 47-52.

[9]

*Id.* ¶¶ 40, 46, 52.

[10]

Both sides have submitted such documents by attaching them to their memoranda of law
without filing authenticating affidavits. As neither side has objected, the Court assumes the
authenticity of this documentary evidence except where otherwise indicated.

6

omissions, events or facts occurring or existing prior to the date hereof as it relates to Greenberg's membership in KPMG and his resignation from that partnership."[11]

On or about August 28, 2003, it entered into a Withdrawal Agreement with Mr. Wiesner (the "Wiesner Agreement") that contained different language. In pertinent part, Mr. Wiesner released KPMG from "each and every claim, cause of action, . . . and demand for relief of any kind of nature whatsover that [he] ever had or now has against [KPMG], including but not limited to any claim arising out of or in any way relating, directly or indirectly, to [Wiesner's] partnership or employment at [KPMG] and [Wiesner's] withdrawal therefrom."[12]   The Agreement went on to say:

> "The consideration offered herein is accepted by [Wiesner] as being in full accord, satisfaction and settlement of any and all claims or potential claims, and [Wiesner] expressly agrees that [Wiesner] is not entitled to and shall not receive any further recovery of any kind from [KPMG] . . . and that in the event of any further proceedings whatsoever based upon any matter released herein, [KPMG] . . . shall have no further monetary or other obligation of any kind to [Wiesner], including any obligation for any costs, expenses and attorneys' fees incurred by or on behalf of [Wiesner]."

Two differences in language bear mention. First, the Greenberg Agreement, but not the Wiesner Agreement, explicitly released KPMG from all contracts. Second, the Greenberg Agreement, in addition to releasing existing claims, perhaps spoke *in futuro,* releasing claims "anticipated or not anticipated." The Wiesner Agreement released only claims that Wiesner "ever had or now has," thus suggesting that it had no effect with respect to claims that might arise in the future. It then went on, however, to add the language set forth in the block quote above. The significance of this language is considered below.

---

[11]        KPMG Mem. Ex. 6, ¶ 8.

[12]        *Id.* Ex. 7, ¶ 6(a).

*B.*     *The Fee Letters*

KPMG claims that ten of the sixteen remaining KPMG Defendants[13] signed letters that acknowledged that KPMG has no legal obligation to advance legal expenses in this case.  It has provided a template which, it claims, was used in each of the ten instances.[14]

The letter in question was written by KPMG's counsel, Skadden Arps, dated March 11, 2004, and thus sent shortly after most of the KPMG Defendants were advised by the government that they were subjects of the investigation.[15]  It provided in pertinent part:

> "This Firm has been asked to convey the decision made by KPMG LLP ('KPMG') regarding the payment of reasonable legal fees and related expenses for [blank] in connection with the federal grand jury investigation regarding certain tax strategies commenced recently in the Southern District of New York (the 'investigation').
>
> "KPMG, in consultation with counsel, has determined that it has no legal obligation to pay any of [blank] legal fees or expenses in connection with this investigation.  Consistent with its past practices, however, KPMG is prepared to pay reasonable legal fees and legal expenses associated with [blank] representation of [blank] in connection with this investigation, subject to the conditions set forth in this

---

[13]

Messrs. Bickham, DeLap, Gremminger, Hasting, Lanning, Rosenthal, Smith, Watson, and Wiesner and Ms. Warley.  *Id.* at 8-9 nn. 5-6.

[14]

KPMG has not provided any affidavit or other admissible evidence supporting its assertions. Nor has it furnished copies of letters signed by any of the defendants.  While copies of such letters, signed by all or most of the ten defendants, were received in evidence at the hearing that preceded *Stein I*, KPMG objects to reliance on the *Stein I* findings on the ground that it did not have an opportunity to object to evidence offered or to examine witnesses in the hearing that preceded that decision.  In consequence, the Court declines to rely on evidence adduced at that hearing unless and until it is offered and received in evidence in proceedings subsequent to KPMG's formal joinder.  Nevertheless, as KPMG would not be entitled to relief based upon these letters even if they were in evidence, the Court assumes the accuracy of KPMG's assertion that the template letter attached to its memorandum of law in fact was sent to and signed by a number of the defendants.

[15]

*Id.* Ex. 3; *see Stein I,* 435 F. Supp.2d at 345-46.

letter.  KPMG's decision to pay [blank] legal fees and expenses is made in its sole discretion, and KPMG reserves the right to cease the payments at any time for any reason with respect to ongoing services."

The template letter then went on to set forth the conditions described in *Stein I,* including the condition that payments would cease if the defendant were charged with criminal wrongdoing.[16]  It concluded with the paragraph:

> "If [blank] wishes to have KPMG pay reasonable legal fees and related expenses in connection with his representation in this investigation, please have [blank] sign this letter below and return it to me."

This was followed by the words "REVIEWED AND AGREED" and a space for a signature.

### C.    The Post-Fee Letter Agreements

KPMG subsequently entered into agreements with three of the KPMG Defendants: Messrs. Eischeid and Rosenthal and Ms. Warley.  All contain release language identical to that in the Wiesner Agreement.[17]  The Rosenthal Agreement, however, unlike those agreements, contains provisions pursuant to which KPMG arguably agreed to defend and indemnify Mr. Rosenthal.[18]  As the release in the Rosenthal Agreement expressly excluded claims against KPMG arising thereunder,[19] it specifically preserved Mr. Rosenthal's claims under its indemnification and advancement provisions.

---

[16]

KPMG Mem. Ex. 3.

[17]

*See id.* Ex. 8 ¶ 8(a); *id.*Ex. 10 ¶ 6(a).

[18]

The Rosenthal Agreement is similar to that between KPMG and Mr. Stein.  *Compare id.* Ex. 11, ¶¶ 6-8 *with Stein I,* 435 F. Supp.2d at 339 & n.25, 356 n. 119.

[19]

KPMG Mem. Ex. 11, ¶ 8(b).

III.     *The Hasting Action and Related Proceedings*

KPMG here seeks dismissal in favor of arbitration.[20]  It therefore is appropriate to review what has occurred in a state court action brought by defendant Hasting long before the initial round of motions in this case.

In September 2005, Mr. Hasting sued KPMG in California state court, seeking among other things an order requiring KPMG to pay the cost of his defense in this case.  KPMG filed a petition to stay the action pending arbitration and, initially at least, prevailed on that point.[21]

KPMG then sought written discovery from and took the deposition of Mr. Hasting in the arbitration.  It sought testimony and other evidence directly relevant to the indictment in this case.  Indeed, although the record is not entirely clear, it evidently sought discovery as well from other defendants in this case.[22]

Mr. Hasting declined to respond to the written discovery and invoked the Fifth Amendment at his deposition, apparently in response to questions that related to this criminal case.[23]  KPMG thereupon moved before the arbitration panel to preclude him from introducing any evidence to support his claims or to refute KPMG's defenses.  Alternatively, it sought an order staying any

---

[20]

KPMG's notice of motion seeks neither to compel nor to stay these proceedings pending arbitration.  Docket item 13, 06 Civ. 5007.

[21]

Docket item 520, 05 Crim. 0888 (KPMG Memorandum), Att. 1.

[22]

KPMG Defs. Mem. Ex. 10, at 1-2.

[23]

*See id.* 16 & Ex. 10, at 1.

arbitration hearing until the conclusion of this case.[24]

*Discussion*

I.    *This Court Has Ancillary Jurisdiction to Determine the Claims of the KPMG Defendants for Advancement of Legal Expenses For Defending this Criminal Case*

This Court held in *Stein I,* over KPMG's objection, that it has ancillary jurisdiction over the fee advancement dispute between the KPMG Defendants and KPMG.[25]  This holding flowed naturally from the Second Circuit's recent decision in *Garcia v. Teitler,*[26] where the Court held that a district court had subject matter jurisdiction to resolve a fee dispute between  criminal defendants and their former attorney where recovery of the disputed retainer was important to the ability of the criminal defendants to retain counsel of their choice in the criminal matter.  It flowed also from *United States v. Weissman,*[27] in which Judge Haight exercised ancillary jurisdiction in another criminal case in this Court to resolve a dispute between a criminal defendant and his former employer concerning the employer's obligation to advance defense costs.  Although KPMG was heard fully on this issue previously, it attempts to argue the point again.

*Garcia* is in point here.  KPMG's principal attempt to deal with the case is again to argue that the dispute in *Garcia* was between defendants in a criminal case and their former attorney,

---

[24]    *Id.* Ex. 11, at 1-2.

[25]    *Stein I,* 435 F.Supp.2d  at 377-78.

[26]    443 F.3d 202 (2d Cir. 2006).

[27]    No. S2 94 Crim. 760 (CSH), 1997 WL 334966 (S.D.N.Y. June 16, 1997).

who was an officer of the court and who had been before the court in the underlying criminal litigation, whereas KPMG is not a former attorney for the KPMG Defendants.  But this distinction remains unpersuasive.

KPMG's argument ignores the Circuit's rationale for finding ancillary jurisdiction in *Garcia*.  In holding that the district court had ancillary jurisdiction to resolve the fee dispute between the defendants and the former attorney, the Court of Appeals said the following:

> "At its heart, ancillary jurisdiction is aimed at enabling a court to administer 'justice within the scope of its jurisdiction.' [*Morrow v. District of Columbia,* 417 F.2d 728, 737 (D.C. Cir. 1969)] (internal quotation marks omitted); *see also Jenkins v. Weinshienk,* 670 F.2d 915, 918 (10th Cir. 1982) ('Ancillary jurisdiction rests on the premise that a federal court acquires jurisdiction of a case or controversy in its entirety. Incident to the disposition of the principal issues before it, a court may decide collateral matters necessary to render complete justice.'). Without the power to deal with issues ancillary or incidental to the main action, courts would be unable to 'effectively dispose of the principal case nor do complete justice in the premises.' *Morrow,* 417 F.2d at 738 n. 36 (internal quotation marks and citation omitted); *id.* at 740 ('The major purpose of ancillary jurisdiction ... is to insure that a judgment of a court is given full effect; ancillary orders will issue when a party's actions, either directly or indirectly, threaten to compromise the effect of the court's judgment.'). Along these lines, the Supreme Court has instructed that ancillary jurisdiction may be exercised 'for two separate, though sometimes related, purposes: (1) to permit disposition of claims that are, in varying respects and degrees, factually interdependent by a single court, and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.' [*Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 379-80 (1994)] (internal citations omitted).

> "Whatever the outer limits of ancillary jurisdiction may be, we hold that resolving a fee dispute after an attorney withdraws following a *Curcio* hearing is within a district court's ancillary powers, as it relates to the court's ability to 'function successfully.' Indeed, we have long approved of the exercise of ancillary jurisdiction by district courts to resolve fee disputes arising in civil cases. In *National Equip. Rental, Ltd. v. Mercury Typesetting Co.,* 323 F.2d 784 (2d Cir. 1963), for example, we held that a district court had power 'ancillary to its conduct of the litigation,' to 'condition the substitution of attorneys in litigation pending before it upon the client's either paying the attorney or posting security for the attorney's reasonable fees and disbursements.' *Id.* at 786. As we explained, this is because the termination of the attorney/client relationship relates to the 'protection of the court's own officers.' *Id.* at 787 n. 1; *see also Petition of Rosenman Colin Freund Lewis & Cohen,* 600 F.Supp. 527, 531

(S.D.N.Y. 1984) (court has jurisdiction over law firm's proceedings to establish a lien against judgment for the recovery of attorney's fees); *Marrero v. Christiano,* 575 F.Supp. 837, 839 (S.D.N.Y. 1983) (court has ancillary jurisdiction to entertain petition to fix lien for attorney's fees).

"In *Grimes v. Chrysler Motors Corp.,* 565 F.2d 841 (2d Cir. 1977), moreover, we held that a district court could exercise ancillary jurisdiction to resolve a fee dispute between attorneys in an underlying personal injury suit, as it related to the distribution of settlement funds. *Id.* at 844. The 'distribution of the . . . settlement funds and . . . determination of appropriate disbursements,' we explained, 'was clearly ancillary to [the district court's] approval of the settlement in the [underlying] case.' *Id.* Finally, in *Cluett, Peabody & Co., Inc. v. CPC Acquisition Co., Inc.,* 863 F.2d 251 (2d Cir. 1988), a case in which a law firm sought attorney's fees from its client for services rendered in an underlying federal action, we held that the district court properly exercised ancillary jurisdiction as the 'fee dispute was properly related to the main action.' *Id.* at 256.

"In light of these decisions, appellant concedes that '[h]ad the underlying federal case [here] been a civil suit, [the] fee dispute' could have been resolved pursuant to a court's ancillary jurisdiction powers. We reject appellant's attempts to distinguish these cases on the ground that the present dispute arises from a criminal matter; the fee dispute here was properly related to the main action, and in managing that proceeding, it was necessary for the court to resolve it.

"The genesis of the present dispute was a *Curcio* hearing, which is itself ancillary to the underlying criminal action. Such proceedings are necessary, as a district court must, on the one hand, ensure that a defendant's representation does not raise any conflict of interest and, on the other hand, protect a defendant's Sixth Amendment right to effective assistance of counsel, which includes the right – albeit qualified – to counsel of one's own choosing. *See United States v. Jones,* 381 F.3d 114, 119 (2d Cir. 2004); *United States v. Perez,* 325 F.3d 115, 125 (2d Cir. 2003); *see also United States v. Gonzalez-Lopez,* 399 F.3d 924, 928-29 (8th Cir. 2005) (discussing right of defendant to counsel of his own choosing balanced against the need of the court to administer justice). A court's administrative duties, including ancillary hearings if necessary, are similarly related to legal representation for indigent defendants who have a right to appointed counsel. *See United States v. Nivica,* 887 F.2d 1110, 1121 (1st Cir.1989) (citing *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)); *see also* 18 U.S.C. 3006A(a)(1)(H) (requiring district courts to set up a plan for the representation of indigent defendants and requiring, as part of that plan, representation of those entitled to counsel under the Sixth Amendment). Any or all of these concerns, which a court undoubtedly has the authority (and hence, jurisdiction) to address, necessarily implicate attorney's fees.

"Although both Garcia and Alvarez have been able to obtain new counsel, the

record reflects that they are of limited means and that the funds paid to Teitler may be needed to pay their new counsel. *Garcia v. Teitler,* 2004 WL 1636982, at *5. In order to guarantee a defendant's right to choose his own counsel where, as here, his criminal case is ongoing, and to avoid the possibility of defendants becoming indigent and requiring the appointment of counsel, a district court must be able to exercise ancillary jurisdiction to resolve a fee dispute. *See Novinger v. E.I. DuPont de Nemours & Co., Inc.,* 809 F.2d 212, 217 (3rd Cir. 1987) (noting that while '[a]ttorneys' fee arrangements . . . are matters primarily of state contract law . . . the federal forum has a vital interest in those arrangements because they bear directly upon the ability of the court to dispose of cases before it in a fair manner'); *United States v. Weissman,* No. S2 94 CR 760, 1997 WL 334966, at * 6 (S.D.N.Y. June 16, 1997) (exercising ancillary jurisdiction to decide whether, under an indemnity agreement, a company was required to continue to advance funds for defendant's legal proceedings as 'resolution of [the] dispute might impact . . . the conduct of the matter that gives rise to the court's original jurisdiction'). In fact, both defendants here are currently represented by counsel provided pursuant to the Criminal Justice Act, 18 U.S.C. 3006A ('CJA'), which allows the court to recover funds from a defendant when the court finds that such funds are available. 18 U.S.C. 3006A(f); *see also United States v. Bracewell,* 569 F.2d 1194, 1197 (2d Cir. 1978) (noting that 'the reimbursement statute, which was duly enacted to carry out salutary policies . . . creates a constitutionally proper ground for depriving a financially able defendant of available funds which, in fairness, should be remitted to the public coffers'); *cf. United States v. Parker,* 439 F.3d 81, 105 (2d Cir. 2006) (noting that the district court must be involved in managing CJA funds so as to 'discourag[e] a few opportunistic attorneys from utilizing substantial partial retainers that, after quickly being exhausted, would then require the use of CJA funds'). As such, it is in the interest of the court to resolve the fee dispute here, and the court must, therefore, be able to exercise ancillary jurisdiction in order to do so."[28]

In this case, this Court already has determined that the government violated the rights of the KPMG Defendants to due process and to the assistance of counsel by interfering with KPMG's advancement of legal fees and other defense costs.  The overarching issue is what to do about it.

The KPMG Defendants urge the Court to dismiss the indictment.  The Court, bearing in mind the Supreme Court's admonition that dismissal is a last resort, has concluded that determination of the KPMG Defendants' claimed right of advancement of defense costs should be decided, if possible,

---

[28]   443 F.3d at 208-10.  *See also Matter of Stabile (United States v. N.Y. Racing Ass'n),* 436 F.Supp.2d 406 (E.D.N.Y. 2006).

before a determination is made on the dismissal issue.  Dismissal of course would defeat the public interest in having this indictment decided on the merits rather than as a result of inappropriate actions by the prosecution.  Proceeding without resolving the advancement issue now would  threaten the right of these defendants "to choose [their] own counsel where, as here, [their] criminal case is ongoing."[29] It would entail also "the possibility of defendants becoming indigent."[30]   Thus, resolution of the fee dispute relates to the Court's ability to "function successfully"[31] and is "necessary to [its ability to] render complete justice."[32]   In such circumstances, as the Circuit has held, "a district court must be able to exercise ancillary jurisdiction to resolve a fee dispute."[33]

KPMG argues also that this Court inappropriately relied upon *Weissman,*[34] which it claims "understandably has not been followed by any other court."[35]  But KPMG's rhetoric overlooks

---

[29]
    *Id.* at 209.

[30]
    *Id.*

[31]
    *Id.* at 208 (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 379-80 (1994) (internal quotation marks omitted)).

[32]
    *Id.* (quoting *Jenkins v. Weinshienk*, 670 F.2d 915, 918 (10th Cir.1982) (internal quotation marks omitted)).

[33]
    *Id.* at 209.

    It bears noting also that the attorney in question in *Garcia* had withdrawn as counsel in the underlying criminal litigation.  When the fee dispute arose, he no longer was before the Court any more than any other lawyer.  Moreover, by the time the appeal was heard, he had died. *Id.* at 202 n.1.

[34]
    1997 WL 334966.

[35]
    KPMG Mem. 33.

the fact that *Weissman* was relied upon by our Circuit in *Garcia* for the precise point at issue here – the district court's ancillary jurisdiction in a criminal case to resolve a fee dispute with a non-party where that is related to the ability of the court to "function successfully" and to "render complete justice."[36]

Insofar as KPMG moves to dismiss for want of subject matter jurisdiction, the motion is denied.[37]

---

[36]

*Garcia,* 443 F.3d at 209-10.

KPMG denigrates *Weissman* on the additional ground that it is "unpublished" (KPMG Mem. 33), presumably a reference to the fact that it is published on Westlaw and Lexis but not in the printed volumes of the Federal Supplement. The Court ordinarily would pass such a contention without comment save for the fact that KPMG's memorandum cites eight cases that are "unpublished" in the same sense as well as one that does not appear even in the computer assisted legal research services. The fundamental point, however, is that the force of a judicial decision depends upon its inherent persuasiveness and logic, not upon whether its author sent it to West Publishing Company for inclusion in a print reporter. This Court, like the Second Circuit, finds *Weissman* quite persuasive.

[37]

KPMG asserts also that "[t]he Court's declaration of ancillary jurisdiction, and the Complaint itself, rest almost entirely on one . . . unsupported finding: that '[a]bsent the Thompson Memorandum and the actions of the [United States Attorney's Office], KPMG would have paid the legal fees and expenses of all of its partners and employees both prior to and after indictment, without regard to cost.'" KPMG Mem. 4. It goes on to complain that "no witness . . . was asked the hypothetical question of what KPMG would have done '[a]bsent the Thompson Memorandum and the actions of' the United States Attorneys' [*sic*] Office." *Id.* These assertions are utterly lacking in merit.

To begin with, there was ample evidence to support the Court's finding. Indeed, it rested heavily on a stipulation between the government and the KPMG Defendants that was promoted by and rested on representations by KPMG. It rested also on the testimony of KPMG's general counsel. *See Stein I,* 435 F. Supp.2d at 340 & n.27, 352 & n.92. The finding of ancillary jurisdiction, moreover, depended on the existence of a dispute as to KPMG's legal obligation to advance defense costs and the significance of that issue to the proper resolution of this case, not on the finding that it would have paid absent the government's interference. *Id.* at 377-78.

The lack of any hypothetical question as to what KPMG would have done, even assuming that such a question would have been proper and that there was a witness competent to answer it, is no more persuasive. The government had every opportunity to ask such a question but elected not to do so. And since the Court does not rely upon the findings in

II.      *The KPMG Defendants Are Not Obliged to Arbitrate Their Claims for Advancement*

KPMG next asserts that the complaint should be dismissed because the KPMG Defendants are obliged to arbitrate their claim for advancement of defense costs.[38]  This argument ultimately is unpersuasive.

To begin with, it is important to bear in mind that this is not an ordinary commercial dispute.  By virtue of the government's unconstitutional interference with KPMG's advancement of defense costs, the question whether KPMG is obliged to advance those costs has become an integral part of a federal criminal case.  The necessity for its decision arises first and foremost from the Court's need to decide the KPMG Defendants' motion to dismiss the indictment or otherwise sanction the United States for the government's violation of their Fifth and Sixth Amendment rights.[39]  Thus, it is doubtful whether the Federal Arbitration Act ("FAA")[40] has any bearing here.[41]  But it is

---

*Stein I* as against KPMG, KPMG could not possibly be aggrieved by that failure.

[38]     Docket item 13, 06 Civ. 5007.

[39]     *See Stein I,* 435 F. Supp.2d at 373-81.

As discussed in more detail below, some of the forms of a civil action – for example, the issuance and service of a summons and complaint on KPMG and the use of a civil docket number purely as a matter of convenience – have been employed pursuant to the Court's power under FED. R. CRIM. P. 57(b) to regulate practice in a criminal case in any manner consistent with federal law where the criminal rules do not otherwise prescribe the mode of procedure, not because this is a civil action subject to the Federal Rules of Civil Procedure.

[40]     9 U.S.C. § 1 *et seq.*

[41]     The analogy to the role of arbitration with respect to issues of patent validity is instructive.

Arbitration clauses requiring arbitration of issues of patent validity formerly were void as

17

unnecessary to determine whether questions arising in criminal cases categorically are inappropriate for arbitration. Careful analysis demonstrates that the advancement dispute in this case is not arbitrable even under the FAA.


A.      *Legal Standards*

The FAA established an "emphatic federal policy in favor of arbitral dispute resolution."[42]  Nevertheless, "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration."[43]  Hence, issues as to the existence and validity of an agreement to arbitrate always are for courts, not for arbitrators.[44]  Moreover, notwithstanding the federal policy in favor of arbitration, the FAA places contracts requiring arbitration "on equal footing with all other contracts."[45]  The party

---

against public policy in view of the preeminent public interest in such questions. *Beckman Instruments, Inc. v. Tech. Dev. Corp.,* 433 F.2d 55, 62-63 (7th Cir. 1970) ("[W]e are in accord with the district court's view that . . . questions [of patent validity] are inappropriate for arbitration proceedings and should be decided by a court of law, given the great public interest in challenging invalid patents.").  Although that rule was changed by the enactment of 35 U.S.C. § 394(a), the fact remains that the public interest in matters of patent validity trumped the FAA until Congress enacted specific legislation to the contrary.

[42]

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 631 (1985); *see also, e.g., Buckeye Check Cashing v. Cardegna,* 126 S.Ct. 1204, 1207 (2006); *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 111 (2001); *Shearson/Am. Exp,. Inc. v. McMahon,* 482 U.S. 220, 225-26 (1987).

[43]

*First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995).

[44]

*E.g., LAIF X SPRL v. Axtel, S.A. de C.V.,* 390 F.3d 194, 198 (2d Cir. 2004).

[45]

*EEOC v. Waffle House, Inc.,* 534 U.S. 279, 293 (2002).

seeking to compel arbitration bears "the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate,[46] just as the party seeking relief under any other alleged contract has the burden of proving that contract's existence. Moreover, agreements to arbitrate under the FAA are subject to avoidance "upon such grounds as exist at law or in equity for the revocation of any contract."[47]

Assuming the existence and validity of an agreement to arbitrate, the question whether a particular dispute is to be resolved by litigation or arbitration also is for the court "unless there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator."[48] This presumption, however, is reversed where the question is the scope of issues intended to be resolved by arbitration. In such cases, ambiguity concerning the scope of the arbitrable issues is decided in favor of arbitration.[49] But this principle is not boundless. Arbitration of a particular grievance will

---

[46]

*Tellium, Inc. v. Corning, Inc.,* No. 03 Civ. 8487 (NRB), 2004 WL 307238, at *5 (S.D.N.Y. Feb. 13, 2004) (citing *Progressive Cas. v. C.A. Reaseguradora Nacional,* 991 F.2d 42, 46 (2d Cir. 1993)); *Roller v. Centronics Corp.,* No. 87 Civ. 5715 (JFK), 1989 WL 71200, at *2 (S.D.N.Y. June 22, 1989) (citing *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440, 442 (2d Cir. 1964)).

[47]

9 U.S.C. § 2. *See also Doctor's Assoc., Inc. v. Casarotto,* 517 U.S. 681, 686-87 (1996) ("[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]."); *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 42 (1987); *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum and Plastic Workers of Am.,* 461 U.S. 757, 766 (1983); 1 DOMKE ON COMMERCIAL ARBITRATION § 39:9 (2006) ("DOMKE").

[48]

*E.g., PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir. 1996).

[49]

*Id.*

19

not be ordered where "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[50]

       With these principles in mind, we turn to the present controversy, assuming *arguendo* that the FAA controls.

       B.      *There Is No Evidence that Nine of the KPMG Defendants Are Parties to Any Relevant Arbitration Agreement*

       KPMG's argument relies primarily on the 2003 KPMG partnership agreement (the "2003 Agreement"),[51] which provides in pertinent part:

> "Any dispute between the Firm and any Member or Separated Member or between or among Members or Separated Members arising out of or relating to the Firm or the accounts or transactions thereof or the dissolution or winding up thereof, the construction, meaning or effect of any provision of this Agreement, or the rights or liabilities of a Member or Separated Member or such Member's or Separated Member's representatives ('<u>Disputes</u>'), shall be submitted for resolution by arbitration in

---

[50]

    *Id. Accord, e.g., Katz v. Feinberg,* 290 F.3d 95, 97 (2d Cir. 2002).

[51]

    One preliminary point must be made with respect to the 2003 Agreement and all of the other KPMG partnership agreements referred to in this opinion. As noted, it was KPMG's burden to demonstrate the existence of an agreement to arbitrate. *Supra* n.46. Yet, as the KPMG Defendants asserted at oral argument, KPMG has not submitted any affidavit or other admissible evidence authenticating any of these agreements or establishing that the conditions prerequisite to their effectiveness (*e.g.,* the 2002 agreement provided that it could not be amended or changed absent the written consent of two-thirds of the members voting, KPMG Defs. Ex. 2, § 19.1, thus putting into question the effectiveness of the 2003 Agreement) were satisfied. In consequence, the KPMG Defendants are technically correct in saying that KPMG has not carried its burden. As KPMG's motion must be denied even assuming that the copies of partnership agreement(s) it relies upon are authentic and were properly adopted, it is unnecessary to rely on this ground, which in any case probably could be cured. The subsequent discussion assumes authenticity and due adoption.

accordance with the procedures set forth in this [section]."[52]

None of the KPMG Defendants remains employed by the firm.[53] KPMG therefore relies heavily on the language in the 2003 Agreement that obligates a Separated Member – a former partner or principal – to arbitrate certain disputes with the firm.  But it is undisputed that eight of the KPMG defendants – Messrs. Bickham, DeLap, Greenberg, Lanning, Larson, Pfaff, Ritchie, and Watson – left KPMG prior to October 1, 2003, the date on which the 2003 Agreement became effective.[54]  One additional defendant, Mr. Wiesner, left the firm after the effective date of the 2003 Agreement,[55] but entered into an agreement with KPMG that provides that his relationship to the firm is governed by the partnership agreement as amended and restated as of April 15, 2002.[56] There is no evidence he ever became a party to the 2003 Agreement.[57]  In consequence, these nine defendants are not bound

---

[52]

KPMG Mem. Ex. 4 (emphasis in original).

[53]

See id. 8-9 ("[a]ll but one of the *Stein* Defendants *were* at one time or another members of the partnership of KPMG . . . .  One of them *was* a Senior Manager . . . .") (emphasis added); KPMG Reply Mem. 6 (referring to KPMG Defendants as "former partners"), 9 (referring to "the[] former status [of KPMG Defendants] as partners of the firm"); *see also* Cpt. ¶¶ 5-20.

[54]

*E.g.,* Cpt ¶¶ 6, 10, 11, 12, 14, 15, 16, 20; Superseding Ind. ¶¶ 9, 13, 14, 17, 18, 19, 24.  *See also* KPMG Reply Mem. 6-7 (arguing that half of the KPMG Defendants are subject to pre-2003 partnership agreements).

[55]

Cpt ¶ 9.

[56]

KPMG Mem. Ex. 7, ¶ 5 and first WHEREAS clause.

[57]

The copy of the 2003 Agreement attached to KPMG's memorandum of law is followed immediately by copies of signature pages apparently bearing the signatures of most of those of the KPMG Defendants who were partners in the firm.  KPMG Mem. Ex. 4.  Close inspection of those signature pages, however, shows that they were not parts of the 2003 Agreement, as all bear earlier dates as follows: Bickham (partnership agreement signed July

by the 2003 Agreement.

To be sure, those KPMG Defendants who at one time were partners in KPMG or its predecessor firms were parties to prior partnership agreements.  The KPMG Defendants have submitted copies of some of them, the authenticity of which KPMG does not dispute, albeit with no indication of which defendants signed which agreements.  But KPMG points specifically to no prior partnership agreement that required *former* partners to arbitrate claims against the firm following their departures.[58]  Indeed, the evidence is clearly to the contrary.

KPMG argues that each partner and principal "is bound by the terms of the last agreement under which he performed services as a partner at the firm, pursuant to which he received benefits."[59]  It is undisputed that all of the KPMG Defendants were employed by KPMG after the

---

[58]     1, 2000), DeLap (articles of partnership dated July 1, 1975), Eischeid (articles of partnership as amended as of April 1, 1987), Gremminger (partnership agreement effective July 1, 1997), Lanning (articles of partnership dated July 1, 1981), Pfaff (same), Ritchie (articles of partnership as amended July 1, 1987), Rosenthal (same), Stein (same), Watson (July 1, 1997), and Wiesner (articles of partnership July 1, 1987).  There is no signature page for Mr. Greenberg (a page for someone named Greenfield having been included instead, presumably in error).  The signature pages provided for Mr. Smith and Ms. Warley have  1995 and 1993 "received" stamps, but it is impossible to tell what documents these page were taken from.  The signature page for Mr. Hasting includes no date nor any indication of what document it was taken from.

[59]     KPMG does note that two of these nine defendants, Messrs. Bickham and Larson, signed a Senior Manager's Agreement in addition to a partnership agreement, which required arbitration of "any claim or controversy arising out of or relating to this Agreement or the breach thereof . . . or any claim or controversy that in any way relates to the terms or conditions of KPMG's employment of Senior Manager."  KPMG Mem. 24-25; KPMG Ex. 5 ¶ 14.  Like the pre-2003 partnership agreements, however, the Senior Manager's Agreements did not purport to bind former employees and, in fact, stated that they would continue in effect only until the termination of the manager's employment.  KPMG Ex. 5 ¶¶ 2, 5.

KPMG Defs. Mem. Ex. 3; *see also* KPMG Reply Mem. 7.

effective date of the 1997 agreement[60] and that most remained so employed in 2002 and more recently.[61]  Hence, on KPMG's alternate theory, the nine KPMG Defendants at issue here would be subject to the 1997 or 2002 partnership agreement.[62]  Those  agreements, however, are inconsistent with KPMG's position.

The 1997 and 2002 agreements both defined "Members" as "the Partners and the Principals" of the firm.[63]  Both defined retired and withdrawn partners and principals as "Separated Members."[64]  Both distinguished between Members and Separated Members in various ways.  The arbitration clause in each of those agreements, however, applied only to disputes "between the Firm and any Member" without any mention of disputes between the Firm and any Separated Member.[65]  Thus, the clear terms of those arbitration clauses unambiguously foreclosed the existence of any obligation on the part of Separated Members to arbitrate disputes with the firm.  KPMG's addition in the 2003 Agreement of Separated Members to those obliged to arbitrate disputes with the firm was a clear

---

[60]

KPMG so conceded at oral argument.

[61]

Cpt. ¶¶ 5-20; Superseding Ind. ¶¶ 8-24.

[62]

It might be noted that the 2002 agreement stated that it amended and restated a previous agreement that was effective as of  February 13, 2001.  KPMG Defs. Mem. Ex. 2, at 1. Neither KPMG nor the KPMG Defendants have provided or otherwise relied upon any such 2001 agreement, so the Court cannot take its contents, whatever they may have been, into account in deciding this matter.  Moreover, as the portions of the 1997 and 2002 agreements relevant to this point are identical, there is no reason to suppose that any 2001 or other intervening agreement was any different.

[63]

KPMG Defs. Mem. Ex. 2, § 1.29; *id.* Ex. 5, § 1(aa).

[64]

*Id.* Ex. 2, §§ 11.1, 1.42; *id.* Ex. 5, §§ 13(a), 1(al).

[65]

*Id.* Ex. 2, § 17(i) (2002 agreement); *id.* Ex. 5, § 19(a) (1997 agreement).

admission, though none was required, that Separated Members were not obliged to arbitrate under prior versions of the agreement.[66]

KPMG's reply memorandum argues that the issue of arbitrability itself is arbitrable. But that argument too is unpersuasive, at least with respect to these nine KPMG Defendants. As indicated, the issue whether there is an agreement to arbitrate is for the court. KPMG has offered no evidence that these defendants ever were parties to the 2003 Agreement upon which it relies.

---

[66]
KPMG contends that the addition of the phrase "or Separated Member" to the arbitration clause in the 2003 Agreement was designed only to make clear that former members had an obligation to arbitrate disputes with the firm concerning their conduct after they left the firm and that this was motivated by aspects of the Sarbanes-Oxley Act. KPMG Reply Mem. 11. But the argument is untenable.

First, the language of the arbitration clause in the 2003 Agreement does not support KPMG's argument that the change related only to disputes concerning post-termination conduct by Separated Members. The clauses in the 1997 and 2002 agreements, on the one hand, and the 2003 Agreement, on the other, are substantially identical save for the insertion of Separated Members among those obliged to arbitrate. There was no change in the scope of the matters within the obligation to arbitrate. While the 2003 Agreement did impose certain new obligations on members that survive their separation from the firm, thus perhaps increasing the possibility of disputes between separated members and the firm, the fact remains that disputes between former partners and the firm were entirely foreseeable from the day the firm was founded. Such disputes could have arisen with respect to events that occurred while the former partners were members of the firm (*e.g.,* embezzlement, receipt of kickbacks) or with respect to events that occurred afterward (*e.g.,* misuse of confidential information or taking advantage of business opportunities that came to the knowledge of the separated member as a partner or principal in the firm). *See, e.g., Int'l Equity Invests., Inc. v. Opportunity Equity Partners, Ltd.,* 407 F. Supp.2d 483, 498-99 (S.D.N.Y. 2005) (discussing duties of former partner to partnership and remaining partners); Restatement (Second) of Trusts § 170 cmt. g (1959); Restatement (Third) of Agency § 8.01 cmt. c (2006). So the 2003 addition of Separated Members to those obligated to arbitrate confirmed that there was no obligation on the part of Separated Members to do so under prior versions of the agreement with respect to disputes concerning either pre- or post-termination events.

Second, KPMG's assertions concerning the motive for the 2003 change are contained only in its unsworn memorandum of law. Although they would not change the result even if accepted, the Court declines to accept such factual contentions, as there is no evidence to support them.

KPMG's next fallback position stands it in no better stead.  Assuming without deciding that each defendant is bound by the partnership agreement in effect when he or she left the firm (or, in the case of Mr. Rosenthal, by the 2002 partnership agreement as specified in his withdrawal agreement), each of these nine defendants is subject either to the 1997 or the 2002 agreement.  The language of those agreements demonstrates that the obligation of former partners to arbitrate ended when their status as partners terminated.[67]

KPMG's final argument with respect to these nine KPMG Defendants is that their obligations to arbitrate under pre-2003 versions of the agreement survived the termination of their employment[68] in light of *Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionary Workers' Union.*[69] To be sure, the Supreme Court there held that parties to a collective bargaining agreement ("CBA") containing an arbitration clause are presumed to intend that the obligation to arbitrate survive the expiration of the CBA, in the absence of strong contrary indications, where the dispute

---

[67]     The question whether individuals who were parties to the 1997 or 2002 partnership agreement remained bound to arbitrate disputes with the firm, even after their associations with the firm ended, conceivably might be characterized either as a question of whether there was an agreement to arbitrate or in terms of the scope of the arbitration clause.  It is unnecessary, however, to determine which characterization better fits the facts here.  If characterized as an issue going to the existence of an agreement to arbitrate, the question would be for the Court.  If characterized as an issue going to the scope of the arbitration clause, the issue nevertheless would be for the Court because the language is such that ""it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *A T & T Techs. Inc. v. Comms. Workers of Am.,* 475 U.S. 643,  650 (1986).  Thus, even if KPMG had established that each of these nine defendants actually signed the 1997 or 2002 partnership agreements, the question whether they are obliged, after their departure from the firm, to arbitrate a dispute such as this would be for the Court in either case.

[68]     KPMG Reply Mem. 2, 8-11.

[69]     430 U.S. 243 (1977).

is "over a provision of the expired agreement."[70]  But *Nolde Brothers* does not carry the day here for at least two reasons.

First, *Nolde Brothers* did no more than establish a  rebutable presumption applicable in the absence of evidence that the parties did not intend arbitration of post-termination disputes.[71] Here, however, the express language of the 1997 and 2002 agreements negates any obligation on the part of former partners to arbitrate disputes with the firm following their termination by excluding former partners from the definition of Members and limiting the obligation to arbitrate to Members.[72] And if this were not clear enough, the 2003 change in the agreement underscored it.  Thus, *Nolde Brothers* does not apply.

Second, even putting this point to one side, *Nolde Brothers* was limited by *Litton Financial Printing Division v. NLRB.*[73]  The Court there held that the *Nolde Brothers* presumption applies only to a dispute that "has its real source in the contract" containing the arbitration clause. It went on to say that the case did "not announce a rule that postexpiration grievances concerning

---

[70]

       *Id.* at 255.

[71]

       *Id.* at 253.

[72]

       Notwithstanding the presumption in favor of arbitrability that applies in other circumstances, the Supreme "Court [has] specifically instructed lower federal courts faced with post-expiration disputes to determine whether parties had agreed to arbitrate these disputes – *i.e.*, to determine arbitrability – even if that analysis requires the court to interpret the arbitration agreement, a task normally remitted to an arbitrator under a broad arbitration clause."  *CPR (USA) Inc. v. Spray,* 187 F.3d 245, 255 (2d Cir. 1999) (citing *Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 208-09 (1991)).

[73]

       501 U.S. 190 (1991).

terms and conditions of employment remain arbitrable."[74]

KPMG has not demonstrated that the dispute concerning advancement of defense costs arises out of any version of its partnership agreement.  Its partnership agreements, so far as the record discloses, always have been silent on the issues of advancement and indemnification.  In consequence, even if the parties were presumed to have intended arbitration of post-termination disputes concerning the partnership agreements, the presumption would not apply to this post-termination dispute about a subject never addressed in those agreements.  Accordingly, even if the language of the pre-2003 partnership agreements did not negate any intent to have post-termination disputes with former partners resolved by arbitration, this dispute would not be arbitrable.[75]

The facts concerning the seven remaining KPMG Defendants vary.  Mr. Stein and, evidently, Mr. Rosenthal have withdrawal or termination agreements that contain arbitration clauses.  Other KPMG Defendants perhaps signed the 2003 Agreement.  But it is unnecessary to decide whether whatever arbitration agreements there may be otherwise apply to the advancement issue, whether the determination would be for the Court or for arbitrators,[76] or, for that matter, to rely on the preceding discussion alone as to the other nine KPMG Defendants.  Enforcement of any applicable arbitration clauses, in the perhaps unique and certainly unusual context of this case, would violate

---

[74]
       *Id.* at 205-06.

[75]
       The other cases relied upon by KPMG on this point are inappposite.  None involved a situation in which the underlying agreement so clearly negated an intent to arbitrate post–termination disputes.  Several were decided before *Litton* clarified the holding of *Nolde Brothers.*

[76]
       *CPR (USA), Inc.,* 187 F.3d at 255, suggests strongly that it would be for the Court.  Moreover, the issue of arbitrability would not be free of doubt.

public policy.

      C.      *In Any Case, Agreements Requiring Arbitration of Claims for Advancement of Legal Expenses to Defend this Criminal Case Are Void as Against Public Policy*

The Supreme Court has made clear that courts may not enforce contracts that "violate[] some explicit public policy."[77]  This includes contracts for the arbitration of disputes.[78]

The question whether a contract is contrary to public policy "is ultimately one for resolution by the courts."[79]  To make this determination, a court must "assess whether there is some competing statute or policy sufficient to outweigh the strong federal policy favoring arbitration, and hence to foreclose arbitration of the dispute raised by plaintiff."[80]  The competing policy "must be

---

[77]

    *W.R. Grace & Co.,* 461 U.S. at 766; *see also  Misco, Inc.,* 484 U.S. at 42.

[78]

    *See Casarotto,* 517 U.S. at 686-87 ("[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]."); *Misco,* 484 U.S. at 42; *W.R. Grace & Co.,* 461 U.S. at 766; 1 DOMKE § 39:9.

    Many states, including Delaware and New York, also prohibit the enforcement of arbitration provisions that contravene public policy.  *Matter of C'tee of Interns and Residents,* 86 N.Y.2d 478, 484, 634 N.Y.S.2d 32, 34 (1995); *see also Matter of Blackburne,* 87 N.Y.2d 660, 665, 642 N.Y.S.2d 160, 163-64 (1996); *Board of Ed. of City of Buffalo v. Buffalo Council of Sup'rs and Administrators,* 52 A.D.2d 220, 229, 338 N.Y.S.2d 732, 737 (4th Dept. 1976); 5 N.Y. JUR. 2d, *Arbitration & Award* § 31 (2006);  *Worldwide Ins. Group v. Klopp,* 603 A.2d 788 (Del. 1992) (clause limiting judicial review of arbitral award void as against public policy); *Graham v. State Farm Mut. Auto. Ins. Co.,* 565 A.2d 908, 911 (Del. 1989); 10 WEST'S DEL. CODE ANN. § 5701.

[79]

    *W.R. Grace,* 461 U.S. at 766; *Misco,* 484 U.S. at 43.

[80]

    *Booker v. Robert Half Int'l, Inc.,* 315 F.Supp.2d 94, 98 (D. D.C. 2004) (quoting *Mitsubishi Motors,* 473 U.S. at 628, 105 S.Ct. 3346), *aff'd,* 443 F.3d 77 (D.C. Cir. 2005).

well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."[81]  Here, a number of important and well defined considerations combine to require the conclusion that enforcement of any requirement of arbitration of the KPMG Defendants' claim for advancement of the costs of defending this case would violate public policy.

First, each of these defendants has a right under the Sixth Amendment and the Speedy Trial Act to a speedy trial.[82]  The interest in a speedy trial, moreover, does not belong to defendants alone.  As the Second Circuit wrote in *United States v. Gambino,* "the public has as great an interest in a prompt criminal trial as has the defendant. Certainly, the public is the loser when a criminal trial is not decided expeditiously, as suggested by the aphorism, 'justice delayed is justice denied.'"[83]  That is why a defendant may not waive the protections of the Speedy Trial Act.[84]

Second, each of these defendants has a right under the Fifth and Sixth Amendments to a fundamentally fair trial.[85]  This includes the right to representation by counsel of his or her choice

---

[81]

    *W.R. Grace,* 461 U.S. at 766 (internal quotation marks omitted); *Misco,* 484 U.S. at 43-44; 1 DOMKE § 39:9.

[82]

    18 U.S.C. §§ 3161 *et seq.*

[83]

    *United States v. Gambino,* 59 F.3d 353, 360 (2d Cir. 1995), *cert. denied,* 517 U.S. 1187 (1996); *see also, e.g., United States v. Yagid,* 528 F.2d 962, 966 (2d Cir. 1976) ("[The purpose of all the [district court] Plans for Achieving Prompt Disposition of Criminal Cases has been to serve the public interest in the prompt adjudication of criminal cases, and not 'primarily to safeguard defendants' rights.'") (citation omitted)).

[84]

    *Gambino,* 59 F.3d at 360.

[85]

    *See generally Stein I,* 435 F. Supp.2d at 356-62 (collecting authorities).

to put on the defense each wishes to present[86] and to use the funds lawfully available to each in order to do so.[87]

Third, there is an obvious public interest in having these criminal charges decided on the merits.  If KPMG, in time for the determination to have an impact in this case, were found to be obligated to advance defense costs, the harm done and threatened by the government's prior misconduct may be remedied or avoided.  This in turn could avoid dismissal or other sanctions that otherwise could terminate or hamper the prosecution.

Fourth, should a defendant become indigent during the course of this case, he or she would be entitled under the Constitution and the Criminal Justice Act ("CJA") to the appointment of counsel and other necessary defense services at public expense.[88]  The CJA requires the district court to "be involved in managing CJA funds" in order to protect the public fisc.[89]  Moreover, it expressly provides that whenever a district court "finds that funds are available for payment from or on behalf of a person furnished representation" under the CJA, it may direct reimbursement of the government out of those assets.[90]  Thus, the public has a demonstrable interest in ensuring that it is not forced to bear the cost of defending any of these defendants if private funds are lawfully available to them, and

---

[86]

      *Id.* at 357-58, 365-66.

[87]

      *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624 (1989); *Stein I,* 435 F. Supp.2d at 365-66.

[88]

      *E.g., Gideon v. Wainwright,* 372 U.S. 335 (1963); 18 U.S.C. § 3006A.

[89]

      *Garcia,* 443 F.3d at 210 (citing *United States v. Parker,* 439 F.3d 81, 105 (2d Cir. 2006)).

[90]

      18 U.S.C. § 3006A(f).

the Court has a clear mandate to determine whether funds are available for payment on behalf of persons furnished representation. Nor is the Court obliged to await a defendant's indigency; it has jurisdiction at least in some circumstances to act to avoid that eventuality.[91]

Fifth, there is a public interest in protecting the jurisdiction and ensuring the proper functioning of the federal courts. By giving United States district courts exclusive jurisdiction to try indictments charging offenses against the United States, the Constitution and laws of our nation placed the responsibility for determining the outcome of federal criminal charges in the hands of federal court juries and judges selected and protected in accordance with Article III of the Constitution. This responsibility necessarily carries with it the authority and the duty to "do complete justice,"[92] to "function successfully,"[93] and "to see that [defendants in a criminal case are] denied no necessary incident of a fair trial."[94]

The placement of this responsibility in the federal courts serves exceptionally important ends. At the broadest level, it is an important structural feature of our system of government. At a more specific level, the choice of federal courts for the determination of federal criminal cases ensures that such matters are decided by neutral decision makers, who are insulated from competing commercial or other interests, and that they are decided in public *fora*.

---

[91] *Garcia,* 443 F.3d at 210.

[92] *Id.* at 208 (quoting *Morrow v. District of Columbia,* 417 F.2d 728, 740 (D.C. Cir. 1969)).

[93] *Id.* (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 379-80 (1994)).

[94] *Powell v. Alabama,* 287 U.S. 45, 52 (1932); *see also Nebraska Press Ass'n v.Stuart,* 427 U.S. 539, 552-53 (1976) (noting the "trial court's duty to protect the defendant's constitutional right to a fair trial").

Finally, it bears emphasis also that states permit, and in some cases require, advancement of defense costs by employers in order to "fill[] the gap . . . so the [employer] may shoulder interim costs," and that its value "is that it is granted or denied while the underlying action is pending."[95]   Thus, there is a strong public interest in the timely resolution of any disputes concerning advancement of defense costs.[96]   Indeed, both New York and Delaware have created special mechanisms to ensure prompt determination of such matters.[97]

Requiring arbitration of the KPMG Defendants' claim for advancement of defense costs would undermine or threaten to undermine all of these public interests.   It would place an important and perhaps outcome-determinative decision in a pending criminal case in the hands of private arbitrators in a private forum.   It would limit the ability of the district court to ensure that the proceedings against the defendants are fair in all respects.   It would undermine the district court's responsibility under the CJA to ensure, should any of the defendants become indigent,[98] that property available to such a defendant – rather than public funds – is used for his or her defense.   And it would implicate the public interests in a speedy trial and in a determination on the merits.

A major risk of arbitration of the advancement claims, especially in this case, is its

---

[95]

Stein I, 435 F.Supp.2d at 355 (quoting Kaung v. Cole Nat'l Corp., 886 A.2d 500, 509 (Del. 2005)).

[96]

Although this is a matter governed by state law, it is an appropriate consideration because respect for the proper role of the states in our federal system itself is an important public interest.

[97]

8 WEST'S DEL. CODE ANN. § 145(k) (2006); N.Y. BUS. CORP. L. §§ 724(a), 1319(a)(4).

[98]

This is not a remote possibility given the exceptional burdens of this extraordinary case.

unpredictable timing and the likelihood of delay.  The sources of this problem are several, above and

beyond the inherent problems of scheduling proceedings involving multiple arbitrators and attorneys,

each with his or her own schedule.

   First, the arbitration clause in the 2003 Agreement provides for a panel of three

arbitrators – one to be appointed by the claimant, one by KPMG, and a third by agreement of the two

party-designated arbitrators.[99]   The selection process thus affords an opportunity for delay, and

KPMG obviously has no interest in having the advancement dispute decided quickly.  Indeed, its

behavior in the Hasting arbitration – where it first obtained a court order compelling arbitration and

now seeks in substance a non-merits dismissal or a stay of any arbitration hearing pending the

outcome of this case from the arbitration panel – makes that clear.  Moreover, if arbitration of the

advancement claims does not result in a confirmed arbitration award well before this case is tried, the

issue for practical purposes will have become moot.[100]   Hence, the material possibility that an

arbitration panel would not be chosen quickly, which could result in litigation concerning the

constitution of the panel, or that arbitration proceedings otherwise would be delayed cannot be

ignored.[101]

---

[99]

   The 1997 and 2002 agreements are the same in this respect.  KPMG Defs. Mem. Ex 2 §
17(ii); *id.* Ex. 5 § 19(b).

[100]

   The qualification refers only to the possibility that an advancement issue might remain as
to the costs of any appeal.

[101]

   In one current case, a former KPMG partner – not any of the defendants here – made an
arbitration demand on KPMG on October 28, 2005.  There were delays in selecting
arbitrators, owing in part to lengthy discussions over whether KPMG would challenge the
claimant's arbitrator.  The first formal conference after selection of the panel occurred on
June 6, 2006, more than seven months after service of the demand on KPMG.  The claimant
then sought an October 2006 hearing at a time when the arbitrators were available.  KPMG,

This problem would be magnified by the number of claimants here.  There are sixteen KPMG Defendants and therefore possibly sixteen separate claimants.[102]  KPMG has pointed to no provision in the arbitration clauses upon which it relies for a consolidated arbitration proceeding.[103]  If consolidation were sought, the issue of its availability likely would lead to pre-hearing litigation both in district and appellate courts, and the weight of authority is against consolidation.[104]  Thus, the

---

however, successfully objected to setting a date.  As of August 14, 2006, more than nine months after service of the demand, there was no hearing date set, and no documents had been produced by KPMG.  KPMG Defs. Mem. Ex. 9 (Stoner Decl.) *passim.*

[102]

The number of claimants in arbitration could depend upon an appellate court's view of this Court's conclusion that nine of the sixteen are not parties to any relevant agreement to arbitrate this matter, as well as consideration of that issue as to the other seven.

[103]

Indeed, those clauses may well be inconsistent with consolidation.  The requirement of panels of three arbitrators, with one selected by each side and the third by the two party-designated arbitrators, at least arguably supports the proposition that consolidation would be contrary to the agreements because it would be inconsistent with the agreed-upon method for selecting the panels.

[104]

It is unclear whether the Second Circuit would construe the FAA to permit consolidation of separate arbitrations arising under the same or similar agreements where the agreement or agreements are silent on the point.  In *Compania Espanola de Petreleos, S.A. v. Nereus Shipping, S.A.,* 527 F.2d 966 (2d Cir. 1975), *cert. denied,* 426 U.S. 936 (1976), it permitted consolidation.  Many courts, however, view *Government of United Kingdom of Great Britain and Northern Island v. Boeing Co.,* 998 F.2d (2d Cir. 1993), as having overruled *Compania Espanola* on this point.  *E.g., Phila. Reins. Corp. v. Employers Ins. of Wausau,* 61 Fed. Appx. 816, 820 (3d Cir. 2003); *Red Ball Interior Demolition Corp. v. Palmadessa,* 947 F. Supp. 116, 119 (S.D.N.Y. 1996); *Specialty Bakeries, Inc. v. Robhal, Inc.,* No. A97-1057, 1997 WL 379184, at *3 (E.D. Pa. 1997).  One Second Circuit panel recently declined to decide the continuing vitality of *Compania Espanola* in light of *Government of United Kingdom.  Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.,* 246 F.3d 219, 229-30 (2d Cir. 2001).  Another has construed *Government of United Kingdom* as having "rejected as no longer sound some of the reasoning in" *Compania Espanola.  Emery Air Freight Corp. v. Int'l Bhd. of Teamsters, Local 295,* 185 F.3d 85, 90 (2d Cir. 1999).  At least the Fifth, Sixth, Eighth, Ninth and Eleventh Circuits have held that consolidation of arbitrations is impermissible under the FAA absent agreement by the parties.  *Am. Centennial Ins. Co. v. Nat'l Cas. Co.,* 951 F.2d 107 (6th Cir. 1991); *Baesler v. Cont'l Grain Co.,* 900 F.2d 1193, 1195 (8th Cir. 1990); *Protective Life Ins. Corp. v. Lincoln Nat'l Life*

best case scenario – measured by speed alone – would be extensive litigation concerning the

availability of consolidated arbitration proceedings followed by a consolidated arbitration and then

the usual post-award litigation over confirmation or vacatur of the award.  The worst case would be

sixteen separate arbitrations, each with its own potential for holding up this case.[105]

   As a practical matter, then, deferring a decision on the advancement issue in favor of

arbitration would force the Court to do violence to one important public interest or another:

    • It could await the outcome of the arbitration(s) and the attendant litigation in

     order to avoid mooting the advancement issue and to ensure that the KPMG

     Defendants, should they prevail, would have the money in time to use it to

---

*Ins. Corp.,* 873 F.2d 281, 282 (11th Cir. 1989); *Del E. Webb Constr. v. Richardson Hosp. Auth.,* 823 F.2d 145, 150 (5th Cir. 1987), *abrogated on other grounds as recognized in Pedcor Mgmt Co., Inc. Welfare Benefit Plan v. Nations Personnel of Texas, Inc.,* 343 F.3d 355, 363 (5th Cir. 2003); *Weyerhauser Co. v. Western Seas Shipping Co.,* 743 F.2d 635, 637 (9th Cir.), *cert. denied,* 469 U.S. 1061 (1984).  Moreover, it must be borne in mind that any arbitrations involving claims of Messrs. Stein and Rosenthal would be governed not by the various KPMG partnership agreements, which themselves vary in some degree, but by their own personal written contracts.

The one thing that may be said with virtual certainty is that the issue of consolidation, if consolidation even were sought by a party, would lead to extensive litigation on the merits. Moreover, in view of the possibility of conflict among circuits, it would be likely to lead to competing actions in different circuits to compel or stay arbitration, as parties sought to procure a decision in a circuit in which they perceived the law to be more favorable to their positions.

[105]

To be sure, the Court is dealing with contingencies rather than certainties.  Perhaps as many as sixteen arbitrations could be completed and awards made and confirmed in plenty of time to permit preparation for the already once-postponed January 2007 trial.  But that is a remote possibility.  Moreover, whether the Court's doubts would prove justified is not even the important point. The unpredictability of the process itself is a difficulty.  If the advancement claims were to be arbitrated,  trial of this case could not be scheduled with any degree of confidence until all of the arbitrations were concluded.  And the scheduling of a trial that may last eight months or more, with all the competing demands on the attorneys' schedules and the Court's docket, is no easy matter in the best of circumstances.

prepare for and try this case.  In that event, there would be little reason to think

that a trial in this case would be "speedy" by anyone's definition.

- It could simply proceed with the case without regard to the advancement

dispute.  In that event, the Court, for reasons discussed at length in *Stein I*,[106]

would be obliged to consider dismissing the indictment or imposing other

sanctions on the government that would undermine the public's interest in

obtaining a verdict purely on the merits of the charges against these

defendants.

Given these considerations, it is important to focus on exactly what lies on the

arbitration side of the balance.  Even viewing the matter without regard to KPMG's tactics, it is

KPMG's purely private interest, albeit an interest entitled to weight in light of the FAA,  in having

the advancement issue litigated before arbitration panels, each of which includes one member chosen

by KPMG or, stated more broadly, in insisting upon adherence to an arbitration clause and thus

choosing the forum in which the advancement dispute will be resolved.[107]  The issue, then, is whether

this private KPMG interest is decisively outweighed by, among other things, the KPMG Defendants'

constitutional rights to a fair trial with counsel of their choice, their and the public's interests in a

speedy trial, and the public interests in having this indictment decided purely on its merits (rather than

---

[106]

435 F. Supp.2d at 373-80.

[107]

While the record is virtually silent on the point and the Court does not rely upon it, in a
giant firm such as KPMG, it is quite likely that the inclusion of an arbitration clause in the
partnership agreement was dictated by senior management rather than the product of an
open discussion and agreement among hundreds or thousands of partners and regarded by
all or most of the partners as a non-negotiable condition of their employment.

36

in a decision dictated or influenced by sanctions imposed on the government) and in avoiding, if possible, the cost of all or part the defense being cast on the public treasury.  This is not a close call.

When one considers KPMG's tactics in the Hasting matter, the balance tips even more decisively in favor of the KPMG Defendants.  KPMG knows full well that any responsible attorney would advise any of the KPMG Defendants to invoke the Fifth Amendment in arbitration proceedings rather than testify concerning matters at issue in this case.[108]  That is what Mr. Hasting did.  KPMG's response – seeking a preclusion order tantamount to dismissal of Mr. Hasting's advancement claim or a stay of the arbitration hearing until this case is concluded, which would moot the advancement issue – demonstrates that KPMG in fact has no more interest in having the advancement issue decided on the merits in arbitration than it has in having this Court decide it.  It seeks to take advantage of the pendency of this indictment to provoke invocation of the Fifth Amendment in the arbitral forum and thus to defeat any rights the KPMG Defendants may have without the question ever being decided on its merits.  But arbitration is a means designed to promote the just and speedy private resolution of disputes – not a weapon for use by the strong to deprive those less able to pursue their claims of any timely resolution at all.

Courts have held arbitration clauses void as against public policy in far less compelling

---

[108]     As the advancement proceeding in this Court is part of the criminal case and arises in the context of the KPMG Defendants' motion to dismiss the indictment or for other relief as a result of the government's violation of their rights, their testimony here probably could not be used against them at trial, at least on the government's case in chief.  *See Simmons v. United States*, 390 U.S. 377, 394 (1968).  In any case, it is unlikely that it would be necessary to examine any of the KPMG Defendants concerning anything relevant to the charges in the indictment in order to decide whether they are entitled to advancement of defense costs by KPMG given the limited nature of the issues pertinent to that question.

circumstances.[109]  In *DeGaetano v. Smith Barney, Inc.*,[110] for example, the court held an arbitration

clause unenforceable as against public policy to the extent that it would have prevented an employee

– a prevailing party in an employment discrimination suit – from recovering legal fees to which she

was entitled under Title VII.  After recognizing that "the fee action in this dispute arises against the

backdrop of an overarching 'liberal federal policy favoring arbitration,'"[111] the court held that the

arbitration clause violated the federal policy, set forth in Title VII and in Supreme Court precedent,

of awarding legal fees to prevailing parties in order to encourage plaintiffs of limited means to pursue

---

[109]

        *See, e.g., Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 669-70 (6th Cir. 2003) (arbitration provision in employment contract was unenforceable as against public policy to the extent that it required employees to shoulder much of the costs of arbitration, which discouraged them from seeking to vindicate their statutory rights); *Circuit City Stores, Inc. v. Adams,* 279 F.3d 889, 893-95 (9th Cir.), *cert. denied,* 585 U.S. 1112 (2002) (arbitration provision in employment contract was unenforceable as against public policy to extent that it required employees to pay half the costs of arbitration, restricted access to remedies available under anti-discrimination statutes, and required employee to arbitrate all grievances without a  similar requirement for the employer); *Booker,* 315 F.Supp.2d at 104-05 (arbitration provision partially unenforceable because it did not permit punitive damages for employment discrimination and therefore violated federal and local anti-discrimination statutes); *DeOrnellas v. Aspen Square Mgmt, Inc.,* 295 F.Supp.2d 753, 763 (E.D. Mich. 2003) (portion of arbitration agreement prohibiting arbitrator from awarding attorney's fees prevailing party would otherwise be entitled to under state whistleblower's statute was void as against public policy);  *see also Blackburne,* 87 N.Y.2d at 665, 642 N.Y.S.2d at 163-64 (public policy prohibited enforcement of arbitration provision where arbitration would have resulted in "impermissible delegation of the sovereign authority to procure, allocate and disburse Federal funds"); *Susquehanna Valley Cent. School Dist. at Conklin v. Susquehanna Valley Teachers' Ass'n,* 37 N.Y.2d 614, 616-17, 376 N.Y.S.2d 427, 429 ( 1975) (noting that public policy concerns often prohibit arbitration of "[s]chool matters [and ] . . . matters affecting marriage, child custody, and the like. . ."); *Matter of Aimcee Wholesale Corp. [Tomar Prods.],* 21 N.Y.2d 621, 626, 289 N.Y.S.2d 968, 971 (1968) (agreement requiring arbitration of antitrust dispute unenforceable because "the enforcement of our State's antitrust policy should not be left within the purview of commercial arbitration").

[110]

        983 F.Supp. 459 (S.D.N.Y. 1997).

[111]

        *Id.* at 465.

meritorious suits, thereby serving as "private attorney[s] general."[112]

    *Board of Education of Buffalo v. Buffalo Council of Supervisors & Adminsitrators*[113] also is instructive.  A collective bargaining agreement ("CBA") there prohibited discipline or reprimand of covered employees without just cause and provided for a grievance procedure culminating in binding arbitration for claimed violations.  The union filed a grievance and demanded arbitration of a claim that the employer school board had violated the CBA in that a board member had verbally attacked one of its members at a public board meeting.  The Appellate Division acknowledged New York's strong policy favoring arbitration of employment disputes.  It concluded that the grievance arguably was within the scope of the arbitration clause.  Nevertheless, it held that arbitration of that grievance would offend public policy because permitting the assertion of such a claim would discourage "free, open, and vigorous legislative discussions."[114]

    The public interests at issue here are at least as important as those at issue in *DeGaetano, Board of Education of Buffalo,* and similar cases.[115]  Accordingly, the Court holds that

---

[112]
      *Id.* at 465, 470.

[113]
      52 A.D.2d 220, 383 N.Y.S.2d 732 (4th Dep't 1976).

[114]
      *Id.* at 229-30, 383 N.Y.S.2d at 737-38.

[115]
      *See also Durst v. Abrash,* 22 A.D.2d 39, 43-44, 253 N.Y.S.2d 351, 354 (1st Dept. 1964) (arbitration clause in usurious agreement unenforceable as against public policy), *aff'd on opinion below,* 17 N.Y.2d 445, 266 N.Y.S.2d 806 (1965).

      The KPMG Defendants' contention that enforcement here of any otherwise applicable arbitration clauses would be against public policy draws support, moreover, from the fact that courts have discretion, in light of the public interest in such questions, to decline to enforce an agreement to arbitrate a "core" bankruptcy matter where the dispute arises under provisions of the Bankruptcy Code that "inherently conflict" with the FAA or where

any arbitration clause that otherwise would require arbitration of claims for advancement of defense costs in this pending criminal case is, to that extent, void as against public policy.

This is a very narrow holding.  The Court does not suggest that advancement disputes concerning civil litigation are not arbitrable.  Nor does it hold even that all advancement disputes concerning criminal cases are not arbitrable.  Finally, there has been no suggestion that any arbitration clause otherwise applicable here would be void as against public policy with respect to any counterclaims KPMG may assert, claims by the KPMG Defendants for indemnification for pre-indictment defense costs, or a host of other issues that might be imagined.   The Court intimates no opinion on those matters.

*III.      The Implied Contract Claim Is Legally Sufficient*

KPMG asserts also that the defendants have failed to state an implied contract claim upon which relief may be granted.  They move to dismiss Count I of the advancement complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

As previously noted, this is a criminal case to which the Civil Rules do not apply.  The Criminal Rules, however, do not regulate practice in the respects required for resolution of the advancement dispute.  The Court therefore exercises its authority under Criminal Rule 57(b) to apply

---

arbitration "would necessarily jeopardize the objectives of the Bankruptcy Code." *MBNA America Bank, N.A. v. Hill,* 436 F.3d 104, 108 (2d Cir. 2006) (internal quotation marks omitted); *In re U.S. Lines, Inc,* 197 F.3d 631, 640 (2d Cir. 1999); *see also In re Gandy,* 299 F.3d 489, 495 (5th Cir. 2002).

the Civil Rules insofar as they cover matters not dealt with by the Criminal Rules.[116]

       KPMG's legal sufficiency argument rests in part on an alleged lack of evidentiary detail in the complaint and in part on its assertion that it always paid the legal expenses of KPMG employees who were sued as a result of their employment pursuant to voluntary, unilateral decisions by KPMG made on a case by case basis.  In other words, the prior payments, KPMG says, were not made out of any legal obligation, but as a matter of grace.  In seeking dismissal on these bases, KPMG overlooks both the procedural rules and the relevant substantive law.

       To begin with, the Federal Rules of Civil Procedure require only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[117] Exactly how short and plain is evident from the official forms annexed to the rules.  Official Form 5, the exemplar of a complaint for goods sold and delivered, for example, reads in its entirety as follows:

     "1.     Allegation of jurisdiction.

     "2.     Defendant owes plaintiff ___ dollars for goods sold and delivered by plaintiff to defendant between June 1, 1936 and December 1, 1936."[118]

---

[116]

     *See United States v. Khan,* 325 F. Supp.2d 218, 227 (E.D.N.Y. 2004) (explaining that "[w]here there is no specific rule on a subject covered in the Federal Rules of Criminal Procedure, the civil rule or practice may be borrowed" pursuant to Rule 57(b) of the Federal Rules of Criminal Procedure, which "explicitly provides that when there is no controlling law, 'a judge may regulate practice in any manner consistent with federal law'"); *see also United States v. Ruggiero,* 726 F.2d 913, 925-26 (2d Cir. 1984), *abrogated on other grounds, Salinas v. United States,* 522 U.S. 52 (1997).

[117]

     Fed. R. Civ. P. 8(a).

[118]

     *Id.* Form 5.

There is no need to plead evidence.[119]  Moreover, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[120]  Measured by this standard, the implied contract claim is more than sufficient.

Nor does KPMG's assertion that it has paid legal expenses in the past as a matter of grace rather than pursuant to a contract warrant dismissal at this stage.  This factual contention does not appear in the complaint and so is not properly considered in ruling on a motion to dismiss for legal insufficiency.  And while Civil Rule 12(b) permits (but does not require) a district court, on a motion to dismiss, to consider matters outside the complaint, the consideration of such matters converts the motion into one for summary judgment.[121]  Motions for summary judgment must be based upon affidavits or other evidence that "would be admissible in evidence [at trial], and [that] . . . show affirmatively that the affiant is competent to testify to the matters stated therein."[122]  As KPMG's factual assertions concerning its past payment of legal expenses of its employees are unsupported by affidavits made on personal knowledge or by other admissible evidence, its motion, insofar as it rests on these assertions, would have to be denied even if the Court were disposed to convert the motion into one for

---

[119]

*Swierkiewicz v. Sorema,* 534 U.S. 506, 510-11 (200); *Twombly v. Bell Atlantic Corp.,* 425 F.3d 99, 111 (2d Cir. 2005), *see also Utility Metal Research, Inc. v. Generac Power Sys.,* No. 05-4940, 2006 WL 1408360, at *1 (2d Cir. May 18, 2006).

[120]

*Conley v. Gibson,* 355 U.S. 41, 46-47 (1957).  *Accord, Bruce v. United States Dep't of Justice,* 314 F.3d 71, 73-74 (2d Cir. 2002); *Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P,* 392 F.Supp.2d 621, 625 (S.D.N.Y. 2005); *Charlton v. New York,* No. 03 Civ. 8986, 2006 WL 406315, at *3 (S.D.N.Y. Feb. 22, 2006).

[121]

FED. R. CIV. P. 12(b).

[122]

*Id.* 56(e).

summary judgment, which on this point it is not.

KPMG's argument misunderstands also the nature of a contract implied in fact.

 "A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct. It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct."[123]

In other words, a contract implied in fact, depending upon the circumstances, may arise from a course of conduct.[124]  Thus, even if KPMG in fact subjectively believed that it paid the defense costs of its employees for all these years as a matter of grace rather than of legal obligation, that would not be conclusive.  Indeed, it probably would not even be relevant, as the formation of contracts is based on the parties' objective manifestations of assent, not their uncommunicated subjective views.[125]

Finally, KPMG's reply memorandum contends, for the first time, that Delaware law indicates "that any mandatory obligation to advance expenses must be set forth in the partnership agreement or other contract."[126]  The Delaware Revised Uniform Partnership Act, however, provides

---

[123]

Beth Israel Med.Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, 448 F.3d 573, 582 (2d Cir. 2006).

[124]

See, e.g., Ward v. Nat'l Geographic Soc'y, 208 F. Supp.2d 429, 437-40 (S.D.N.Y. 2002).

[125]

E.g., Rosoff v. Mount Laurel Ctr. for the Performing Arts, 317 F.Supp.2d 493, 499 & n.37 (S.D.N.Y. 2004); Faulkner v. Nat'l Geog. Soc'y, 294 F.Supp.2d 523, 531 n.30, reconsideration denied by 296 F. Supp.2d 488 (S.D.N.Y. 2003), aff'd sub nom. Faulkner v. Nat'l Geographic Enters., Inc., 409 F.3d 26 (2d Cir.), cert. denied, 126 S.Ct. 833 (2005); Ward, 208 F. Supp.2d at 439; Hotchkiss v. Nat'l City Bank, 200 F. 287, 293 (S.D.N.Y. 1911) (L. Hand, J.), aff'd, 201 F. 664 (2d Cir. 1912), aff'd, 231 U.S. 50 (1913).

[126]

KPMG Reply Mem. 16.

The fact that this argument is raised for the first time in a reply memorandum is sufficient

that Delaware partnerships may indemnify their members "from and against any and all claims and demands whatsoever" subject only to "[s]uch standards and restrictions, if any, as are set forth in its partnership agreement."[127]  This language, found also in the Delaware Limited Liability Company Act,[128] is intended "to give the maximum effect to the principle of freedom of contract."[129] And neither the Delaware statute of frauds nor any other provision of Delaware law prevented KPMG from becoming obligated to advance defense costs by virtue of a contract implied in fact.[130]  The cases upon which KPMG relies are entirely inapposite.[131]

---

to warrant its rejection.  *E.g., Ruggiero v. Warner Lambert Co.,* 424 F.3d 249, 252  (2d Cir. 2005) ("Arguments made for the first time in a reply brief need not be considered by a court.") (quoting *Playboy Enters., Inc. v Dumas,* 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997), *aff'd,* 159 F.3d 347 (2d Cir. 1998) (table)).

[127]

6 WEST'S DEL. CODE ANN. § 15-110 (2006).

There is nothing in KPMG's partnership agreement that restricts advancement of defense costs.

[128]

*Id.* § 18-108.

[129]

*Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Holding Co. LLC,* 853 A.2d 124, 126 (Del. Ch. 2004) (quoting *id.* § 18-1101(b)).

[130]

The latter assumes, without deciding, that Delaware law will govern the question whether there is an implied contract here, as distinct from the question whether KPMG, a Delaware limited liability partnership, had the power to enter into such a contract.

[131]

*Morgan v. Grace,* No. Civ. A. 20430, 2003 WL 22461916 (Del. Ch. Oct. 29, 2003), simply noted, in the context of construing written agreements concerning advancement of defense costs, that the court would not "rewrite those agreements to provide for a right the parties clearly did not intend." *Id.* at *2. *Delphi Easter Partners Ltd. v. Spectacular Partners, Inc.,* Civ. A. No. 12409, 1993 WL 328079 (Del. Ch. Aug. 6, 1993), in the context of granting partial summary judgment compelling advancement of defense costs pursuant to an unambiguous partnership agreement so requiring, said that "[t]he public policy of Delaware is to allow advancement, if the partnership agreement so provides." *Id.* at *8.  Neither case addressed the question whether an obligation to advance defense costs could rest on a contract implied in fact or anything remotely approaching that issue.

As noted, the issue on a Rule 12(b)(6) motion is whether the claimant would be permitted to prove facts under its complaint that would entitle it to relief.  Here, the KPMG Defendants quite plainly would be permitted to prove that KPMG routinely paid the legal expenses of its employees sued in KPMG-related cases, that this was an important part of the benefits it gave its employees in light of the large volume of litigation brought against and investigations of accounting firms and their personnel, and that there was no statement or agreement that this was not an integral part of the employment bargain between the firm and its employees.  Were they to do so, a reasonable trier of fact could well find the existence of an implied in fact contract.  Indeed, it might do so on the basis of less.[132]

Accordingly, insofar as KPMG moves to dismiss Count I on the ground that it fails to state a claim upon which relief may be granted, the motion must be denied.

IV.     *KPMG's Defenses*

KPMG advances a number of defenses based on materials outside the complaint – the 2003 Agreement, the Fee Letters, and agreements between KPMG and a few of the KPMG Defendants.  As KPMG moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), there are only two theories pursuant to which these materials properly could be considered.

---

The taking of language out of context in this manner to advance arguments that are not supported by the cases from which the language is taken consumes resources and energies of all concerned without benefit to anyone.

[132]

KPMG claims also that the alleged implied in fact contracts fail for lack of consideration and lack of mutual assent.  Certainly the KPMG Defendants would be entitled to prove, even assuming that such proof were necessary, that they were aware of KPMG's uniform practice of advancing defense costs and provide their services to the firm in part on account of that practice.

First, a court acting on a Rule 12(b)(6) motion may consider documentary evidence that is neither set out in nor attached to the complaint where that evidence fairly may be said to have been incorporated by reference as, for example, where the complaint refers to and relies upon it despite a failure to set it forth *in extenso*.[133]   The advancement complaint does not do so here except with respect to Mr. Stein's contract and the Fee Letters.[134]   Accordingly, the Court considers the Stein contract and the Fee Letters, but not the other documents, in resolving the 12(b)(6) motion.

Second, as noted above, a district court may convert a Rule 12(b)(6) motion into one for summary judgment and then consider materials outside the pleading.   Even if the Court were to convert here, however, a motion for summary judgment by KPMG on these grounds would fail in most respects.

A.      *The Merger Clause*

KPMG argues that no contract may be implied in fact because the 2003 Agreement provides that:

> "This Agreement (i) constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, among the Members with respect to the subject matter hereof and (ii) except to the extent set forth herein, is not intended to confer upon any person other than the parties hereto any rights or remedies."[135]

---

[133]

      *See, e.g., Global Network Comms., Inc. v. City of New York,* ___ F.3d ___, No. 05-3298-cv, 2006 WL 2106632, at *5 (2d Cir. July 28, 2006).

[134]

      *See* Cpt. ¶ 33.

[135]

      KPMG Mem. 43-46 & Ex. 4 ¶ 19.7.

KPMG is right, of course, that "a contract cannot be implied in fact . . . where there is an express contract covering the subject matter involved."[136] But it does not follow that the 2003 Agreement forecloses the KPMG Defendant's implied contract claim. This is so for two reasons.

First, the language upon which KPMG relies states that the partnership agreement is "the entire agreement . . . among the Members." It says nothing about agreements between members and KPMG, the firm.[137] Moreover, the arbitration clause in the 2003 Agreement, as distinguished from its merger clause, specifically refers both to disputes among members and to disputes between a member and the firm.[138] It thus makes quite clear that the drafters distinguished between (a) relationships among the members of the firm and (b) relationships between members and the firm as an entity.

This distinction is significant, as the two relationships are quite different. The Delaware Revised Uniform Partnership Act, under which KPMG is organized, provides that "[a] partnership is

---

136

    *Miller v. Schloss,* 218 N.Y. 400, 406-07 (1916).

    The implied in fact contract claim would appear to be governed either by New York or Delaware law except in the case of those KPMG Defendants who were employed in California, whose claims may be governed by California law. KPMG asserts that there are no material differences between the law of New York and Delaware for purposes of this motion (KPMG Mem. 41 n.20) and it tacitly assumes that California law is to the same effect.

137

    KPMG's reply memorandum contains the following assertion: "Given that the KPMG Partnership Agreement is, by its own terms, the 'entire agreement, and supersedes all prior agreements and understandings, both written and oral' *between KPMG and KPMG partners*, these former partners cannot seek to modify that agreement by reference to an inchoate historical practice." KPMG Reply Mem. 18 (emphasis added). The italicized language, however, does not appear in the partnership agreement, which says instead that it is "the entire agreement . . . among the Members," without referring to the firm.

138

    It provides in relevant part that "[a]ny dispute between the Firm and any Member *or* between or among Members" of certain character is subject to arbitration. KPMG Mem. Ex. 4, § 17(i) (emphasis supplied).

a separate legal entity which is an entity distinct from its partners" except in a limited circumstance not pertinent here.[139]  Thus, whatever effect the merger clause in the partnership agreement may have with respect to foreclosing other alleged agreements among KPMG's members, it has none at all with respect to agreements between KPMG's members and the firm itself.

KPMG would not prevail on this argument even if the Court were to assume that the merger clause applied to disputes between KPMG as an entity and its members.  The version of the partnership agreement upon which KPMG relies purports to be the entire agreement of the parties only "with respect to the subject matter [t]hereof."  But the agreement is entirely silent on the subjects of indemnification and advancement of defense costs. Hence, the subject matter of the alleged implied in fact contract – indemnification and advancement – is not "the subject matter" of the partnership agreement.

Were any confirmation of this conclusion required, one would need to look no farther than the Rosenthal Agreement.  It stated in relevant part:

> "NOW, THEREFORE, for good and valuable consideration, receipt whereof is acknowledged, the Partnership and the Partner agree as follows:
>
> *     *     *
>
> "7.     Indemnification.  *   *   *   To the extent that the Partner is a 'subject' or 'target' of any investigation by the U.S. Department of Justice or any U.S. Attorney's Office . . . , *the Partnership has no obligation to indemnify Partner* for the costs of his defending such an investigation but may voluntarily do so, to the extent and under such terms and conditions as the Partnership believes are in the best interests of the Partnership."[140]

---

[139]

6 WEST'S DEL. CODE ANN. § 15-201(a) (2006).

[140]

KPMG Mem. Ex. 11, ¶ 7 (emphasis supplied).

48

If, as KPMG claims, the merger clause in the partnership agreement foreclosed any obligation to indemnify its partners because indemnification is within "the subject matter" of the partnership agreement, then this language in the Rosenthal Agreement was entirely unnecessary.  Its inclusion by KPMG therefore is highly probative because it shows that KPMG in fact did not construe the partnership agreement as it now asserts it should be construed.[141]

Finally, KPMG suggests also that the "subject matter" of the partnership agreement is the entire relationship between KPMG and its partners and, in consequence, that there can be no contractual obligations between KPMG and its partners that are not found in that agreement.[142]  But there would be a major flaw in that argument even if one were to overlook the important distinction between KPMG, on the one hand, and its members, on the other.

If the merger clause meant to say that the partnership agreement is the entire agreement among the members or between the members and the firm, it would have been easy enough to say so.  But it does not say that.  It says that it is "the entire agreement . . . among the Members *with respect to the subject matter hereof."*  Accepting KPMG's argument impermissibly would render the italicized language, which defines the scope of the merger clause, superfluous.  The meaning of the phrase "subject matter hereof" must be determined by reference to the contents of the partnership agreement. As the agreement is silent as to advancement and indemnification, the merger clause would not foreclose the implied in fact contract claim even if it applied to agreements between the firm and its

---

[141]

> *See, e.g., Fireman's Fund Ins. Cos. v. Siemens Energy & Automation, Inc.,* 948 F. Supp. 1227, 1233-34 & n. 15 (S.D.N.Y.1996) (practical construction of contract by parties properly considered in construing terms) (citing cases).

[142]

> KPMG Mem. 43-44.

members, which it does not.[143]

        *B.*     *The Fee Letters*

        KPMG argues that the signatures of those of the KPMG Defendants who are said to have signed the Fee Letters beneath the words "REVIEWED AND AGREED" evidenced agreement that KPMG had no obligation to advance or pay their legal expenses and that it was doing so conditionally, during the investigatory stage only, as a result of a discretionary decision on its part.  In substance, it seeks summary judgment on this basis.  There is, however, a salient difficulty with this contention.

        The Fee Letters said that KPMG had determined that it had no legal obligation to pay, but was prepared to do so conditionally upon request.  Thus, by their own terms, they are not clear whether a recipient's signature at the foot signified agreement that KPMG's determination was correct or simply agreement with the proposition that KPMG was taking that position.  And while this is plain on the face of the letters themselves, it becomes even clearer when considered in the context in which the Fee Letters were executed.

        When KPMG wanted to make clear that an agreement with a partner included an admission by the partner that KPMG had no legal obligation to pay fees on the partner's behalf, it knew how to accomplish that.  Once again, the Rosenthal Agreement illustrates the point.  As noted

---

143

        *See, e.g., Brady v. i2 Technologies, Inc.,* No. Civ. A. 1543-N, 2005 WL 3691286, at *3 (Del. Ch. Dec. 14, 2005) (clause in agreement providing for indemnification and reciting that the agreement was the entire agreement with respect to the "subject matter" did not foreclose claim for advancement).

        This latter point applies fully to the senior management agreement that pertained to the employment relationships of John Larson and (until they became partners) Randy Bickham and Carl Hasting.  *See* KPMG Mem. 44 n.22.

previously, it stated in relevant part that *"the Partnership and the Partner agree . . . [that t]o the extent that the Partner is a 'subject' or 'target' of any investigation by the U.S. Department of Justice or any U.S. Attorney's Office . . . , the Partnership has no obligation to indemnify Partner* for the costs of his defending such an investigation but may voluntarily do so, to the extent and under such terms and conditions as the Partnership believes are in the best interests of the Partnership."[144]  The Fee Letters, however, contained no such language.

There is a world of difference between these two interpretations of the Fee Letters.  If the signatures, as KPMG claims, evidenced agreement that there was no legal obligation to pay, they probably would be fatal to the signatories' claim that KPMG is bound to advance defense costs.  But agreement by a KPMG Defendant that KPMG *had determined* that there was no legal obligation would have no more significance here than agreement by a KPMG Defendant that KPMG had determined that the New York Yankees won the 1955 World Series (which in fact was won by the Brooklyn Dodgers). The signatory in that case would have acknowledged and agreed only that KPMG had made a determination contrary to fact.  But it would not have agreed that KPMG's determination was correct.

The interpretation of an unambiguous contract is a question of law for the Court.[145] Ambiguity, however, "exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally

---

[144]
       KPMG Mem. Ex. 11, ¶ 7 (emphasis supplied).

[145]
       *E.g., Alexander & Alexander Servs,. Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir. 1998).

understood in the particular trade or business."[146] Where the terms or the inferences that reasonably may be drawn from the terms are susceptible of more than one meaning, the construction of the contract presents an issue of fact.[147]

The Fee Letters at least are reasonably susceptible of the interpretation that favors the KPMG Defendants.  They certainly do not unambiguously favor KPMG.  They therefore cannot be construed in favor of KPMG as a matter of law.[148]   Summary judgment for KPMG would be inappropriate.

### C.    The Alleged Releases

Both the pre- and post-Fee Letter agreements between KPMG and a handful of the KPMG Defendants contained releases.  Although the argument section of KPMG's memorandum of law does not contend that the releases are defenses to these claims, there is a comment in its description of these agreements in its statement of facts to the effect that they relieved it "of any obligation to

---

[146]

*British Int'l Ins. Co. v. Seguros La Republica, S.A.,* 342 F.3d 78, 82 (2d Cir. 2003) (internal quotation marks omitted).

[147]

*See, e.g., id.*

[148]

This conclusion is not altered in the case of Ms. Warley by KPMG's reference to what purports to be her attorney's response, attached to KPMG's memorandum as Exhibit 9, to the Fee Letter.  While the attorney's letter, assuming its authenticity, might well have a bearing on the interpretation of any agreement formed by Ms. Warley's signature at the foot of the Fee Letter, the exhibit was not incorporated by reference in the complaint.  And even if the Court were to convert KPMG's Rule 12(b)(6) motion into one for summary judgment on this point, an issue of fact as to the meaning of the alleged agreement would remain. KMPG of course is at liberty to offer the letter at trial.

advance legal fees."[149]  Accordingly, the Court addresses that point.


### 1.    The Greenberg Agreement

There is little or no lack of apparent clarity in Mr. Greenberg's agreement with KPMG. On September 5, 2003, after the termination of his employment with KPMG, he released KPMG "from any and all causes of actions, . . . contracts, . . . claims, liabilities, . . . and demands, known or unknown, suspected to exist or not suspected to exist, anticipated or not anticipated, . . . which Greenberg has or may have against [it] . . . by reason of any and all acts, omissions, events or facts occurring or existing prior to the date hereof as it relates to Greenberg's membership in KPMG and his resignation from that partnership . . ."  Greenberg's employment ended with that agreement, so any implied contract arising by reason of events during the course of his employment existed and at least arguably was released as of its date.  Hence, even if there was an implied contract to advance defense costs to Greenberg, it appears likely that he released KPMG from it.

As the language of the Greenberg Agreement seems clear, the Court will convert so much of KPMG's Rule 12(b)(6) motion as seeks dismissal of Mr. Greenberg's claim based on the release in his agreement into a motion for partial summary judgment for that relief.  Nevertheless, Mr. Greenberg has not previously been given the requisite notice that summary judgment is sought against him and an opportunity to present opposing evidence.[150]  The parties shall submit any additional evidence or other papers on that motion no later than 10 days after the date of this order.

---

[149]    KPMG Mem. 9.

[150]    E.g., *Kopec v. Coughlin,* 922 F.2d 152, 154-55 (2d Cir. 1991).

2.    *The Eischeid, Warley and Wiesner Agreements*

The Eischeid, Warley and Wiesner Agreements differ substantially from the Greenberg Agreement.  The release language in their three agreements, however, is identical.

Each begins by releasing KPMG from "each and every claim, cause of action, . . . and demand for relief of any kind or nature whatsoever that Partner *ever had or now has* against [KPMG], including but not limited to any claim arising out of or in any way relating, directly or indirectly, to Partner's partnership or employment at [KPMG] and Partner's withdrawal therefrom."[151]  None refers to contracts.  As all of these agreements antedated the indictment in this case, all antedated the existence of any claim for advancement of the costs of defending it.  Those therefore were not claims that Eischeid, Warley and Wiesner, as of the date of their agreements, "ever had or now has."  In consequence, if the agreements had stopped at that point, they obviously would have afforded no defense to these defendants' advancement claims. Each, however, went on to say:

> "The consideration offered herein is accepted by Partner as being in full accord, satisfaction and settlement of any and all claims or potential claims, and Partner expressly agrees that Partner is not entitled to and shall not receive any further recovery of any kind from [KPMG] . . . and that in the event of any further proceedings whatsoever *based upon any matter released herein*, [KPMG] . . . shall have no further monetary or other obligation of any kind to Partner, including any obligation for any costs, expenses and attorneys' fees incurred by or on behalf of Partner."[152]

KPMG implies that the paragraph quoted immediately above – particularly the language to the effect that KPMG would have no further obligation for any legal fees – changes this result.  It suggests that the language should be read in isolation and that it released any claim for legal fees and

---

            Emphasis added.

            Emphasis added.

expenses, regardless of circumstances.  But it cannot properly be read in isolation, and KPMG's is not the only reasonable interpretation of the language if, indeed, it is reasonable at all.

Eischeid, Warley and Wiesner agreed that KPMG would have no further obligation only for any legal fees "in the event of any further proceedings . . . based on any matter released herein." The "matter released herein" is defined in the prior paragraph.  It consisted of certain claims that Eischeid, Warley and Wiesner, respectively, "ever had or now has" – in other words, claims that existed as of the date on which their agreements were signed.  Unlike the Greenberg Agreement, it did not include contracts that existed as of those dates.  Hence, it certainly cannot be said that these releases unambiguously require the conclusion that KPMG seeks.  As the matter will go to trial, the question whether the releases favor the KPMG Defendants as a matter of law or whether, instead, they present issues of fact, shall abide the event.

### 3.      The Rosenthal Agreement

The Rosenthal Agreement contains the same release language as the Eischeid, Warley and Wiesner Agreements.  The release therefore does not foreclose Mr. Rosenthal's implied contract claim for advancement of defense costs.[153]

---

[153]

Although KPMG has not raised the point, Mr. Rosenthal's situation is more complicated for another reason.

Paragraph 7 of the Rosenthal Agreement provides in part that KPMG will indemnify him "through, and pursuant to the terms of, its Professional Indemnity Insurance Program to the same extent it would if [he] had remained a Member of the Firm."  It then goes on to add:

"To the extent that the Partner is a 'subject' or 'target' of any investigation by the U.S. Department of Justice or any U.S. Attorney's Office . . . , the Partnership has no obligation to indemnify Partner for the costs of his defending such an investigation but may voluntarily do so, to the extent and under such terms and

*V.     KPMG's Procedural Objections Are Without Merit*

KPMG argues that a "summary" process to resolve the KPMG Defendants' claims for advancement of legal expenses would violate its rights for several reasons.  Upon examination, each of its contentions is baseless, academic, or both.  At the outset, however, it is well to begin with what is meant here by a summary process.

It means, first of all, an expeditious resolution of the matter – expedited discovery to the extent that discovery is appropriate and a prompt trial of any genuine issues of material fact.  Although

---

conditions as the Partnership believes are in the best interests of the Partnership." KPMG Mem. Ex. 11 ¶ 7.

This language is notable in at least two respects.

First, as there is an express contract between Mr. Rosenthal and KPMG with respect to indemnification for the cost of defending the government's investigation, Mr. Rosenthal could not claim that there is an implied in fact contract governing that subject.  As he does not here seek indemnification or other relief with respect to the cost of defending the government's pre-indictment investigation, however, this is of no moment.

The more important point is that the Rosenthal Agreement is silent with respect to KPMG's obligations in respect of the cost of defending the indictment as opposed to the pre-indictment investigation.  This stands in marked contrast to Skadden Arps' March 11, 2004 letter to most of the KPMG Defendants – a letter that preceded the Rosenthal Agreement by more than three months.  That document set forth KPMG's willingness to pay fees, up to a maximum of $400,000 and subject to other conditions, for the cost of defending the government's investigation but said further that KPMG would not pay anything further if the recipient were indicted.  In other words, before it entered into the Rosenthal Agreement, KPMG drew a sharp distinction between payment of defense costs for the investigation and paying the costs of defending any indictment.  Yet in the Rosenthal Agreement itself, it spoke only to the former issue.

In these circumstances, there appears to be no express contract between Rosenthal and KPMG with respect to payment of post-indictment defense costs.  In consequence, the Rosenthal Agreement is not an obstacle to the maintenance of Mr. Rosenthal's implied contract claim.

56

this dispute between the KPMG Defendants and KPMG concerning advancement of defense costs is part of the criminal case because it is integral to determination of the remedy for the government's violation of the KPMG Defendants' rights,[154] the Court, as previously noted, is empowered by Rule 57(b) of the Federal Rules of Criminal Procedure to "regulate practice in any manner consistent with federal law, these rules, and the local rules of the district."[155]  It intends to do that by applying the Federal Rules of Civil Procedure to the extent they are consistent with the Criminal Rules.[156]

Summary process refers, secondly, to the consequences of applying controlling substantive law to identify the issues properly considered in determining whether these defendants are entitled to advancement of expenses. That controlling law, as will appear, suggests strongly that issues such as the existence of any right to indemnification, any claim by KPMG to set-off or recoupment, and any KPMG counterclaims relating to the alleged actions of the KPMG Defendants while at KPMG, if KPMG injects them here, probably cannot properly delay prompt resolution of the advancement issue and, if the result is favorable to the KPMG Defendants, enforcement of that right.

---

[154]

The Court has said this from the start.  *E.g., Stein I,* 435 F. Supp.2d at 377-80.  Indeed, the only basis of subject matter jurisdiction is ancillary jurisdiction derived from the Court's jurisdiction over the indictment.  *Id.*  KPMG nevertheless insists that it is a separate civil case.

KPMG of course is entitled to disagree with the Court's conclusion that it has ancillary jurisdiction and, if relief is granted against it, to appeal at an appropriate time. Repetition of a characterization that the Court already has held to be incorrect, however, accomplishes nothing.

[155]

FED. R. CRIM. P. 57(b).

[156]

*See Ruggiero,* 726 F.2d at 925-26; *Khan,* 325 F. Supp.2d at 227.

That is all that is meant by summary process.[157]

With that in mind, the Court turns to KPMG's arguments.

A.    *Rule 57 Specifically Authorizes a Speedy Hearing*

KPMG first argues that the Federal Rules of Civil Procedure do not authorize a summary proceeding here.  In view of the preceding discussion of just what is meant by a summary proceeding, it perhaps is unnecessary even to address this argument.  Nevertheless, the Court does so in the interest of clarity and completeness.

To the extent that KPMG means that the Federal Rules of Civil Procedure do not authorize expeditious treatment of the advancement claim, it is mistaken.  Rule 57 expressly authorizes a court hearing a declaratory judgment action to "order a speedy hearing . . . and [to] advance [the case] on the calendar."[158]  KPMG nevertheless argues that this is warranted "only when the action involves 'an issue of law on undisputed or relatively undisputed facts,'"[159] citing *Rechler Partnership v. Resolution Trust Corp.*[160]  But it miscites the case and misunderstands the law.

The *Rechler* case did not say that a speedy hearing in a declaratory judgment action is appropriate "only" when the action involved few or no disputed facts.  Rather, the *Rechler* court, in the

---

[157]

> To the extent that the KPMG Defendants maintain that KPMG is not entitled to a trial of any genuine issues of material fact, the Court disagrees.

[158]

> FED. R. CIV. P. 57.

[159]

> KPMG Mem. 36.

[160]

> No. 90-3091, 1990 WL 711357, at *7 (D. N.J. Sept. 7, 1990).

58

course of concluding that a speedy hearing was appropriate, referred to the following statement in the

1937 Advisory Committee note on Rule 57:

> "A declaratory judgment is appropriate when it will 'terminate the controversy' giving rise on undisputed or relatively undisputed facts, it operates frequently as a summary proceeding, justifying docketing the case for early hearing as on a motion, as provided for in California (Code Civ.Proc. (Deering, 1937) § 1062a), Michigan (3 Comp.Laws (1929) § 13904), and Kentucky (Codes (Carroll, 1932) Civ.Pract. § 639a-3)."

Whatever precisely that statement meant, any suggestion that declaratory judgments,

or speedy hearings in declaratory judgment actions, are restricted to cases in which the facts are

entirely or nearly undisputed is, at best, obsolete.  District courts have discretion to hold prompt

hearings or trials in declaratory judgment cases, as indeed they do in all other cases, regardless of

whether the facts are mostly undisputed.[161]  The question in every case instead is whether a prompt

resolution may be reached, consistent with the interests of justice and the rights of all parties to due

process of law, not some tallying of the number and nature of any disputed issues of fact or law.   In

---

[161]    No one knows this better than KPMG's counsel, Skadden Arps, which is prominent for, among other things, handling contested corporate takeovers.  Litigation in such matters often has been conducted on an expedited basis, including expedited trials or extensive expedited preliminary injunction hearings where necessary.  Indeed, brief research has disclosed the following cases in which Skadden Arps participated in trials held only a short time after commencement of the actions: *Mason Capital, Ltd. v. Kaman Corp.,* No.3:05CIV1470 (MRK), 2005 WL 2850083 (D. Conn. Oct. 31, 2005) (trial three weeks after filing of complaint with expedited discovery, several briefs, stipulations and proposed findings during the "brief interim between filing and trial"); *IBP Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 299 F. Supp.2d 1024, 1027 (D. S.D. 2003) (citing *In re IBP, Inc. Shareholders Litig.,* 789 A.2d 14, 23 & n.1 (Del. Ch. 2001) (explaining that in a related case the Delaware Chancery Court held expedited trial after parties conducted "massive amounts of discovery" in only six weeks); *United States v. Sungard Data Systs., Inc.,* 172 F.Supp.2d 172, 179 (D. D.C. 2001) (trial on merits consolidated with preliminary injunction hearing and held two weeks after filing of complaint following expedited discovery and briefing).  Doubtless many other examples, involving both Skadden Arps and other law firms, could be cited.

any event, KPMG has not pointed to many, if any, disputed issues of fact of the sort that require extensive evidentiary development.  In short, it has failed to advance a single persuasive reason for failing to proceed expeditiously with this matter, subject of course to assuring all parties of a fair opportunity to be heard.

KPMG suggests also that the Court is not authorized to conduct a summary advancement proceeding under Section 145(k) of the Delaware General Corporation Law[162] or Sections 724(a) and 1319(a)(4) of the New York Business Corporation Law.[163]  To the extent that these statutes authorize particular state courts to conduct statutorily defined proceedings of particular types, KPMG is correct, although the issue is academic.[164]  To the extent that KPMG implies, however, that the elements of a claim for the advancement of legal expenses, or the defenses available to such a claim, are governed not by the substantive law of the relevant state, but by the Federal Rules of Civil Procedure or some other body of law, it assuredly is not.

It has been clear since *Erie R.R. Co. v. Tompkins*[165] that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the

---

[162]

8 WEST'S DEL. CODE ANN. § 145(k) (2006).

[163]

N.Y. BUS. CORP. L. §§ 724(a), 1319(a)(4) (McKinney 2003).

[164]

As noted in *Stein I,* there is no jurisdictional obstacle to a federal court determining an advancement dispute under state law.  435 F. Supp.2d at 379 n. 237.

[165]

304 U.S. 64 (1938).

state."[166]   The question whether KPMG is obliged to advance legal expenses to the KPMG Defendants, including both the elements of the claims to advancement and the availability of defenses thereto, is not governed by the United States Constitution or any act of Congress.   It therefore is governed by state law.

As this Court pointed out in *Stein I,* the critical point about advancement of defense costs – as distinguished from, among other things, claims for indemnification after the fact – is that its value "is that it is granted or denied while the underlying action is pending."[167]   It protects the "ability [of the employee] to mount . . . a defense . . . by safeguarding his ability to meet his expenses at the time they arise, and to secure counsel on the basis of such assurance."[168]   In consequence, the scope of an advancement proceeding "is limited to determining 'the issue of entitlement according to the corporation's advancement provisions.'"[169]   "Neither indemnification nor recoupment of sums previously advanced are appropriate for litigation" in such a proceeding.   They necessarily are reserved for subsequent determination.[170]

Nowhere is this clearer than from the line of Delaware cases that distinguishes between

---

[166]

*Garperini v. Center for Humanities, Inc.,* 518 U.S. 415, 427 (1996) (quoting *Erie,* 304 U.S. at 78) (internal quotation marks omitted).

[167]

*Stein I,* 435 F. Supp.2d at 355 (quoting *Kaung,* 884 A.2d at 509).

[168]

*Weissman,* 1997 WL 334966 at *16.

[169]

*Kaung,* 884 A.2d at 509 (quoting *Homestore, Inc. v. Tafeen,* 886 A.2d 502, 503 (Del. 2005)).

[170]

Steven A. Radin, *"Sinners Who Find Religion": Advancement of Litigation Expenses to Corporate Officials Accused of Wrongdoing,* 25 Rev. Litig. 251, 265-66 (2006).

advancement and indemnification and requires companies to advance the cost of defending claims

that allege wrongs to the companies, even lawsuits brought by companies themselves against former

officers and directors.[171]   The fundamental principle is that a company that undertakes to advance

defense costs may not avoid that obligation by claiming that the litigation against its former employee

for which the employee seeks advancement of defense costs accuses the employee of conduct that,

if proved, would foreclose indemnification or establish a breach of the employment contract or of a

fiduciary or other duty owed to the company.   Nor may the company try the merits of its claims

against an employee "in order to assert a set-off or recomponent [*sic* - reoupment] as an advancement

defense."[172]

---

[171]

E.g., *Ridder v. CityFed Fin. Corp.,* 47 F.3d 85 (3d Cir. 1995) (advancement required for defense of bank employees sued by RTC, as receiver, to recover alleged damages to the bank); *Pearson v. Exide Corp.,* 157 F. Supp.2d 429, 438 (E.D. Pa. 2001) (company could not invoke claim that former officers would not be entitled to indemnification to defeat claim for advancement of defense costs in criminal case and civil claims filed by the company); *Citadel Holding Corp. v. Roven,* 603 A.2d 818 (Del. 1992) (ordering advancement of cost of defending action brought by company itself); *Radiancy, Inc. v. Azar,* No. Civ. A. 1547-N, 2006 WL 224059 (Del. Ch. Jan. 23, 2006) (company required to advance to former officers and directors costs of defending suits brought by the former employer that alleged breach of fiduciary duty, fraud and waste); *Weinstock v. Lazard Debt Recovery GP, LLC,* No. Civ. A. 20048, 2003 WL 21843254 (Del. Ch. Aug. 8, 2003); *Morgan v. Grace,* 2003 WL 22461916 (ordering advancement despite fact that conduct alleged in underlying action, if proved, would preclude indemnification); *Reddy v. Elec. Data Sys. Corp.,* No. Civ. A. 19467, 2002 WL 1358761 (Del. Ch. June 18, 2002); *Greco v. Columbia/HCA Healthcare Corp.,* No. Civ. A. 16801, 1999 WL 1261446 (Del. Ch. Feb. 12, 1999) (requiring company to advance to former executive costs of defending federal criminal investigation and claims filed by the company itself); *see also Envirokare Tech Inc. v. Pappas,* 420 F. Supp.2d 291 (S.D.N.Y. 2006).

[172]

*Reddy,* 2002 WL 1358761, at *9 & n.26.

*Reddy* rested this conclusion in part on § 145(k) of the Delaware General Corporation Law, which is not applicable here because KPMG is a partnership.   Some other cases speak in terms of that statute.   But the principle is not found in the language of § 145(k) and in any event antedates its enactment in 1994.   It rests ultimately on the propositions that advancement of defense costs serves important interests, *e.g., Stein I,* 435 F. Supp.2d at 355

This principle concerns something considerably more than merely the procedure by which an advancement claim is presented.  If a right to advancement of defense costs exists, the inherent nature of the right is to receive the funds as the defense costs are incurred.  Postponement of determination whether such a right exists would render the right meaningless.  By the time a decision were reached, the underlying proceeding would be over -- the occasion for advancing defense costs would have passed and its purpose would have been defeated.  In consequence, determination of a claim for advancement cannot wait until the underlying case is over, when an employee's right to indemnification may be determined.  Nor can it wait until an employer decides whether to pursue any independent claims that it may have against the employee or, if it has brought such claims, until the employer's claims are determined.

These considerations make clear that rules governing the issues properly considered in determining a claim for advancement of defense costs are matters of substance, not procedure.  *Erie* and its progeny therefore require that this Court apply state law.  In consequence, to the extent that KPMG suggests that the a "summary" proceeding is not appropriate because the scope of the issues properly considered in determining the KPMG Defendants' claims for advancement is governed by the Federal Rules of Civil Procedure or some other federal law, it is mistaken.

This view is strongly supported by *Gasperini v. Center for Humanities, Inc.,*[173] where

---

(collecting cases); *Homestore, Inc. v. Tafeen,* 888 A.2d 204, 210-11, 218 (Del. 2005), that a right to advancement is independent of any right to indemnification, *e.g., Kaung,* 884 A.2d at 509-10; *Citadel Holding Corp.,* 603 A.2d at 822, and that disputes concerning advancement must be determined promptly if any right to advancement is to be meaningful, *Kaung,* 884 A.2d at 509; *Homestore, Inc. v. Tafeen,* 886 A.2d 502, 505 (Del. 2005).  Thus, it applies equally to partnerships.

[173]    518 U.S. 415.

the Supreme Court dealt with the effect in federal court of N.Y. CPLR § 5501(c), which empowers the Appellate Division of the New York Supreme Court to order a new trial when a jury verdict "deviates materially from what would be reasonable compensation." The Court recognized that the state statute "is both 'substantive' and 'procedural': 'substantive' in that § 5501(c)'s 'deviates materially' standard controls how much a plaintiff can be awarded; 'procedural' in that § 5501(c) assigns decisionmaking authority to New York's Appellate Division."[174] Insofar as the statute assigned review of jury awards to the Appellate Division, it of course could not be applied in federal courts. The Court held, however, that the "deviates materially" standard is part of the substantive law of New York and that federal courts are obliged to give it effect.[175]

So too here. Procedures established by the pertinent state for litigating advancement disputes in its own courts, like those governing appellate review of New York State court jury awards, do not apply here. The substantive policies that control the nature and scope of the issues that are pertinent in an advancement proceeding, however, must be given effect in federal courts.

---

[174]

    *Id.* at 426.

[175]

    In order to do so, the Court crafted a means of effectuating New York's substantive policy of providing for review of jury awards that was consistent with the federal court structure. It held that "practical constraints combine with Seventh Amendment constraints to lodge in the district court, not the court of appeals, primary responsibility for application of § 5501(c)'s 'deviates materially' check" on jury awards. *Id.* at 438.

**B.**   *KPMG's Due Process Argument*

KPMG asserts also that no summary proceeding may be conducted because KPMG is entitled to due process of law.  It argues that "[t]his includes the right under the Federal Rules to conduct discovery and develop a factual record regarding each individual [KPMG] Defendant's claims."[176]  KPMG's rhetoric, however, gets in the way of substance.

Of course KPMG is entitled to due process.  It is entitled to an appropriate opportunity to develop evidence and, to the extent that there are genuine issues of material fact, to a trial of those issues.  But it is not entitled to discovery for its own sake, or to a trial broader than is necessary to decide any material factual issues, any more than would any litigant in a garden variety civil case.  So it is critical to focus on what really is at issue here.

Some of the KPMG Defendants were employed in California and assert that they are entitled to advancement of legal expenses under California law simply by virtue of their employment.  KPMG has not questioned any of the facts upon which they rely.

All of the KPMG Defendants, save Mr. Stein, assert that there is an implied in fact contract between them and KPMG pursuant to which KPMG is obliged to advance defense costs.  They rely on KPMG's past practices and, apparently, the litigation-prone nature of the business in which KPMG is engaged.  None of this, at least thus far, seems to be in dispute although other facts also may prove material.

Mr. Stein relies upon a written contract, the terms of which are undisputed.

In short, the advancement issue is a relatively simple matter.  California law and the

---

[176]   KPMG Mem. 38.

Stein agreement either mean what the KPMG Defendants claim or they do not.  There either is or is not a contract implied in fact, primarily by KPMG's undisputed past practices and the nature of the business and the employment relationships in question.  If there are any disputes concerning historical facts, they appear to be limited.  Nor is the law especially complex.   There is no reason why the claim of the KPMG Defendants for advancement of their defense costs cannot and should not be resolved expeditiously and fairly.

It is not now entirely clear exactly how this will play out.  But some preliminary observations may be helpful in understanding the Court's approach.

It remains to be seen whether KPMG will assert any affirmative defenses.  Should it do so, and should their sufficiency be challenged, the Court will determine that question in the ordinary course.  It will do so in accordance with the Rules of Civil Procedure unless a Rule of Criminal Procedure requires a different course, which seems unlikely.

Likewise, it remains to be seen whether KPMG will assert counterclaims.  Even if it should it do so, however, and even if the Court were to conclude that it has subject matter jurisdiction over them, the Rules of Civil Procedure would provide ample flexibility for an expeditious resolution of the advancement claims if that continues to seem appropriate.  Rules 56(d) and 42(b) would permit partial summary judgment on or a separate trial of the advancement claim.  Rule 54(b) would permit entry of final judgment on the advancement claims, regardless of how they are decided, notwithstanding the continued pendency of counterclaims.  Indeed, the Court would have discretion under Rule 62(h) to stay or decline to stay enforcement of such a judgment pending resolution of any

KPMG counterclaims.[177]

      All of these matters remain to be determined.  But the bottom line is clear.  KPMG's seizure on the words "summary proceeding" should not obscure the reality of what has been and remains to be done here.  What KPMG is entitled to is notice and a fair opportunity to be heard.  It has had the former.  By the time the Court reaches any conclusion on the advancement issue as to the KPMG Defendants who have not released those claims, it will have had the latter.  And it will have had it with the protections inherent in the Federal Rules of Civil Procedure, regardless of whether they are strictly applicable here.

*VI.     The KPMG Defendants' Motion to Compel Advancement*

      Although an immediate resolution of the advancement issue – which now has been pending for a considerable period – would be highly desirable, the Court has concluded that a decision on the present record is not advisable.  While much of the evidence received in the hearing that preceded *Stein I* probably is admissible against KPMG,[178] KPMG did not examine witnesses there.  Moreover, although the parties should have submitted affidavits or declarations on these motions authenticating the documentary evidence upon which they rely, they did not uniformly do so.  In consequence, and to give the parties a full opportunity to be heard, the Court will try the remaining

---

[177]

    *See Amerisourcebergen Corp. v. Dialysist West, Inc.,* 445 F.3d 1132, 1137 (9th Cir. 2006).

[178]

    For example, the stipulation of fact between the government and the KPMG Defendants concerning KPMG's past practices appears to have been based upon or identical to representations made to those parties by KPMG.  The testimony of Joseph Loonan, KPMG's general counsel, and Messrs. Rauh,  Pilchen, and Michael of Skadden Arps, are admissions that properly would be considered against KPMG under FED. R. EVID. 801(d)(2).  *See United States v. Capri,* 111 Fed. Appx. 32, 35 (2d Cir. 2004).

claims of the KPMG Defendants for advancement save for the possibility that Mr. Greenberg's claim may be resolved by summary judgment.  Moreover, the parties may conduct expedited discovery in preparation for that trial.[179]

The parties shall serve and file witness and exhibit lists and exchange copies of their premarked exhibits no later than October 11, 2006.[180]  The trial will commence on October 17, 2006 at 9:30 a.m.

Any jury demand shall be served and filed no later than September 9, 2006.  Any motion to strike a jury demand shall be served and filed no later than September 12, 2006, with any opposition served and filed no later than September 15, 2006 and any reply papers served and filed no later than September 18, 2006.

---

[179]
Document requests, if any, shall be responded to and within five business days.  Unless otherwise ordered, depositions shall be limited to a Rule 30(b)(6) deposition by the KPMG Defendants of KPMG and to depositions by KPMG of the KPMG Defendants, and depositions of the latter each shall be limited to two hours or such length as the parties may agree upon, shall be confined to whether KPMG is obliged to advance defense costs, and shall not go into matters pertinent to the indictment.  All discovery shall be concluded by October 6, 2006.

The parties are encouraged to stipulate to the relevant facts, the vast majority of which appear to be undisputed, to the maximum extent possible.

[180]
Each side shall supply the Court with a set of premarked exhibits.

68

*Conclusion*

KPMG's motion to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted is converted into a motion for summary judgment dismissing the claim of Mr. Greenberg and, to that extent, will be dealt with as indicated above.  It is denied in all other respects.   The claims of the KPMG Defendants for advancement of defense costs are set for trial as indicated above.

SO ORDERED.

Dated:        September 6 , 2006

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)